**DISTRICT 2 - POTOMAC**

**WAGE SCHEDULE: 29**                                                     **EFFECTIVE AUGUST 07, 2005**

CUSTOMER SERVICE ADMINISTRATOR, MATERIAL EQUIPMENT TECHNICIAN

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE Locality Wage Group A | INCREASE AMOUNT | ZONE Locality Wage Group B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $467.00 | | $438.50 | |
| 6 Mos. | 6 Mos. | $532.00 | $65.00 | $503.00 | $64.50 |
| 12 Mos. | 6 Mos. | $606.50 | $74.50 | $577.00 | $74.00 |
| 18 Mos. | 6 Mos. | $692.00 | $85.50 | $661.50 | $84.50 |
| 24 Mos. | 6 Mos. | $789.00 | $97.00 | $760.00 | $98.50 |
| 30 Mos. | 6 Mos. | $900.00 | $111.00 | $870.50 | $110.50 |
| 36 Mos. (Maximum) | | $1,025.50 | $125.50 | $998.00 | $127.50 |
| **PENSION BAND** | | **116** | | **115** | |

**DISTRICT 2 - POTOMAC**

**WAGE SCHEDULE: 30**                                                     **EFFECTIVE AUGUST 07, 2005**

CUSTOMER SERVICE AGENT

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE Locality Wage Group A | INCREASE AMOUNT | ZONE Locality Wage Group B | INCREASE AMOUNT |
|---|---|---|---|---|---|
| Start | 6 Mos. | $487.50 | | $459.00 | |
| 6 Mos. | 6 Mos. | $546.00 | $58.50 | $517.50 | $58.50 |
| 12 Mos. | 6 Mos. | $613.50 | $67.50 | $583.00 | $65.50 |
| 18 Mos. | 6 Mos. | $687.50 | $74.00 | $657.00 | $74.00 |
| 24 Mos. | 6 Mos. | $771.50 | $84.00 | $741.50 | $84.50 |
| 30 Mos. | 6 Mos. | $864.50 | $93.00 | $834.00 | $92.50 |
| 36 Mos. | 6 Mos. | $969.50 | $105.00 | $940.00 | $106.00 |
| 42 Mos. | 6 Mos. | $1,087.50 | $118.00 | $1,059.50 | $119.50 |
| 48 Mos. (Maximum) | | $1,219.50 | $132.00 | $1,194.00 | $134.50 |
| **PENSION BAND** | | **124** | | **123** | |

**DISTRICT 2 - POTOMAC**

**WAGE SCHEDULE: 6A**                                              **EFFECTIVE AUGUST 07, 2005**

### BUILDINGS MECHANIC (WASH AREA ONLY)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE Locality Wage Group A | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $449.50 | |
| 6 Mos. | 6 Mos. | $509.50 | $60.00 |
| 12 Mos. | 6 Mos. | $576.50 | $67.00 |
| 18 Mos. | 6 Mos. | $653.50 | $77.00 |
| 24 Mos. | 6 Mos. | $739.50 | $86.00 |
| 30 Mos. | 6 Mos. | $838.00 | $98.50 |
| 36 Mos. (Maximum) | | $948.50 | $110.50 |
| **PENSION BAND** | | **113** | |

**DISTRICT 2 - POTOMAC**

**WAGE SCHEDULE: 8A**                                              **EFFECTIVE AUGUST 07, 2005**

### SALES ASSOCIATE (SOUTH AND NORTH)

| WAGE STEP | NEXT INCREASE INTERVAL | ZONE 2 | INCREASE AMOUNT |
|---|---|---|---|
| Start | 6 Mos. | $384.00 | |
| 6 Mo. | 6 Mos. | $434.00 | $50.00 |
| 12 Mo. | 6 Mos. | $490.50 | $56.50 |
| 18 Mo. | 6 Mos. | $554.50 | $64.00 |
| Top (Maximum) | | $627.50 | $73.00 |
| **PENSION BAND** | | **101** | |

2006 WAGE SCHEDULES

2007 WAGE SCHEDULES

**2003 COMMON ISSUES**
**MEMORANDUM OF UNDERSTANDING**

**BETWEEN**

**VERIZON MARYLAND, INC., VERIZON VIRGINIA INC., VERIZON WASHINGTON
D.C., INC., VERIZON WEST VIRGINIA, INC., VERIZON PENNSYLVANIA, INC.,
VERIZON DELAWARE INC., VERIZON NEW JERSEY INC., VERIZON SERVICES
CORP., VERIZON CORPORATE SERVICES CORP., VERIZON AVENUE INC.,
VERIZON ADVANCED DATA INC.**

**AND**

**COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO**

**Agreement Continuation**

The following Common Issues MOU provisions with an expiration date of August 2,

2003 (unless otherwise noted) are hereby extended for the life of the new collective bargaining

agreements, with no change in their terms and will be included in the applicable collective

bargaining agreement(s):

- Outside Copper Cable Splicing
- Internal v. External Staffing Commitment
- IME Program
- Stress Letter of Understanding
- 1991 Memorandum of Understanding ("PA Information Age Agreement")
- BANI Customer Bid Work Letter
- Letter Agreement on Termination of Outside Contractors
- Letter Agreement on Service Quality Observing
- Letter Agreement on Service Monitoring
- FMLA – Absence for Union Business
- Provisions on Vacation Scheduling Percentage (Percentage is 18%)
- Short Notice Excused Work Days

Any Memorandum of Understanding provision that was in effect during the period of the

2000 collective bargaining agreements which has not been altered, changed, or removed, but

which may have been inadvertently omitted from the above list, will speak for itself.
South CWA

The status of MOU provisions with an expiration date of August 2, 2003 which have been modified by the parties during 2003 negotiations will speak for themselves.

All Local, District and International agreements that were valid and enforceable under the 2000 collective bargaining agreements, and which have not been separately renegotiated by the parties in 2003 negotiations, will continue in effect for the life of the new agreements.

The status of all Local, District and International agreements that have been renegotiated during 2003 negotiations will speak for themselves.

In the event a letter agreement has been inadvertently omitted, it will be treated in accord with the above provisions.

On the subject of oral agreements, there is no intention on the Companies' part to change the status of any oral agreement -- whatever contractual status any oral agreement had during the term of the 2000 contracts will remain unchanged unless a change is made subsequent to collective bargaining.

If there are particular oral agreements that the Union wishes to discuss or which become the subject of a dispute after the contract, the Union may bring them to the attention of Labor Relations. If we are unable to resolve the situation, the dispute can be submitted to arbitration under the usual procedures.

FOR THE COMPANIES

FOR THE COMMUNICATIONS WORKERS OF
AMERICA

By_____

    Ronald H. Williams
    Executive Director, Labor Relations

By_____

    Doug Thompson
    Administrative Assistant to
        Vice President
    CWA District 2

Dated:_____

Dated:_____

By:_____

    James J. Short
    Assistant to Vice President
    CWA District 13

Dated:_____

By:_____

    Pat Niven
    Area Director - New Jersey
    CWA District 1

Dated:_____

South CWA

iii

\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc

## TABLE OF CONTENTS

I.     LUMP SUM PAYMENT.................................................................................1

II.    WAGES.........................................................................................................1

III.   COST-OF-LIVING........................................................................................1

IV.    CORPORATE PROFIT SHARING (CPS) ....................................................2

V.     PENSION BAND INCREASES.....................................................................3

VI.    PENSION LUMP SUM CASHOUT .............................................................4

VII.   VOLUNTARY TERMINATION BONUS ...................................................7

VIII.  BENEFITS....................................................................................................9

IX.    CHANGE SENIOR MANAGED CARE COORDINATOR TITLE TO
       RETIREE HEALTH CARE BENEFIT COORDINATOR AND
       CONTINUATION OF THE HEALTH CARE BENEFIT COORDINATORS
       ("HCBC") ...................................................................................................22

X.     TRAINING LIAISON COORDINATOR .................................................22

XI.    ANNUAL DISCUSSIONS..........................................................................22

XII.   JOINT MEDIATION SESSIONS ..............................................................23

XIII.  JOINT COMMITTEE ON ABSENCE CONTROL ...................................23

XIV.   ADVISORY COUNCIL ON FAMILY CARE (ACFC)..............................23

XV.    ADVISORY COMMITTEE ON HEALTH CARE ("ACHC") ..................24

XVI.   TRAINING ADVISORY BOARD EXECUTIVE COUNCIL (TABEC) ...................24

XVII.  JOINT TIME FOR PARTICIPATION IN JOINT COMMITTEES ........................24

XVIII. MODIFICATIONS TO CURRENT PROVISIONS ON "TREATMENT OF
       GRIEVANCES SETTLED BY THE PARTIES OR ARBITRATION
       AWARDS WHICH INVOLVE BACKPAY AND/OR REINSTATEMENT"...........24

XIX.   INDEPENDENT MEDICAL EXAMINATION REPORTS ........................28

South CWA                                         iv

XX.    SERVICE BRIDGING ..................................................................................28

XXI.   MEMORANDUM OF UNDERSTANDING IN ELECTRONIC FORMAT .............28

XXII.  LIMITED EXTENSION AGREEMENT .....................................................28

XXIII. DURATION...........................................................................................29

**ATTACHMENTS - FOLLOWING PAGE 29**

.

\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc

## I.     LUMP SUM PAYMENT

The Company shall make a single lump-sum payment, less applicable taxes and deductions, to each bargaining unit employee equal to three percent (3%) of the employee's basic weekly wage for one year calculated as of August 3, 2003.  The lump sum shall be paid by separate payroll remittance (EFT or check) not later than October 31, 2003.

## II.     WAGES

The schedule of wage increases for the term of this Agreement shall be as follows:

| Effective Date | Percentage Increase | Applied to: |
|---|---|---|
| Sunday, 8/1/04 | 2% | all steps of the basic wage schedules |
| Sunday, 8/7/05 | 2% | all steps of the basic wage schedules |
| Sunday, 8/6/06 | 2% | all steps of the basic wage schedules |
| Sunday, 8/5/07 | 2% | all steps of the basic wage schedules |

## III.     COST-OF-LIVING

During the term of this 2003 MOU, the existing Cost-of-Living provisions in each of the collective bargaining agreements will be deleted and replaced with the language set forth below:

(1)     Effective August 6, 2006 and August 5, 2007, adjustments will be made in basic weekly rates in each wage schedule in accordance with the following:

(a)     the amount of the August 6, 2006 adjustment shall be:  (i) one-half of the increase above four percent (4.0%) in the "CPI-W" (1982-84 = 100) for May 2006 over May 2004, applied to (ii) the scheduled rates in effect in each wage schedule on August 5, 2006, (iii) rounded to the nearest 50 cents.

(b)     the amount of the August 5, 2007 adjustment shall be: (i) one-half of the increase above two percent (2.0%) in the "CPI-W" (1982-84 = 100) for

1

South CWA
\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc

May 2007 over May 2006, applied to (ii) the scheduled rates in effect in
each wage schedule on August 4, 2007, (iii) rounded to the nearest 50
cents.

(2)     In no event shall a decrease in the CPI-W result in a reduction of any basic
weekly wage rate.

(3)     In the event the Bureau of Labor Statistics does not issue the appropriate
Consumer Price Indexes on or before the dates referred to in Paragraph 1, the cost-of-living
adjustment required by such appropriate indexes shall be effective at the beginning of the first
payroll week after receipt of the indexes.

(4)     No adjustment, retroactive or otherwise, shall be made as the result of any
revision which may later be made in the first published figures for the CPI-W for May 2004,
May 2006 and May 2007.

(5)     The cost-of-living adjustment is dependent upon the availability of the CPI-W in
its present form and calculated on the same basis as the CPI-W for May 2003.  In the event the
Bureau of Labor Statistics changes the form or the basis of calculating the CPI-W, the
Companies and the Union agree to request the Bureau to make available, for the life of this
agreement, a CPI-W in its present form and calculate it on the same basis as the CPI-W for May
2003, which was 179.4 (1982-84 = 100).

## IV.     <u>CORPORATE PROFIT SHARING (CPS)</u>

The Corporate Profit Sharing (CPS) Plan shall continue in effect with the following
modifications:

Section 2.     <u>Plan Years</u>:  The CPS will provide awards for results in calendar years
2003, 2004, 2005, 2006, and 2007, with awards payable in 2004, 2005, 2006, 2007 and 2008.

South CWA                                          2

Section 6.    CPS Distribution Calculations

(a)    Standard Award:  The "Standard" CPS Distribution shall be as follows:

| Performance Year | Standard CPS Distribution | Year Payable |
|---|---|---|
| 2003 | $500 | 2004 |
| 2004 | $500 | 2005 |
| 2005 | $500 | 2006 |
| 2006 | $500 | 2007 |
| 2007 | $500 | 2008 |

\* \* \*

(c)    Notwithstanding paragraphs (a) and (b) above, the minimum distribution for Performance Year 2003 will be $500, the minimum distribution for Performance Year 2004 will be $550, the minimum distribution for Performance Year 2005 will be $600, the minimum distribution for Performance Year 2006 will be $650, and the minimum distribution for Performance Year 2007 will be $700, subject in all cases to prorating under Section 3.

## V.    PENSION BAND INCREASES

1.    There will be a pension band increase of 5% for each associate whose separation from service occurs during the window period between  October 1, 2003 and December 31, 2003.  The pension band increase of 5% will be eliminated at 11:59 p.m. on December 31, 2003.

2.    The Verizon Pension Plan for Mid-Atlantic Associates (the "Pension Plan") will be amended to provide for increases in pension bands by the "Percentage Increase" amounts shown in the following table, as applied to participating employees whose "Pension Effective Date" (which is the first day following the last day on the payroll) is on or after the corresponding "Effective Date" shown below.

South CWA                            3

| Effective Date | Percentage Increase |
|:--:|:--:|
| 11/1/04 | 2% |
| 10/1/05 | 3% |
| 10/1/06 | 3% |
| 10/1/07 | 3% |

3.    <u>Pension Band Adjustment for Operators</u>.  Effective retroactive to July 1, 2003, through August 2, 2008, the Pension Band for the Operator Job Title in New Jersey, Delaware and Potomac Locality Wage Group A (Washington, D.C., Washington Suburban Area-Maryland and Northern Virginia Area) will be increased from Band 107 to Band 108.  On and after August 2, 2008, the Pension Band for the Operator Job Title in these locations will revert to Band 107.

## VI.    PENSION LUMP SUM CASHOUT

1.    An associate who separates from service during the periods October 1, 2003 to December 31, 2003 or November 1, 2004 to August 2, 2008, and only during those periods, with eligibility for a vested pension or a service pension, shall be eligible to receive his or her vested or service pension under the Pension Plan as a total lump-sum cashout.  The terms of the cashout programs during the periods October 1, 2003 to December 31, 2003 and November 1, 2004 to August 2, 2008 shall be the same as the terms of the cashout program set forth in the 2000 MOU, except that

(a)    The cashout programs shall provide for payment of a lump-sum cashout on a commencement date elected by the associate that occurs on or after the date the associate's written request is received by the Pension Plan administrator and that is either:

i.    the day following the associate's separation from service, or

ii.    the first day of any month following separation from service.

South CWA                                4

(b)     The calculation of a lump-sum cashout for an eligible associate who separates

from service on or before August 2, 2008, shall be based on the largest of the

amounts determined by the factors set forth in the Pension Plan on August 2,

2003, for the cashout trials in the 2000 MOU, in addition to any legally-mandated

interest rate and mortality table set forth in section 417(e) of the Internal Revenue

Code.

(c)     If the 30-year Treasury Bond rate ceases to be published before August 2, 2008,

the parties will establish a joint committee which will review the historic

relationship between the interest rates on 30-year Treasury Bonds and the interest

rates on AAA Corporate Bonds and will agree on a factor which when applied to

historic AAA Corporate Bond rates produces an interest rate equal to the historic

30-year Treasury Bond rate.  This rate will be made available as another

calculation standard for lump-sum cashouts under the Pension Plan following the

last publication date for the 30-year Treasury Bond rate.  For this purpose,

"historic" rates shall be equal to the average rates over the 3-year period that ends

six months before the last date on which the U.S. Treasury Department publishes

the 30-year Treasury Bond rate.  (Example:  If historic 30-year Treasury Bond

rates equal 6% and historic AAA Corporate Bond rates equal 8%, then the factor

would be 75%.  The new standard for calculating a lump sum would be 0.75 times

the AAA Corporate Bond rate in effect on the lump sum commencement date.)

(d)     An associate who separates from service on or after October 1, 2003, and on or

before November 30, 2003, and who elects to receive his vested or service

pension as a total lump-sum cashout shall receive a lump sum equal to the greater

South CWA                                              5

of (i) the lump-sum cashout determined based on the PBGC or GATT basis (whichever is more favorable) applied to determine lump sums paid under the Pension Plan to associates separating from service during the third quarter of 2003 or (ii) the lump-sum cashout determined under the terms of the Pension Plan in effect on the associate's commencement date.

2.      If an associate dies during employment on or after January 1, 2004, and on or before October 31, 2004, and after becoming vested under the Pension Plan, the associate's beneficiary for the pre-retirement death benefit under the Pension Plan shall be eligible to receive payment of the death benefit as a total lump-sum cashout.  In addition, the pre-retirement death benefit paid to such beneficiary shall equal the larger of (a) the lump-sum cashout that would have been paid to the associate if he or she had separated from service on the date of death and elected to receive payment on the  beneficiary's commencement date (or, if the beneficiary is a spouse who elects an annuity, the actuarial equivalent of that lump sum in the form of a single life annuity), or (b) the pre-retirement death benefit otherwise payable to such beneficiary under the Pension Plan.

3.      If an associate separates from service on or after January 1, 2004, and on or before October 31, 2004, due to his or her exhaustion of 52 weeks of sickness  disability benefits and is eligible for a vested pension or a service pension under the Pension Plan, the associate shall be eligible to receive his or her vested pension or service pension (but not a disability pension) as a total lump-sum cashout.

4.      For a cashout-eligible associate who has separated from service before death:

(a)      If death occurs while the associate has in effect a valid election (with spousal consent) to receive a lump-sum cashout from the Pension Plan and before the

South CWA                                    6

commencement date specified in such election, the associate's beneficiary for the pre-retirement death benefit under the Pension Plan shall receive a death benefit equal to the larger of (i) the lump-sum cashout that would have been paid to the associate if he or she had survived until the elected commencement date, or (ii) the pre-retirement death benefit otherwise payable to such beneficiary under the Pension Plan.

        (b)     If death occurs (i) before the associate makes a valid election to commence payment of his or her vested or service pension (in any form) under the Pension Plan or (ii) while the associate has in effect a valid election to receive payment of his or her vested or service pension in a form of payment other than a lump-sum cashout <u>and</u> before the commencement date specified in such election, the associate's beneficiary for the pre-retirement death benefit under the Pension Plan shall receive a death benefit equal to the larger of (I) the lump-sum cashout that would have been paid to the associate if he or she had elected to receive payment on the beneficiary's commencement date (or, if the beneficiary is a spouse who elects an annuity, the actuarial equivalent of that lump sum in the form of a single life annuity), or (II) the pre-retirement death benefit otherwise payable to such beneficiary under the Pension Plan.

## VII.   <u>VOLUNTARY TERMINATION BONUS</u>

Any employee who makes a voluntary election to leave the service of the Company pursuant to any Income Security Plan or Enhanced ISP offer made during the term of this 2003 MOU, and who does separate from the Company pursuant to that offer shall receive, as applicable:

     1.     A lump-sum payment of $10,000, less taxes and withholdings, in addition to any ISP/EISP for which the employee is otherwise eligible, and

2.      For those not otherwise eligible, six months of continuation medical coverage under the terms of the plan and the employee's coverage in effect at the time of separation.

## VIII.   BENEFITS

## A.   CONTINUATION OF BENEFIT PLANS

The following employee benefit plans are continued in effect through August 2, 2008, in accordance with their existing terms and the changes agreed in this MOU.  To the extent that any provision of this Benefits Section (including appendices) of this 2003 MOU is inconsistent with or contravenes the terms of the 2000 MOU, any local collective bargaining agreement, the 2000 MOA or any other agreements between the parties, this Benefits Section (including appendices) of the 2003 MOU shall govern and shall supersede the 2000 MOU and/or the local collective bargaining agreements and/or the 2000 MOA and/or the other agreements.

Verizon Accidental Death and Dismemberment Plan for Mid-Atlantic Associates

Verizon Adoption Reimbursement Program for Mid-Atlantic Associates

Verizon Dental Expense Plan for Mid-Atlantic Associates

Verizon Dependent Accidental Death and Dismemberment Plan for Mid-Atlantic Associates

Verizon Dependent Care Account for Mid-Atlantic Associates

Verizon Dependent Group Life Insurance Plan for Mid-Atlantic Associates

Verizon Group Life Insurance Plan for Mid-Atlantic Associates

Verizon Health Care Account for Mid-Atlantic Associates

Verizon Income Security Plan for Mid-Atlantic Associates

Verizon Long Term Care Insurance Plan for Mid-Atlantic Associates

Verizon Long Term Disability Plan for Mid-Atlantic Associates

Verizon Managed Care Network and Medical Expense Plan for Mid-Atlantic Associates

Verizon Pension Plan for Mid-Atlantic Associates

Verizon Savings and Security Plan for Mid-Atlantic Associates

Verizon Sickness and Accident Disability Benefit Plan for Mid-Atlantic Associates

Verizon Supplemental Accidental Death and Dismemberment Plan for Mid-Atlantic Associates

Verizon Supplemental Group Life Insurance Plan for Mid-Atlantic Associates

Verizon Vision Care Plan for Mid-Atlantic Associates (including the VDT User Eyecare Program)

Verizon Dental Expense Plan for Mid-Atlantic Post-1989 Associate Retirees

Verizon Managed Care Network and Medical Expense Plan for Mid-Atlantic Post-1989 Associate Retirees

Verizon Life Insurance Plan for Mid-Atlantic Associate Retirees

Verizon Supplemental Life Insurance Plan for Mid-Atlantic Associate Retirees

**B.     CHANGES TO EXISTING ACTIVE HEALTH CARE BENEFITS AND PRESCRIPTION DRUG COVERAGE.**

1.  <u>Medical Benefit Changes</u>.  Effective January 1, 2004 or as of any later effective date described in the attached Appendix A (the "Effective Date"), the provisions of the Verizon Managed Care Network and Medical Expense Plan for Mid-Atlantic Associates (the "VMEP") regarding medical benefits and prescription drug coverage for active associates who participate in the VMEP shall be amended as described in the attached Appendix A in accordance with the following:

       (a)     <u>Benefit Changes Applicable To All VMEP Options</u>.  As of the Effective Date, the provisions of all VMEP options regarding medical benefits and prescription drug coverage for active associates who participate in any VMEP option shall be amended as described in paragraph I of the attached Appendix A.

       (b)     <u>MCN Benefit Changes</u>.  As of the Effective Date, the provisions of the Managed Care Network option offered under the VMEP ("MCN") regarding medical benefits and prescription drug coverage for active associates who participate in the MCN option shall be amended as described in paragraph II of the attached Appendix A.

       (c)     <u>MEP-Indemnity Benefit Changes</u>.  As of the Effective Date, the provisions of the Indemnity option offered under the VMEP ("MEP-Indemnity") regarding medical benefits and prescription drug coverage for active associates who participate in the MEP-Indemnity option shall be amended as described in paragraph III of the attached Appendix A.

       (d)     <u>HMO Benefit Changes</u>.  As of the Effective Date, the provisions of the HMO options offered under the VMEP regarding medical benefits and prescription drug coverage for active associates who participate in an HMO option shall be amended as described in paragraph IV of the attached Appendix A.

2.  <u>Dental Benefit Changes</u>.  Effective January 1, 2004, the provisions of the Verizon Dental Expense Plan for Mid-Atlantic Associates (the "Dental Plan") regarding dental care benefits for active associates who participate in the Dental Plan shall be amended as described in the attached Appendix B.

## C.    CHANGES TO RETIREE HEALTH AND WELFARE BENEFITS

Effective January 1, 2004 or as of any later effective date described herein, the provisions of the Verizon Managed Care Network and Medical Expense Plan for Mid-Atlantic Post-1989 Retirees (the "VMEP") regarding retiree health and welfare benefits to be provided to eligible retirees who retired after December 31, 1989 ("Covered Retirees"), shall be as amended, and shall be as described, in this Section C and in the attached Appendix A.

1.    <u>Non-Contributory Retiree Health Care Coverage for MEP-Indemnity, MCN and HMO Options</u>. For Plan Years 2004 through and including 2008, the Company shall pay 100% of the cost of coverage for the "Coverage Category" elected by a Covered Retiree enrolled in the MEP-Indemnity option, the MCN option or an HMO option, and no contributions shall be required of a Covered Retiree enrolled in any such option. For purposes of this Section C, the Coverage Categories are pre-Medicare retiree-only coverage, pre-Medicare retiree-plus-one-dependent coverage, pre-Medicare retiree-plus-family coverage, Medicare-eligible retiree only coverage, Medicare-eligible retiree-plus-one-dependent coverage, and Medicare-eligible retiree-plus-family coverage.

2.    <u>Contributions for 2009 and Later Plan Years</u>. For Plan Years beginning on and after January 1, 2009, the Company's annual contribution toward the cost of coverage for the Coverage Category elected by a Covered Retiree under any retiree medical option shall be capped as follows (the "2009 Company Contribution Cap"):

| Coverage Category | Pre-Medicare | Medicare-Eligible |
|---|---|---|
| Retiree | $8,450 | $4,600 |
| Retiree + 1 | $16,900 | $9,200 |
| Retiree + Family | $21,120 | $13,800 |

If the cost of coverage for the Coverage Category elected by a Covered Retiree exceeds the 2009 Company Contribution Cap, the Covered Retiree shall pay the difference.

3.    <u>Retiree Health Care Benefit Changes</u>. The changes to the health care coverage provided to active employees, as set forth in this Memorandum of Understanding, shall also be made to the health care coverage provided to eligible post-12/31/89 retirees, except as otherwise provided herein, as set forth below, and the applicable retiree health care plans shall be amended accordingly; provided, however, that a retiree's contributions toward the cost of health care coverage shall be governed by the provisions of the preceding paragraphs.

(a)    <u>Managed Care Network ("MCN") Benefits</u>. Effective January 1, 2004, for eligible post-12/31/89 retirees who participate in an MCN Option offered under the Verizon Managed Care Network and Medical Expense Plan for Mid-Atlantic Post-1989 Associate Retirees (the "VMEP"), the MCN provisions shall be amended in the same manner as those provisions are amended for active employees pursuant to this Memorandum of Understanding; provided, however, that the copayment for an individual who is eligible for Medicare shall be five dollars ($5).

(b)    <u>MEP-Indemnity Benefits</u>.  Effective January 1, 2004, for eligible post-12/31/89 retirees who participate in the MEP-Indemnity, the MEP-Indemnity provisions shall be amended in the same manner as those provisions are amended for active employees pursuant to this Memorandum of Understanding; provided, however, that, effective January 1, 2004, the MEP-Indemnity annual deductible for an individual who retired prior to August 3, 2003, shall be a flat dollar amount calculated based on the formula in effect for determining the annual deductible on August 2, 2003.  The MEP-Indemnity annual deductible for an individual who retires during the term of this 2003 MOU shall be determined as of the date of retirement.  The copayment for an individual who is eligible for Medicare shall be five dollars ($5).

(c)    <u>HMO Benefits</u>.  Effective January 1, 2004, for eligible post-12/31/89 retirees who participate in an HMO option offered under the VMEP, the HMO options shall be subject to the provisions of Appendix A, paragraph IV of this Memorandum of Understanding.

(d)    <u>Prescription Drug Benefits</u>.  Effective January 1, 2004, for eligible post-12/31/89 retirees, the Company shall provide the same prescription drug benefits as will be provided for active employees described in Appendix A, paragraph I.C. of this Memorandum of Understanding.

# Appendix A.
# Medical Benefit Changes

---

I.   **Verizon Managed Care Network and Medical Expense Plan Benefit Changes—Applicable To All Options**

The medical benefits provided to associates and their eligible dependents enrolled in any option offered under the Verizon Managed Care Network and Medical Expense Plan for Mid-Atlantic Associates (the "VMEP") shall be as described in the VMEP plan document, with the following modifications, effective on and after January 1, 2004 (except as otherwise specifically provided herein):

A.   **Surcharge for Spousal or Same Sex Domestic Partner Coverage (Add a new section 3.10.2 to the VMEP entitled "Spousal or Same Sex Domestic Partner Surcharge")**

The Company shall introduce contributions for associates who elect to cover their spouse or same sex domestic partner (Spousal Surcharge) where the spouse or same sex domestic partner is eligible for medical coverage from another employer and does not enroll in their employer's medical plan. The Spousal Surcharge shall not apply to current and future retirees.

- Monthly employee contribution as a Spousal Surcharge shall apply to all medical plan options.

- Monthly employee contribution as a Spousal Surcharge (where the spouse or same sex domestic partner is also eligible for medical coverage from their employer's medical plan) shall be $40 per month beginning January 1, 2004.

- The Spousal Surcharge shall not apply for a Plan Year in the case of a spouse who is eligible for medical coverage from their employer's plan when the spouse's gross base wage rate on an annualized basis as of the previous July 1 from that employer is $25,000 or less or if the spouse would need to make annual individual premium contributions of $900 or more.

- The Spousal Surcharge shall be administered as follows:

  The Company and the Union shall work together through the ACHC to develop an administrative process and associated employee communication and ongoing education program for the Spousal Surcharge.

  As soon as practical after contract ratification, a subcommittee of the ACHC shall meet to review the administrative process that will implement the Spousal Surcharge. The ACHC shall have up to three Union representatives serving on the subcommittee. The subcommittee shall have 30 days to review the

South CWA                                    13

administrative process to be implemented consistent with the guidelines listed below:

- Initial communications needed to implement Spousal Surcharge effective January 1, 2004.

- Associates who enroll their spouse or same sex domestic partner for Verizon Associates Medical Coverage shall be responsible for notifying the Verizon Benefits Center as to whether or not the spouse/partner has alternate medical coverage from his or her employer.  For Plan Year 2004, such notification must be made in time for the surcharge to commence with the first paycheck in January.

- Notifications shall be in writing, via the Verizon Benefits Center web site, or via telephone.

- The Verizon Benefits Center shall implement notifications and provide written verification to the employee.

- Employees may report an incorrect deduction of the Spousal Surcharge.  Any amounts incorrectly withheld from the employee's paycheck may be reimbursed for up to one (1) year of retroactivity as determined through an appeals process to be established by the ACHC.

- The employee shall be responsible for notifying the Verizon Benefits Center of any change in the spouse/partner's employment status or change in the availability of coverage from the spouse/partner's employer if such change would affect application of the Spousal Surcharge.  The surcharge shall be waived or (re)instated effective with the first of the month following notification.

Prior to January 1, 2005, the only penalty for failure to notify the Company will be retroactive billing for past due surcharge amounts.

- The Spousal Surcharge may apply where both husband and wife or same sex domestic partner are eligible for Verizon enrollment in their own right:

  - If both husband and wife or same sex domestic partner are Verizon associates, the Spousal Surcharge shall not apply.

  - If one spouse or same sex domestic partner is an associate and the other is eligible for the Verizon Management Medical options, the Spousal Surcharge shall apply if spouse or same sex domestic partner coverage is elected for an associate medical option.

South CWA                                    14

**B.** **Disease Management and Educational Programs (Amend the following provisions of the VMEP: Section 13.4)**

The Company shall work together with the Union and the ACHC to identify and implement targeted disease management programs and to develop a written employee educational program designed to encourage and promote health care consumerism, more effective health care utilization, and improve quality outcomes.

**C.** **Prescription Drug Coverage (Amend the following provisions of the VMEP: Article 2, sections 5.3, 8.11, and 16.4; Article 14; and Article 18)**

The current prescription drug coverage shall change as follows:

- **In-Network Retail Pharmacies.** The current prescription drug coverage at retail for drugs purchased at in-network pharmacies in the Medco Health Select National Network shall change as follows:

  - The days' supply shall be the supply appropriate for a maximum of 30 days of therapy.

  - The following copays will apply:

    - The copay for generic drugs shall be 15% of the Discounted Network Price ("DNP") for the original prescription and each refill, with a $25 maximum copay for the original prescription and each refill.

    - The copay for brand name drugs when there is no generic equivalent available shall be 20% of the DNP for the original prescription and each refill, with a $40 maximum copay for the original prescription and each refill. The copay provisions of this paragraph also shall apply when there is a generic equivalent available and the prescribing physician has ordered the prescription to be Dispensed As Written ("DAW").

    - The copay for brand name drugs when there is a generic equivalent available and the prescribing physician has not ordered the prescription to be DAW shall be 30% of the DNP for the original prescription and each refill, with a $50 maximum copay for the original prescription and each refill.

- **Out-of-Network Retail Pharmacies.** The current prescription drug coverage at retail for drugs purchased at a pharmacy not in the Medco Health Select National Network will change as follows:

  - There shall be a $50 per person annual deductible.

  - The days' supply shall be the supply appropriate for a maximum of 30 days of therapy.

- After the $50 per person annual deductible is satisfied, the following copays will apply:

  - The copay for generic drugs shall be 15% of the retail cost for the original prescription and each refill, with a $25 maximum copay for the original prescription and each refill.

  - The copay for brand name drugs when there is no generic equivalent available shall be 20% of the retail cost for the original prescription and each refill, with a $40 maximum copay for the original prescription and each refill. The copay provisions of this paragraph also shall apply when there is a generic equivalent available and the prescribing physician has ordered the prescription to be DAW.

  - The copay for brand name drugs when there is a generic equivalent available and the prescribing physician has not ordered the prescription to be DAW shall be 30% of the retail cost for the original prescription and each refill, with a $50 maximum copay for the original prescription and each refill.

- **Mail Order Pharmacy.** The current prescription drug coverage for mail order drugs shall change as follows:

  - There shall be no annual deductible.

  - The days' supply shall be the supply appropriate for a maximum of 90 days of therapy.

  - The copay for generic drugs shall be the lesser of $8 or the DNP.

  - The copay for brand name drugs when there is no generic equivalent available shall be the lesser of $12 or the DNP. The copay provisions of this paragraph also shall apply when there is a generic equivalent available and the prescribing physician has ordered the prescription to be DAW.

  - The copay for  brand name drugs when there is a generic equivalent available and the prescribing physician has not ordered the prescription to be DAW shall be the lesser of $20 or the DNP.

- **HMO Prescription Drug Coverage.** For those participants enrolled in an HMO option, the above design only shall apply to HMOs where prescription drug coverage is currently "carved out" of the commercial plan design offered by the HMO. The Company, in consultation with the ACHC, may "carve out" the prescription drug benefit from HMOs where economically and administratively feasible.

**D.    Obesity Treatment**

South CWA                                      16

\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc

The Company agrees to modify the Obesity Treatment provisions under the MEP-Indemnity and the MCN (in-network only) to include coverage for medically necessary nutritional counseling. Coverage shall be for conditions in which dietary adjustment has a therapeutic role and which is prescribed by a physician and furnished by a licensed dietician or nutritionist. An annual maximum of $500 per participant will apply.

## II.   VMEP Benefit Changes—Applicable To The MCN Option

The medical benefits provided to associates and their eligible dependents enrolled in either MCN option on and after January 1, 2004 (except as otherwise specifically provided herein) shall be as described in the VMEP, with the following modifications:

### A.   Preventive Care (Amends section 8.16 of the VMEP)

- The frequency schedule attached as Exhibit 1 shall apply to the preventive care benefit features in the MCN option.

### B.   Covered Services (Amends sections 7 and 8 under the VMEP)

- Effective on and after January 1, 2004, the MCN option shall provide a maximum reimbursement of $1,000 for the cost of a hearing aid(s) over a period of 24 months, whether such cost is incurred in-network, out-of-network or any combination thereof.

- Effective on and after January 1, 2004, the requirement of a PCP referral to a network-participating oral surgeon is eliminated.

## III.   VMEP Benefit Changes—Applicable To The MEP-Indemnity Option

The medical benefits provided to associates and their eligible dependents enrolled in the MEP-Indemnity option on and after January 1, 2004 (except as otherwise specifically provided herein) shall be as described in the VMEP, with the following modifications:

### A.   Active PPO Overlay with Copay Features (Amend the following provisions of the VMEP: section 4.1; Article 5; and Exhibit B)

- The Company shall implement an active PPO network where feasible for MEP-Indemnity option members:

  - The out-of-network benefit design shall reflect the existing MEP-Indemnity option provisions. For preventive care features, the frequency schedule attached hereto as Exhibit 1 shall apply.

  - "In-network" physician office visits shall be subject to a $10 copay for the 2004 Plan Year ($15 effective January 1, 2005), then covered at 100%, rather than being subject to the MEP-Indemnity option's current annual deductible and coinsurance.

  - "In-network" preventive care benefit features shall be added to the MEP-Indemnity option as follows:

South CWA                                          17

- Immunizations and related office visits shall be covered at 100%. The frequency schedule attached hereto as Exhibit 1 shall apply.

- Mammograms, PAP tests, PSA tests, FOB, and colonoscopy shall be covered at 100%. Office visits shall be subject to a $10 copay ($15 effective January 1, 2005). The frequency schedule attached hereto as Exhibit 1 shall apply.

- Routine physicals shall be covered at 100%. The frequency schedule attached hereto as Exhibit 1 shall apply.

- For admissions to an in-network hospital, all covered and medically necessary charges shall be paid in full, including those charges that currently are paid at less than 100% and flow to Other Covered Charges for additional reimbursement.

- For any MEP-Indemnity/PPO benefit continuing to require a 20% patient coinsurance payment after the deductible (e.g., physical therapy), the patient's payment shall be calculated on the negotiated network fee (lowering the patient's cost) and there shall be no balance billing to the patient.

- The Company will provide an opportunity for a subcommittee of the ACHC to participate in the process of reviewing bids from potential third-party administrators of this program and to jointly select a third-party administrator that is mutually agreeable to the representatives of the Company and the Union who serve on the Committee.

**B.    Annual Deductible (Amend the following provisions of the VMEP: section 5.2.1)**

- The current MEP-Indemnity annual deductible shall be a per individual deductible as follows:

| | |
|---|---|
| January 1, 2004 | $150 |
| January 1, 2005 | $150 |
| January 1, 2006 | $200 |
| January 1, 2007 | $200 |
| January 1, 2008 | $250 |

- The family deductible shall be equal to two-and-a-half times the applicable individual deductible. If three or more covered family members have expenses applied toward the individual deductibles that total the family deductible (i.e., two-and-a-half times the individual deductible), then no further individual deductibles shall apply for the remainder of the calendar year.

- Notwithstanding the foregoing provisions of this paragraph B, the increases in the MEP-Indemnity annual deductible shall not apply to an employee who resides outside of the MEP-Indemnity PPO vendor's standard service area and who is not eligible to participate in the MCN option.

**C.    Infertility Treatment.**

South CWA                                    18

The Company agrees to provide coverage for infertility treatment on an in-network and out-of-network basis, up to a lifetime maximum of $20,000 per family.

## IV.   VMEP Benefit Changes—Applicable To The HMO Options

The medical benefits provided to associates and their eligible dependents enrolled in an HMO option on and after January 1, 2004 (except as otherwise specifically provided herein) shall be as described in the VMEP, with the following modifications:

### Company Discretion Regarding HMO Options (Amend the following provisions of the VMEP: section 16.1; Exhibit C; and Supplements A-R)

The Company agrees to actively involve the Unions, via the ACHC process, in the HMO evaluation and selection process.  Such involvement may include, but not necessarily be limited to, attending annual HMO renewal meetings, viewing relevant HMO performance statistics and benefit summaries as provided by the Company, receiving verbal and written presentations from HMOs from time to time, receiving summaries of HMOs' service areas, general business direction, and estimates of possible forthcoming business changes as the Company interprets them, and making recommendations to the Company regarding HMO benefits design, vendors and service areas.  The Company will have sole and exclusive right to determine which HMOs are offered, retained or disciplined, how the HMOs are managed, what benefits designs are offered, what HMO service areas are offered, and all related administrative, fee, and vendor management issues related to HMOs.  In no event will the copay for an office visit for a provider exceed ten dollars ($10) nor will the copay for an emergency room visit exceed fifty dollars ($50).  Participants shall not be required to pay any premiums toward the cost of HMO coverage through December 31, 2008.

The Company also agrees not to change HMO benefits intermittently during a Plan Year but rather in a timeframe that corresponds with the annual benefits renewal (open enrollment) period, to notify the Unions by September 1 of each year via ACHC of any pending changes to benefits or vendors for the upcoming benefits renewal period, and to consider reasonably the Unions' suggestions and response to the Company's HMO decisions.

## V.   Legislation.

In the event legislation is enacted at the federal level which may impact the cost or coverage of benefits included in the MEP-Indemnity option, the MCN option, the HMO option, or the prescription drug plan, the Company and the Union shall meet within sixty days to discuss the impact of the legislation.  No benefit changes shall be made unless the Company and the Union negotiate to agreement.

South CWA                                              19

\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc

**EXHIBIT 1**

## Preventive Care Age and Frequency Schedules

| Benefit Coverage | VZ Standard Schedule |
|---|---|
| Well Baby/Child Exams | 0-2 years as prescribed |
| | Age over 2-25 - 1 exam every year; includes immunizations |
| Adult Physical Exams | Age over 25-50 - 1 exam every 2 years |
| | Age 50 and over - 1 exam every year |
| Immunizations and Flu Shot | One complete regimen of immunizations and one flu vaccine annually for children and adults |
| Fecal Occult Test | Age 18-39 - 1 every 2 years |
| | Age 40 and over - 1 every year |
| Colonoscopy | Age 50 and over - one every three years |
| Routine Mammogram | One annual routine mammogram for women regardless of age |
| Well Woman Exam | One well-woman exam, every year, regardless of age and with or without a Pap test, including the blood count and urinalysis. |
| PSA | Age 18-49 - 1 every 2 years |
| | Age 50 and over - 1 every year |

# Appendix B.
# Dental Benefit Changes

---

The dental benefits provided to associates and their eligible dependents enrolled for dental coverage on and after January 1, 2004 shall be as described in the Verizon Dental Expense Plan for Mid-Atlantic Associates (the "Dental Plan"), with the following modifications:

**Coverage of Dental Implants and Finishing Crowns (Amend section 7.3 of the Dental Plan)**

The Plan shall reimburse for amounts incurred for services related to dental implants up to $1,000 per implant, subject to the $1,500 annual maximum and consistent with plan reimbursement for other dental services. The Plan shall also reimburse for amounts incurred for services related to a finishing crown.

South CWA                                          21

\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc

IX.    **CHANGE SENIOR MANAGED CARE COORDINATOR TITLE TO RETIREE HEALTH CARE BENEFIT COORDINATOR AND CONTINUATION OF THE HEALTH CARE BENEFIT COORDINATORS ("HCBC")**

Effective August 3, 2003, the title Senior Managed Care Coordinator will be changed to Retiree Health Care Benefit Coordinator (RHCBC).  The job duties and responsibilities, benefits and pension band of the Retiree Health Care Benefit Coordinator will not change from the Senior Managed Care Coordinator title, nor does this title change constitute an agreement by the Company to bargain over retiree health care issues or any other retiree issue.

In addition, the Companies agree to continue the existing Health Care Benefit Coordinator (HCBC) positions for the term of the Agreement.

The Retiree Health Care Benefit Coordinator and Health Care Benefit Coordinators shall continue to be paid in accord with the CWA International Staff Representative Wage Table.

Both the RHCBC and the HCBCs are excluded from the lump sum and base wage increases set forth in Sections I and II of this 2003 MOU.

X.    **TRAINING LIAISON COORDINATOR**

During the term of this Agreement, the Companies agree to continue the Training Liaison position, to be funded by the Companies at $115,000 per year for each contract year.   The Training Liaison Coordinator will be paid in accordance with the provisions in Section IX above.

XI.    **ANNUAL DISCUSSIONS**

The Union and the Companies agree that the Companies, the CWA, and the IBEW shall meet during the term of this 2003 MOU to discuss wage increases above those set forth in this 2003 MOU, pensions and job security issues.  Such discussions will open in April of each year and continue for 30 days.  Any agreements that are reached as a result of such discussions shall

South CWA                                    22

be reduced to writing.  In the event the parties fail to agree on any issues proposed or discussed, the status quo shall remain.

## XII.   JOINT MEDIATION SESSIONS

The Union and the Companies agree to meet and confer with the Director of the Federal Mediation and Conciliation Service, Peter J. Hurtgen ("Director"), pursuant to the letter to the parties from Director Hurtgen dated August 22, 2003, attached hereto as Attachment 1.

## XIII.   JOINT COMMITTEE ON ABSENCE CONTROL

Within 60 days of the effective date of this 2003 MOU, there shall be established a Mid-Atlantic Joint  Committee, comprised of representatives of the CWA, IBEW Locals 827 and 1944 and the Verizon companies  in the states of New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, and the District of Columbia that are parties to the 2003 MOUs with the CWA and IBEW Locals 827 and 1944 (the "fBA-South Companies"), for the purpose of discussing a plan or program for absence reduction for those fBA-South Companies' operations within the former operating territory of fBA-South.

## XIV.   ADVISORY COUNCIL ON FAMILY CARE (ACFC)

The Companies will provide funding to the ACFC in the amount of $1,600,000 for each contract year beginning August 3, 2003.

The Companies agree that for the term of the 2003 collective bargaining agreements, any portion of the $1,600,000 allotted annually to the ACFC that is not spent in a contract year will be carried over into the next contract year and added to that year's funding. Any monies not spent by the ACFC when the 2003 collective bargaining agreements expire will be forfeited.

South CWA                              23

## XV.   ADVISORY COMMITTEE ON HEALTH CARE ("ACHC")

During the term of this Agreement, the Companies agree to continue the ACHC, under the same terms that governed the ACHC under the 2000 Common Issues MOU.

## XVI.   TRAINING ADVISORY BOARD EXECUTIVE COUNCIL (TABEC)

The Companies will provide funding to the TABEC in the amount of $2,600,000 for each contract year beginning August 3, 2003.

The Companies agree that for the term of the 2003 collective bargaining agreements, any portion of the $2,600,000 allotted annually to the TABEC that is not spent in a contract year will be carried over into the next contract year and added to that year's funding. Any monies not spent by the TABEC when the 2003 collective bargaining agreements expire will be forfeited.

## XVII.  JOINT TIME FOR PARTICIPATION IN JOINT COMMITTEES

For the term of the new agreements, the Companies will pay for joint time spent in all regional joint committees, all of which are also continued for the term of the Agreement.

## XVIII. MODIFICATIONS TO CURRENT PROVISIONS ON "TREATMENT OF GRIEVANCES SETTLED BY THE PARTIES OR ARBITRATION AWARDS WHICH INVOLVE BACKPAY AND/OR REINSTATEMENT"

Replace the existing provision on this subject in the collective bargaining agreements with the following modified provision:

### Treatment of Grievances Settled by the Parties or Arbitration Awards Which Involve Backpay and/or Reinstatement

If, as a result of the settlement of a grievance by the parties or an arbitration award, the grievant is to receive back pay and/or reinstatement following a discharge, layoff, demotion, or suspension, unless and to the extent the settlement or arbitration award specifies otherwise, the employee will be entitled to the following compensation and benefits, and no other compensation (other than any back pay awarded or agreed upon) or benefits:

South CWA                                      24

1.  In the case of a discharged employee reinstated to employment with full back pay, or regardless of the amount of back pay if the settlement or award specifies that the employee is to be "made whole" for the entire period off the payroll, the employee shall receive, less any applicable deductions: (a) full service credit under the pension plan for the period off the payroll, (b) reimbursement for the COBRA premiums the employee paid for medical, dental and/or vision coverage if the employee continued those coverage(s) under COBRA, or if the employee did not continue those coverage(s) under COBRA, reimbursement for premiums paid by the employee for medical, dental and/or vision coverage not to exceed the amount the employee would have paid as premiums for such coverage(s) had the employee elected COBRA coverage and reimbursement for out-of-pocket medical, vision and dental expenses if, under the provisions of the applicable plans, the employee would not have incurred these expenses if they had remained on the payroll.  The appropriate Plan Administrator would determine which expenses would be reimbursable.  Copies of bills and receipts for services provided must be submitted in order for the employee to be eligible for a reimbursement.  (c) any Corporate Profit Sharing Award(s) the employee would have received but for the termination, (d) any Ratification Bonus the employee would have received but for the termination, (e) reimbursement for telephone-related services that would have been covered by Concession Telephone Service had the employee remained on the payroll, (f) recognition of the time off the payroll as "hours worked" for purposes of FMLA eligibility, and (g) if a reinstated employee was a participant in the Verizon Savings and Security Plan for Mid-Atlantic Associates, the Companies will deduct from any backpay awarded or agreed upon, the contributions the employee would have made based on the last election

South CWA                                    25

on file as of the date of the employee's termination, and the employee will receive the

Companies match in his or her Savings and Security Plan account to which the employee

would have been entitled proportionate to the employee's contribution.

2.  A laid off employee who is reinstated as a result of a grievance settlement or arbitration

award shall receive the compensation and benefits set forth in paragraph 1 irrespective of

the amount of back pay the employee is to receive.

3.  In the case of a discharged employee reinstated to employment with no back pay or

partial back pay, pursuant to a settlement or award which does not specify that the

employee is to be "made whole" for the entire period off the payroll, the employee shall

receive, less any applicable deductions, the following, each of which will be prorated as

specified: (a) prorated service credit under the pension plan for the period off the payroll

based upon the ratio between the amount of back pay and the amount which the

employee would have received in pay if continuously employed, with immediate bridging

of service, and (b) reimbursement for the COBRA premiums the employee paid for

medical, dental and/or vision coverage if the employee continued those coverage(s) under

COBRA, or if the employee did not continue those coverage(s) under COBRA,

reimbursement for premiums paid by the employee for medical, dental and/or vision

coverage not to exceed the amount the employee would have paid as premiums for such

coverage(s) had the employee elected COBRA coverage and reimbursement for out-of-

pocket medical, vision and dental expenses if, under the provisions of the applicable

plans, the employee would not have incurred these expenses if they had remained on the

payroll, based upon the employee's coverage at the time of the discharge, prorated for the

period off the payroll based upon the ratio between the amount of back pay and the

amount which the employee would have received in pay if continuously employed (The appropriate Plan Administrator will determine which expenses will be reimbursable. Copies of bills and receipts for services provided must be submitted in order for the employee to be eligible for a reimbursement), (c) any Corporate Profit Sharing Award(s) the employee would have received but for the termination, prorated according to Section 3 of the Corporate Profit Sharing Plan, so that the employee receives one-twelfth of the applicable Corporate Profit Sharing Award(s) for each full month's worth of backpay awarded, (d)  any Ratification Bonus the employee would have received but for the termination, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed,  (e) reimbursement for telephone-related services that would have been covered by Concession Telephone Service had the employee remained on the payroll, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed, (f) recognition of the time off the payroll as "hours worked" for purposes of FMLA eligibility, prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have received in pay if continuously employed, and (g) if a reinstated employee was a participant in the Verizon Savings and Security Plan for Mid-Atlantic Associates, the Companies will deduct from any backpay awarded or agreed upon, the contributions the employee would have made based on the last election on file as of the date of the employee's termination prorated for the period off the payroll based upon the ratio between the amount of back pay and the amount which the employee would have

South CWA                                    27

received in pay if continuously employed, and the employee will receive the Company

match in his or her Savings and Security Plan account to which the employee would have

been entitled proportionate to the employee's contribution.

4.  Any backpay awarded or agreed upon will be reduced by the amount of money the

employee received under any governmental unemployment compensation program, and

the amount of money the employee received from other employment, during the period

the employee was discharged or suspended.

## XIX.   INDEPENDENT MEDICAL EXAMINATION REPORTS

The Companies and the Union agree that the letter relating to Independent Medical

Examinations reports attached as Attachment 2 will be signed and included in the collective

bargaining agreement.

## XX.   SERVICE BRIDGING

The Companies and the Union agree that the agreement relating to service bridging issues

attached as Attachment 3 will be signed and included in the collective bargaining agreement.

## XXI.   MEMORANDUM OF UNDERSTANDING IN ELECTRONIC FORMAT

The Companies agree to provide a copy of the 2003 MOU in electronic format.

## XXII.   LIMITED EXTENSION AGREEMENT

The Companies and the Union agree that the letter agreement relating to a limited

extension of the Grievance and Arbitration and Union Security provisions of their local

collective bargaining agreements, and a No Strike/No Lockout provision, attached as Attachment

4, will be signed and included in their local collective bargaining agreements.

\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc

## XXIII.  <u>DURATION</u>

All provisions of the parties' agreements shall remain in full force and effect until 11:59 p.m. on August 2, 2008.

.

South CWA                                      29

**Attachment 1**

August 22, 2003

**JOINT MEDIATION SESSIONS**

The Parties agree to continue to meet and confer with the Director of the Federal Mediation and Conciliation Service, Peter J. Hurtgen ("Director"), in order to attempt to develop means to solve issues and improve the collective bargaining process and Union/Management relationship.

Meetings shall occur at the request of the Director.  No issues or questions arising out of these discussions shall be subject to the grievance and arbitration provisions contained in the collective bargaining agreements.

To more specifically implement this process, the parties agree as follows:

The purpose of the process shall be:

    a.  To redirect attitudes and interests away from an adversarial relationship and to a collaborative, problem solving partnership;

    b.  To address issues and interests designated by the parties which would enhance the relationship.

Implementation shall begin with Director Hurtgen meeting with each party to discuss the structure, personnel, and location of committees.  Thereafter, an Executive Committee will meet at the call of the Director as soon as mutually convenient.  Local Committees will commence meeting at a mutually convenient date and time.



## **Attachment 2**

**Ron Williams**

1710 H Street, NW, Tenth Floor
Washington, DC  20006
Office:     202-392-1000
Fax:        202-392-0246
E-mail: ronald.h.williams@verizon.com

**Verizon Communications, Inc**
Executive Director
Verizon Labor Relations
Mid-Atlantic States

August 22, 2003

Mr. James Short
Assistant to Vice President, CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA    19103

Dear Mr. Short:

   During 2003 collective bargaining, the Union presented two demands regarding Independent Medical Examination (IME) reports (VI.4 and VI.5).

   This letter will confirm our agreement to meet within 90 days following contract ratification to discuss and attempt to resolve the issues involved.

                                   Sincerely,

                                   Executive Director – Labor Relations

Agreed:

_____
Bargaining Agent
Communications Workers of America

South CWA

\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc



## Attachment 3

**Ron Williams**

1710 H Street, NW, Tenth Floor
Washington, DC 20006
Office:   202-392-1000
Fax:      202-392-0246
E-mail: ronald.h.williams@verizon.com

**Verizon Communications, Inc**
Executive Director
Verizon Labor Relations
Mid-Atlantic States

August 22, 2003

Mr. James Short
Assistant to Vice President, CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA   19103

Dear Mr. Short:

During 2003 collective bargaining, the Union presented a demand proposing immediate service bridging for movement between companies in which Verizon has a majority ownership interest.

This letter will confirm our agreement to meet after bargaining to discuss service bridging issues, including reduction of the 5-year bridging rule to one year. Your signature below also affirms that you are and will continue to be the authorized agent to bargain on behalf of and bind Locals 827 and 1944, International Brotherhood of Electrical Workers, on the issues we discuss post-bargaining concerning service bridging.

Sincerely,

Executive Director – Labor Relations

Agreed:

_____
Bargaining Agent
Communications Workers of America

South CWA

## Attachment 4

**Ron Williams**

1710 H Street, NW, Tenth Floor
Washington, DC  20006
Office:      202-392-1000
Fax:          202-392-0246
E-mail: ronald.h.williams@verizon.com

**Verizon Communications, Inc**
Executive Director
Verizon Labor Relations
Mid-Atlantic States

August 3, 2003

       Re:    **Limited Extension Agreement**

Mr. James Short
Assistant to Vice President, CWA, District 13
230 South Broad Street, 19th Floor
Philadelphia, PA    19103

Dear Mr. Short:

     The CWA and the Company agree as follows:

### Grievance and Arbitration Extension

     If the parties' tentative agreements on new collective bargaining agreements are ratified by the Union's membership, the grievance and arbitration provisions of the parties' expired agreements shall be applied retroactively to the period between August 3, 2003 and the date of ratification.

### Union Security Agreement

     The parties' agree to extend the Union Security provisions of their respective collective bargaining agreements during the period from expiration of their 2000 agreements until the parties' reach new agreements.

     The Union hereby agrees to indemnify the Company and hold it harmless from all claims, damages, costs, fees or charges of any kind which may arise out of the honoring by the Company of deduction authorizations in accordance with the provisions of this Limited Extension Agreement, the making up of sums owed the Union in cases of inadvertent failure to timely honor authorizations, and the transmitting of such deductions to the Secretary-Treasurer of the Union.

### No Strike – No Lockout

South CWA

\\WAFS01\VOL1\USERS\JP004114\Verizon Negotiations\Complete MOUs with TAs\9-4-03 Track Change Documents\CWA South MOU 9-4-03 Changes.doc

The parties agree that until ratification of, or a vote of the Union's membership rejecting ratification of, the new collective bargaining agreements, the Union agrees on behalf of itself and the employees that it represents, that, in relation to these negotiations, there shall be no strikes, stoppages of work or other job actions of any kind by any employee or employees, or any action by the Union contrary to such obligations.  Further, until ratification of, or a vote and failure to ratify, the new collective bargaining agreements by the Union, the Companies agree that they shall not engage in a lockout, except a defensive lockout in response to a material breach of the express promises of the Union set forth herein.

Sincerely,

Executive Director – Labor Relations

Agreed:

_____
Bargaining Agent
Communications Workers of America

South CWA