# EXHIBIT "B"

# GENERAL AGREEMENT

Between



COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO

and

VERIZON WASHINGTON, D. C. INC.

VERIZON MARYLAND INC.

VERIZON VIRGINIA INC.

VERIZON WEST VIRGINIA INC.

VERIZON SERVICES CORP.

VERIZON ADVANCED DATA INC.

VERIZON AVENUE CORP.

VERIZON SOUTH INC. (VIRGINIA)

VERIZON CORPORATE SERVICES CORP.

**August 3, 2008**

# UNION-MANAGEMENT RELATIONSHIPS

A JOINT STATEMENT BY
COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO

and

VERIZON WASHINGTON, DC INC.

VERIZON MARYLAND INC.

VERIZON VIRGINIA INC.

VERIZON WEST VIRGINIA INC.

VERIZON SERVICES CORP.

VERIZON ADVANCED DATA INC.

VERIZON AVENUE CORP.

VERIZON SOUTH INC. (VIRGINIA)

VERIZON CORPORATE SERVICES CORP.

**August 3, 2008**

August 3, 2008

**TO MANAGEMENT AND ASSOCIATES:**

The Communications Workers of America is the recognized bargaining representative for all employees in the collective bargaining unit described in the General Agreement between Verizon Washington, D. C. Inc., Verizon Maryland Inc., Verizon Virginia Inc., Verizon West Virginia Inc., Verizon Services Corp., Verizon Advanced Data Inc. ("VADI"), Verizon Avenue Corp., Verizon South Inc. (Virginia) and Verizon Corporate Services Corp. (the "Companies") and CWA. This relationship carries with it serious obligations and responsibilities which the Companies and the Union are determined to fulfill. As a sign of good faith between them, the Companies and the Union have included in this General Agreement, Article 10 - Responsible Union-Company Relationship.

What is meant by a "Responsible Union-Company Relationship"? While Article 10 does not change or modify the intent or meaning of the other articles of the General Agreement, here are some examples that both the Companies and the Union agree upon:

1.  The Union's status as exclusive bargaining representative confers upon its Local and Union Representatives an equality of relationship with Company Representatives in the handling of appropriate matters between them. The Companies and the Union always will endeavor to deal reasonably and in good faith with the representatives of the other.

2.  There is no place in a relationship of mutual responsibility and respect for attempts to pull rank, or for words, written or spoken, or for other actions on the part of either Company or Union representatives which are intended or appear to belittle or undercut the representatives of the other party regarding any matter involved in the relationship. The Companies and the Union will do their best to see that this attitude is understood and practiced.

3.  Respect for the grievance procedure as a means for the orderly settlement of disputes and for the clarification of understanding in the application and interpretation of the terms of the General Agreement implies the genuine willingness of both parties to stand ready to find reasonable solutions to disputes before the procedure is invoked where feasible and prior to the conclusion of each succeeding step.

4.  In their endeavor to administer the grievance procedure fairly, the Companies and the Union will afford each other's representatives an adequate opportunity to present each case properly and will give careful and respectful consideration to all views and facts presented. The Union agrees that the grievance procedure is not intended to be used and will not condone its use as an irritant or as a means of harassing management.

5.  The Companies are not anti-union and the Union is not anti-management. Both parties believe that a strong and responsible Union that fairly represents employees will contribute more to the vitality and continued success of the business than will a weak and

irresponsible Union.  A member's loyalty to the Union or his participation in legitimate Union activities will have no bearing on his treatment as an employee.  Both parties also believe that it is to the best interests of employees and their Union that the Companies are financially sound and provide the best possible service to their customers at all times.

6.     The Companies and the Union affirm their responsibility to train and instruct their respective representatives in the meaning and spirit of the General Agreement to the end that their relations will be conducted in a businesslike manner at all times in an atmosphere free from harassment, attempted humiliation, browbeating or threats of intimidation.

In summary, the Companies and CWA pledge themselves to continuous and sincere effort to work together harmoniously each respecting the rights and viewpoints of the other, to resolve any disputes or misunderstandings which may exist or develop between them.


Verizon Washington, DC Inc.            Communications Workers of America
Verizon Maryland Inc.                            AFL-CIO
Verizon Virginia Inc.
Verizon West Virginia Inc.
Verizon Services Corp.
Verizon Advanced Data Inc.
Verizon Avenue Corp.
Verizon South Inc. (Virginia)
Verizon Corporate Services Corp.



By _____          By _____
     Company Bargaining Chair                    Union Bargaining Chair

**GENERAL AGREEMENT**

between

COMMUNICATIONS WORKERS OF AMERICA
AFL-CIO

and

VERIZON WASHINGTON, D. C. INC.

VERIZON MARYLAND INC.

VERIZON VIRGINIA INC.

VERIZON WEST VIRGINIA INC.

VERIZON SERVICES CORP.

VERIZON ADVANCED DATA INC.

VERIZON AVENUE CORP.

VERIZON SOUTH INC. (VIRGINIA)

VERIZON CORPORATE SERVICES CORP.

**August 3, 2008**

# TABLE OF CONTENTS

**Article**                                                                                               **Page**

| | | |
|---|---|---|
| 1. | Recognition | 2 |
| 2. | Collective Bargaining | 4 |
| 3. | Payroll Deduction of Union Dues, etc. | 5 |
| 4. | Agency Shop | 6 |
| 5. | Union Bulletin Boards | 7 |
| 6. | Information Furnished Union | 9 |
| 6A. | Union Access to Employee Personnel Files | 10 |
| 7. | Promotion or Transfer of Union Officers | 11 |
| 8. | Union Activity on Company Premises | 12 |
| 9. | Absence for Union Business | 13 |
| 10. | Responsible Union-Company Relationship | 15 |
| 10A. | Occupational Safety and Health | 16 |
| 11. | Non-Discrimination | 17 |
| 12. | Grievances and Grievance Meeting Procedure | 18 |
| 13. | Procedures for Regular and Expedited Arbitration | 21 |
| 14. | Pension and Sickness and Accident Disability Benefit Plans | 25 |
| 15. | Federal or State Laws | 26 |
| 16. | Basic Wage Schedules | 27 |
| 16A. | Wage Start Rates | 28 |
| 16B. | New Job Titles and Job Classifications | 29 |
| 16C. | Team-Based Incentive Pay Plan | 31 |
| 17. | Corporate Profit Sharing Plan | 32 |
| 18. | Special City Allowance | 36 |
| 19. | Differentials | 37 |
| 20. | Union Representation | 38 |
| 21. | Promotional Wage Adjustments | 39 |
| 22. | Temporary Assignments | 41 |
| 23. | Transfer and Reassignment | 42 |
| 24. | Overtime and Sunday Practices | 48 |
| 25. | Work Schedules and Changes in Scheduled Work Time | 50 |
| 26. | Inclement Weather | 52 |
| 27. | Emergency Call-Outs | 53 |
| 28. | Travel Allowances, Travel Time and Expense Payments | 55 |
| 29. | Reimbursement of Incidental Expenses | 58 |
| 30. | Holidays | 59 |

iii

# Table of Contents
## (continued)

| Article | | Page |
|---|---|---|
| 31. | Vacations | 62 |
| 32. | Payments During First Seven Days of Sickness Absence | 67 |
| 33. | Excused Time | 68 |
| 34. | Seniority | 70 |
| 35. | Force Adjustment, Layoff, Part-Timing and Rehiring After Layoff | 73 |
| 36A. | Income Security Plan | 78 |
| 36B. | Employment Security Training | 80 |
| 36C. | Reassignment Pay Protection Program | 82 |
| 37. | Termination Allowances | 83 |
| 38. | Excused Work Days | 85 |
| 39. | Contract Labor | 86 |
| 40. | Definitions | 87 |
| 41. | Cancellation and Duration | 92 |
| | Exhibit I    Authorization for Payroll Deduction of Amounts Equal to Union Dues | 93 |
| | Exhibit II   Negotiated Agreements on Job Duties | 95 |
| | Exhibit III  Pension Band Table | 103 |
| | Exhibit IV  Transfer Plan and Intercompany Job Bank | 104 |
| | Exhibit V   Broadband Network Employment Security Provisions | 108 |
| | Exhibit VI  Settlement Agreement and Release – VCS | 112 |
| | Exhibit VII Enhanced Income Security Plan | 121 |
| | Letters of Understanding Index | 122 |

# WAGE SCHEDULES

| Exhibit A | i - xv |
|---|---|

iv

THIS AGREEMENT, made this 3rd day of August, 2008, by and between Verizon Washington, D.C. Inc., Verizon Maryland Inc., Verizon Virginia Inc., Verizon West Virginia Inc., Verizon Services Corp., Verizon Advanced Data Inc., Verizon Avenue Corp., Verizon Corporate Services Corp., Verizon South Inc. (Virginia) (hereinafter referred to collectively as the "Companies," or individually as the "Company," which shall mean the employing Company) and Communications Workers of America, hereinafter referred to as the "Union."

## WITNESSETH:

WHEREAS, the Union hereby certifies to the Companies that a majority of the employees in the bargaining unit hereinafter defined are members of the Union and have designated the Union as their representative for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment; and

WHEREAS, the Companies are willing to recognize the Union as the exclusive bargaining representative of the employees in the said bargaining unit and to enter into a collective bargaining agreement with the Union as the representative of said employees; and

WHEREAS, the Companies and the Union have engaged in joint collective bargaining which has resulted in this Agreement resolving all issues in dispute;

NOW, THEREFORE, in consideration of the covenants and the terms and conditions herein contained, the parties hereto mutually agree as follows:

## Article 1. - Recognition

**SECTION 1.**   The Companies hereby recognize the Union as the exclusive representative of all employees in the bargaining unit hereinafter defined for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment or other conditions of employment; provided that any individual employee or a group of employees shall have the right at any time to present grievances.

**SECTION 2.**  The bargaining unit shall consist of:

(a)     Washington Area - All non-supervisory employees in the job classifications listed in Exhibit A, attached hereto, whose duties are not of a confidential nature, (1) employed by Verizon Washington, D. C. Inc., (2) employed by Verizon Maryland Inc. within the geographical portion of the Washington Metropolitan Area currently designated as the Washington Suburban Area-Maryland, (3) employed by Verizon Virginia Inc. or Verizon Avenue Corp. within the geographical portion of the Washington Metropolitan Area currently designated as the Northern Virginia Area, and (4) employed by Verizon Services Corp., Verizon Advanced Data Inc. or Verizon Corporate Services Corp. within the District of Columbia, the Washington Suburban Area - Maryland, or the Northern Virginia Area.

(b)     Maryland Area - All non-supervisory employees in the job classifications listed in Exhibit A, attached hereto, whose duties are not of a confidential nature, and who are employed by Verizon Maryland Inc. or Verizon Services Corp., Verizon Advanced Data Inc. or Verizon Corporate Services Corp. within Maryland, excluding employees who are located in that portion of the Washington Metropolitan Area currently designated as the Washington Suburban Area - Maryland.

(c)     Virginia Area - All regular and temporary non-supervisory employees in the job classifications listed in Exhibit A, attached hereto, whose duties are not of a confidential nature, and who are employed by Verizon Virginia Inc. or Verizon Services Corp. or Verizon Advanced Data Inc. or Verizon Corporate Services Corp. or Verizon South Inc. within Virginia, excluding employees within the geographical portion of the Washington Metropolitan Area currently designated as the Northern Virginia Area.

(d)     West Virginia Area - All non-supervisory employees in the job classifications listed in Exhibit A, attached hereto, whose duties are not of a confidential nature, and who are employed by Verizon West Virginia Inc. or Verizon Services Corp. or Verizon Advanced Data Inc. or Verizon Corporate Services Corp. within West Virginia.

(e)     Employees of Verizon South Inc. are limited to those (1) set forth in the "Transfer of Certain Verizon South Inc. Employees to the Potomac Bargaining Unit dated August 2, 2003"; and (2) Directory employees of Verizon South Inc. in Warsaw,

2

VA, who are subject to modifications to this General Agreement set forth in General Agreement.

(f)    Employees of Verizon Avenue are limited to Systems Technicians only.

**SECTION 3.**  Those portions of the bargaining unit described in paragraphs (a), (b), (c) and (d) of Section 2 above shall hereinafter be referred to as the "Washington Area," "Maryland Area," "Virginia Area," and "West Virginia Area," respectively.

**SECTION 4.**  A copy of the General Agreement with wage schedules applicable to the appropriate Area shall be furnished by the Company to each employee in the bargaining unit.  The Company will provide the Union with a copy of the contract between the Communications Workers of America and the Companies in the word processing format that the Company generally uses at the time new contracts are printed.

**SECTION 5.**  Within fifteen (15) days of his initial employment by the Company, a new employee will be introduced to a Local Representative by his supervisor for purposes of permitting the Local Representative to provide the employee with information about the Union.  As an exception to the provisions of Article 8, which prohibit Union activity during work time, the Local Representative and the new employee may be released for up to one-half (1/2) hour of paid work time, provided the time taken is during the employee's and Local Representative's assigned tours.    The discussion between the Local Representative and the employee shall be conducted away from space where Company operations or administrative work is performed, as required by Article 8.

The Company will advise a Local Representative within fifteen (15) days of an employee's transfer into a work group.

3

## Article 2. - Collective Bargaining

**SECTION 1.**  The Companies and the Union agree to keep each other informed, in writing, regarding the names of their authorized representatives on their respective Collective Bargaining Committees.

**SECTION 2.**  Negotiations concerning the interpretation of this Agreement (except those involved in grievances) and negotiations concerning matters for which the Union is recognized for purposes of collective bargaining shall take place only between the Collective Bargaining Committee of the Union (which shall not exceed eight (8) members) and the Collective Bargaining Committee of the Companies.  If agreements are reached in these negotiations modifying the provisions of this Agreement or covering conditions not contained in this Agreement, they shall be reduced to writing in the form of an addition or amendment to this Agreement and signed by the authorized representatives for both the Union and the Companies.

**SECTION 3.**  Meeting for negotiations, as provided in the preceding section, shall be held upon request of either party at a time and place agreeable to both parties.  Local Representatives on the Union's Collective Bargaining Committee who are active employees of the Company shall be excused with pay on each day they participate in meetings with the Companies' Collective Bargaining Committee.  Pay for attendance at such meetings shall not exceed the employee's normal work week at the employee's basic weekly wage.

**SECTION 4.**  The Union will notify the Company in writing of any changes in its roster of Officers, Representatives and Job Stewards, including their alternates, within thirty (30) days after the date of such changes.

**SECTION 5.**  The Company will provide the Union with copies of notices which it issues concerning changes in its management organization up through the department head level as soon as practicable after such notices are issued.

**SECTION 6.**  It is the intention of the parties, with respect to the collective bargaining of future replacing agreements, to conduct their negotiations thereon in such a manner as to reach a new Agreement on or before the termination date of this present Agreement.

## Article 3. - Payroll Deduction of Union Dues, Etc.

**SECTION 1.** The Company shall deduct from the pay (including sickness or accident disability payments) of employees, all applicable Union initiation fees, regular membership dues or "amounts equivalent thereto" upon receipt of properly executed authorizations signed by the employee for whom deductions are to be made, delivered to the Company at least ten (10) days prior to the date the first deduction is to be made. The Company will continue to honor effective dues deduction authorizations on file with the Company as of the effective date of this Agreement in accordance with their terms. The Company will accept new authorizations only in the form of Exhibit I.

**SECTION 2.** The Secretary-Treasurer of the Union shall specify the amount to be deducted in each interval by the Company. The Company shall forward monthly such deductions to the Secretary-Treasurer of the Union.

**SECTION 3.** The Union hereby agrees to indemnify the Company and hold it harmless from all claims, damages, costs, fees or charges of any kind which may arise out of the honoring by the Company of deduction authorizations in accordance with the provisions of this Article, the making up of sums owed the Union in cases of inadvertent failure to timely honor authorizations, and the transmitting of such deductions to the Secretary-Treasurer of the Union.

## Article 4. - Agency Shop*

**SECTION 1.**  Each employee who is a member of the Union or who is obligated to tender to the Union amounts equal to periodic dues on the effective date of this Agreement, or who later becomes a member, and all employees entering into the bargaining unit on or after the effective date of this Agreement, shall as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members, for the period from such effective date or, in the case of employees entering into the bargaining unit after the effective date, on or after the thirtieth day after such entrance, whichever of these dates is later, until the termination of this Agreement.  For the purpose of this Article, "employee" shall mean any person entering into the bargaining unit, except an occasional employee.

Each employee who is a member of the bargaining unit on or before the effective date of this Agreement and who on the effective date of this Agreement was not required as a condition of employment to pay or tender to the Union amounts equal to the periodic dues applicable to members, shall, as a condition of employment, pay or tender to the Union amounts equal to the periodic dues applicable to members for the period beginning 30 days after the effective date of this Agreement, until the termination of this Agreement.

**SECTION 2.**  The condition of employment specified above shall not apply during periods of formal separation** from the bargaining unit by any such employee but shall reapply to such employee on the thirtieth day following his return to the bargaining unit.

_____

* Where permitted by law.

**The term "formal separation" includes transfers out of the bargaining unit, removal from the payroll of the Company, and leaves of absence of more than one month duration.

## Article 5. - Union Bulletin Boards

**SECTION 1.** Arrangements for Bulletin Boards - The Company will install and maintain bulletin boards upon its property for use by the Union at such locations and of such size and type as may from time to time be mutually agreed upon by the parties. The cost of providing, installing, maintaining and relocating such boards will be paid by the Union. The bulletin boards shall be designated as Union bulletin boards in a manner mutually agreeable to the Company and the Union.

**SECTION 2.** Material Permitted on Bulletin Boards - Union bulletin boards, as referred to in Section 1 of this Article, shall be used only for:

(a)     Factual notices and announcements of the Union pertaining to the following:

      (1)     Meetings and Convention calls of the Union,
      (2)     Nominations and elections of the Union,
      (3)     Results of Union elections,
      (4)     Appointments to Union offices and committees, and
      (5)     Social and recreational affairs of the Union.

(b)     Full or partial copies of Collective Bargaining Agreements concluded by the Union and the Companies.

(c)     Announcements or letters issued jointly by the Union and the Company.

The term "Union" as used in (a) of this Section 2 shall be construed to include any Local of the Union which admits employees of the Company to its membership.

**SECTION 3.** General Limitations on Bulletin Board Use - Material posted shall not contain anything of a controversial or political nature, anything derogatory to any of the Companies, their Management or any of their employees, or anything derogatory to any labor or other organization among its employees.

**SECTION 4.** Special Requests for Bulletin Board Use - Should the Union desire to post any material, including promotional and organizational material, not provided for in Section 2 of this Article, it shall be posted only after an International Representative of the Union has secured the written approval of the Director - Labor Relations, or his designated representative.

**SECTION 5.** Responsibility for Proper Bulletin Board Use - The Union assumes responsibility for complete compliance with the spirit and intent of the provisions of this Article. Should the Company believe that posted material is not in accordance with the spirit and intent of the provisions of this Article, such material shall be brought to the attention of any Local or International Representative of the Union and it shall be removed by the Union immediately after such notification. Failure to comply, shall entitle the Company to cover up or remove the bulletin board(s) involved.

7

Material removed in accordance with the above provisions of this Section 5 may be posted again only after a mutual agreement that it is appropriate for posting has been reached between an authorized International Representative of the Union and the Director - Labor Relations, or his designated representative.

## Article 6. - Information Furnished Union

**SECTION 1.** The Company will furnish the Union, as soon as practicable after the first of each month, the following information in connection with employees represented by the Union:

(a)    Name, social security number, payroll number, net credited service date, classification (regular full-time, regular part-time, temporary full-time, temporary part-time, regular term or occasional), basic weekly wages, work location, date of birth, race, sex, home address and Union local.

(b)    Appropriate codes identifying any current changes in this information, as well as identification of those currently added to, or separated from, or transferred into any of the Areas; or going on, returning from, or presently on, leave of absence.

(c)    The following information for those with effective Authorization for Payroll Deduction of Union Dues, etc., cards on file:

    (1)    Amount of deduction.

    (2)    Amount omitted or made up.

    (3)    Appropriate codes indicating changes in deductions or cancellations.

    (4)    Last weekly dues rate of reporting month.

**SECTION 2.** Prior to engaging a regular term employee or employees for any project, the Company shall notify the Union of the purpose, job title(s), location(s) and expected duration of employment in connection with the project.

**SECTION 3.** The Company agrees to furnish the information set forth in Section 1 of this Article to the Union. Should the Union request and the Company agree to furnish additional information, the costs for such information will be billed to the Union.

9

## Article 6A. - Union Access to Employee Personnel Files

**SECTION 1.**   The Union and the Company reaffirm their commitment to maintain optimum confidentiality for employee personnel records.   The parties, moreover, appreciate that the privacy of employee records would be impaired by improvident access to and/or duplication or publication of materials or information contained in employee personnel files.  Consistent with these concerns, the Union agrees that it will be judicious in requests for access to or copies of materials in individual employee personnel files and that it will handle all such materials with an abiding respect for the need to maintain optimum confidentiality of personally identifiable information balanced against its obligation as bargaining representative to process grievances and administer the General Agreement.

**SECTION 2.**   When reasonably required in the judgment of a Union Representative to administer the General Agreement or to process a grievance, the Company will make available for review and/or furnish copies to said Union Representative all, or designated, materials in an individual employee's personnel file in accordance with Section 4 of this Article.

**SECTION 3.**   When reasonably required in the judgment of a Local Representative to process a grievance, the Company will make available for review and/or furnish copies to said Local Representative all, or designated, materials in an individual employee's personnel file in accordance with Section 4; provided, that the Local Representative furnishes the Company with the express written consent of the employee.

**SECTION 4.**   Review of an employee's personnel file pursuant to Sections 2 and 3 shall be at a time and place designated by the Company upon reasonable notice to the employee's immediate supervisor.   Copies of personnel files or designated portions thereof shall be furnished upon receipt of a written request on a Company-provided form. For each page copied and furnished by the Company to a Union Representative or an authorized Local Representative pursuant to this Article, the Union shall pay the Company fifteen cents ($.15) per page.

10

## Article 7. - Promotion or Transfer of Union Officers

**SECTION 1.**   Except when a shorter notice is mutually agreed to by the parties, the Company will furnish the Local President with thirty days notice before the effective date of a promotion or transfer out of the bargaining unit or from the jurisdiction of one Local to another, or of a temporary transfer involving board and lodging, of any employee whom the Union has previously advised the Company in writing is a Local Officer, namely, President, Vice President, Secretary, Treasurer, or other elected member of the Local executive board.

## Article 8. - Union Activity on Company Premises

**SECTION 1.** Neither the Union nor the Locals, their representatives or members, shall conduct Union business or carry on Union activities on Company premises or on Company time, except that Union and Local members who are employees (and authorized representatives of the Union who are not employees of the Company, by mutual agreement of the Company and the Union) may solicit members and carry on other legitimate Union activities outside of working periods in space where no Company operations or administrative work is performed; provided that such solicitation or other legitimate Union activity shall be limited to small groups of employees and shall not interfere with the operation of the Company or the use of space by other persons or employees for the purposes for which the space is intended.

### Article 9. - Absence for Union Business

**SECTION 1.**   To the extent that the Company determines that force and service conditions permit, employees who are authorized representatives of the Union or a Local will be excused without pay upon request by the employee to his immediate supervisor, or granted leaves of absence without pay at the request of an authorized officer or representative of the Union to attend to the business of the Union or his Local in accordance with the following provisions of this Article:

(a)     Excused Absences: All requests for excused absences shall be made as far in advance as possible, ordinarily not later then 3:00 P.M. of the second preceding calendar day, and the Company shall act promptly on each request.  Excused absences shall not exceed thirty (30) consecutive calendar days or a total of 90% of the scheduled working days in any calendar year.  Absence in excess of such limits will not be authorized except by a leave of absence to be applied for in writing by the employee and an authorized officer or representative of the Union.  In the interpretation and application of this paragraph, the term "scheduled working days" shall include no more than five (5) normal daily tours in any calendar week and shall exclude scheduled vacation periods, sickness absence days (unless such sickness absence is preceded or followed by a scheduled working day), Excused Work Days and days observed as holidays.  A period of "consecutive calendar days" of excused absence shall be considered to be broken by any calendar day on which the Company pays the employee wages for a normal daily tour or its equivalent.

(b)     Leaves of Absence: All requests for leave of absence shall be made as far in advance as possible, ordinarily not less than two (2) weeks, and the Company shall act promptly upon each request.  The initial period of a leave of absence granted hereunder shall not exceed twelve (12) months.  Additional leaves for periods not to exceed twelve (12) months each may be granted.*

Leaves of Absence under this Article shall be granted only for the purpose of enabling the employee to accept full-time employment with the Union or his Local except that the Company may agree to grant leave of absence hereunder for the purpose of permitting the employee to accept full-time employment with the AFL-CIO staff or in a union-sponsored position with a nonprofit charitable or community organization such as the United Way.

**SECTION 2.**   Under the provisions of this Article the number of employees to be on leave of absence at any one time shall not exceed ten (10) in any Area.  No more than sixty (60) employees in any Area, shall be excused at any one time under the provisions of this Article.  Additional employees may be excused without pay at the request of the Union for incidental absences of short duration to the extent that Company determines that force and service conditions permit.

13

**SECTION 3.** A Union or Local representative upon return from an excused absence or leave of absence shall be reinstated at work generally similar to that in which he was last engaged prior to his absence, subject, however, to the provisions of this Agreement relating to layoffs, part-timing and rehiring and, in case the employee had been on leaves of absence for a total of more than three (3) years during his service life, subject to there being a suitable job available. He shall be placed on the payroll at the rate received when such absence began, adjusted for any general changes in wage level made during the period of absence. Adjustments shall also be made for any changes in location or position in accordance with existing practices and wage schedules. No physical or other examination shall be required as a requisite of reinstatement except where an obvious physical or mental condition exists which requires medical advice regarding job placement or fitness for work.

**SECTION 4.** In computing his net credited service, a Union or Local Representative shall be allowed full credit for periods of leaves of absence during his total Bell System service (through 12-31-83) and his Bell Atlantic or Verizon service (after 1-1-84).* Except for the sole purpose of pension computation, an employee shall not receive credit for wage progression purposes for periods covered by leaves of absence granted pursuant to this Article. Employees shall retain eligibility, if any, to death benefits during any leave of absence granted under this Article.

**SECTION 5.** During any period of leave of absence granted pursuant to this Article the employee shall pay the premiums for the Dental Expense Plan and the Vision Care Plan. The Company shall pay premiums for Basic coverage under the Group Life Insurance Program, and the same amount toward the employee's (single or family) coverage under the Medical Expense Plan as the Company would have paid if the employee had remained on the active payroll.

**SECTION 6.** When an employee is excused without pay or granted a leave of absence without pay under the provisions of this Article he will not be paid for time spent in attending grievance meetings with Company or other meetings with the Company, unless mutually agreed to by the Company and the Union.

**SECTION 7.** Notwithstanding the provisions of this Agreement relating to its termination or any action taken thereunder, this Article shall continue in effect for one (1) year and thereafter until specifically terminated by either party on sixty (60) days written notice.

---

*Net credited service for leaves taken prior to August 7, 1977, prior to August 10, 1980, prior to August 7, 1983, prior to August 9, 1986 and prior to August 6, 1989 shall be limited to four (4) years, nine (9) years, twelve (12) years, fifteen (15) years and eighteen (18) years, respectively.

14

## Article 10. - Responsible Union-Company Relationship

**SECTION 1.**  The Company and the Union recognize that it is in the best interests of both parties, the employees, and the public that all dealings between them continue to be characterized by mutual responsibility and respect.  To insure that this relationship continues and improves, the Company and the Union and their respective representatives at all levels will apply the terms of this Agreement fairly in accord with its intent and meaning and consistent with the Union's status as exclusive bargaining representative of all employees in the unit.  Each party shall bring to the attention of all employees in the unit, including new hires, their purpose to conduct themselves in a spirit of responsibility and respect and of the measures they have agreed upon to insure adherence to this purpose.

**SECTION 2.**  Should either party claim a violation of Section 1 of this Article, its authorized representative will provide written notice of the complaint to the authorized representative of the other party.  The written notice shall identify the actions, persons, dates and other details of the complaint with sufficient particularity to allow for a fair and thorough investigation of the complaint.  The receiving party shall respond in writing to the complaint.  The parties may by mutual agreement also meet to discuss the matter.

**SECTION 3.**  It is agreed that appropriate action shall be taken by each party to resolve complaints presented pursuant to Section 2 of this Article in a prompt and conclusive manner; however, no provision of this Article shall be subject to the grievance procedure and the procedure outlined in Section 2 shall be the exclusive means to resolve any questions regarding the interpretation or application of this Article.

### Article 10A. - Occupational Safety and Health

**SECTION 1.**  The Company and the Union mutually recognize the need for a work environment in which safe operations can be achieved in accomplishing all phases of work, and the need to promote better understanding and acceptance of the principles of safety and occupational health on the part of all employees to provide for their own safety and health and that of their fellow employees, customers and the general public.  In specific recognition of the extensive use of video display terminals (VDTs), the parties re-emphasize their joint goal to maximize the advantages of VDTs and minimize any potential disadvantages their use may present to employees.

**SECTION 2.**  To help achieve the above principles, the Company and the Union agree to participate in an Advisory Committee on Occupational Safety and Health principles at the Company headquarters level.  The Committee shall consist of not more than a combined total of six (6) management representatives from the Companies and six (6) representatives appointed by the Union.  The Committee shall meet from time to time but at least three times per year and during these meetings shall consider an agenda which may include ergonomics and other issues related to VDTs.

**SECTION 3.**  The Companies agree to reimburse for actual time spent by active employees in attendance at Committee meetings during the employee's scheduled tour at his basic hourly rate of pay.

16

## Article 11. - Non-Discrimination

**SECTION 1.**  In a desire to restate their respective policies, neither the Company nor the Union shall unlawfully discriminate against any employee because of such employee's race, color, religion, sex, sexual orientation, age, disability, or national origin; or because of his activities in behalf of the Union; or because he is a disabled veteran or a veteran of the Vietnam era;  Provided, however, that nothing in this provision shall be construed to create rights under any provision of the Company's pension or welfare benefits plans or to modify or affect those plans in any way.

**SECTION 2.**  The use of the masculine or feminine gender in this General Agreement shall be construed as including both genders and not as a sex limitation.

## Article 12. - Grievances and Grievance Meeting Procedure

**SECTION 1.**  Any individual employee or group of employees shall have the right to present grievances directly to the Company and to have such grievances adjusted without the intervention of the Union as long as the adjustment is not inconsistent with the terms of this Agreement.

**SECTION 2.**  The following provisions shall apply to the presentation and processing of all grievances by the Union:

(a)  *How Grievances are Presented*: In presenting any grievance, the aggrieved employee(s) involved, if any, shall be identified, the action(s) complained of and dates thereof shall be specified, the contract provision(s) alleged to have been violated shall be stated, if any, and the remedy requested.

(b)  *Discussion or Settlement of Grievances*: Once any Local or Union representative has dealt with a Company representative to negotiate a grievance, the Company will not discuss or attempt to settle the matter with the individual employee or employees involved without affording the Local or Union an opportunity to be present.

(c)  *Time Limit for Presenting Grievances*: No grievance need be considered by the Company or the Union unless presented within thirty (30) calendar days after the action or occurrence complained of last occurred.  In no event shall the settlement of any grievances have retroactive effect more than thirty (30) calendar days prior to the initial presentation of the grievance.

(d)  *Grievance Terminated Unless Appealed*: At the conclusion of the first step in the grievance procedure, the grievance shall be considered as finally disposed of unless it is appealed to the second step within the time limits specified in Section 3 of this Article.

(e)  *Limitations on Number of Persons Attending Grievance Meetings*: The total number of aggrieved employees and authorized Local and Union representatives to attend grievance meetings with Company representatives shall not exceed four (4) at the first step and five (5) at the second step.  A maximum of four (4) employees at the first step and five (5) employees at the second step will be excused without loss of time or pay for regularly scheduled work time during the normal work week for attendance at such grievance meetings; provided that pay for attendance at grievance meetings shall be limited to time spent in meeting with the Company representatives and actual time required in traveling to and from such meetings, such travel time not to exceed a total of one and one-half (1-1/2) hours.

(f)  *Method of Settling Grievances*:  It is agreed that neither the Company, its representatives, nor the Union, the Locals, their representatives or members, will

18

attempt by means other than the grievance procedure to bring about the settlement of any issue which is properly a subject for disposition through the grievance or arbitration procedures.

(g)    By mutual agreement of the parties, grievance meetings may be conducted via video or teleconference.

**SECTION 3.** *Grievance Meeting Procedure*: It is the intent of both parties that grievances shall be handled as expeditiously as practicable and within the time limits spelled out in each step of the grievance procedure. It is understood that by mutual consent expressed in writing, the time limits specified at any given step, or the time limits for taking the grievance to the second step may be extended with respect to a specific grievance. However, time limits for presentation of a grievance may not be extended. Steps may be waived by written agreement between the Company's appropriate Director or his designated representative and the International Representative of the Union. The Company shall provide the Local Representative at the first step with all information relevant to the specific circumstances and actions leading to the instant grievance.

(a)    *First Step*: The grievance shall be presented initially by a designated Local Representative to the immediate supervisor of the aggrieved employee(s) or in the event of his unavailability to another supervisor designated by the Company. The meeting at this step shall be held concurrent with the presentation or within seven (7) calendar days after the request to meet, and seven (7) calendar days beginning with the day of the meeting shall be allowed for settlement.

(b)    *Second Step*: If the grievance is appealed to the Second Step, the Local involved shall submit a written notice of appeal within seven (7) calendar days after the expiration of the time limits in Step 1 to the Director of the immediate supervisor, except that in a grievance involving a promotion or demotion the written statement of appeal shall be submitted to the Director of the supervisor who effected the promotion or demotion. The appeal letter shall identify the aggrieved employee(s) involved, if any, set forth the act or occurrence complained of, the date(s) of said act(s) or occurrence(s), the contract provisions alleged to have been violated, if any, and the remedy requested. The grievance may then be presented by the Union Representative or his designee to the appropriate Director or his designated representative. If the grievance involves a dismissal for cause, a Director's designee shall be another Director or higher level manager. However, if the grievance involves a dismissal for cause of an employee with five (5) or more years of net credited service, the grievance will be heard by the person to whom the Director reports. The Company's designated representative at this step will not be the same representative who heard the first step.

For all other grievances, a Director's designee shall be a Manager or higher level manager. The meeting at this step shall be held within fourteen (14) calendar days after the Company receives the written notice of appeal, and fourteen (14) calendar days from the date of the meeting at this step shall be allowed for

19

settlement.  Within seven (7) calendar days after having concluded the Second Step by orally announcing its final position to the Union, the Company shall transmit to the International Representative of the Union or his designated representative, a written confirmation of its final position.

(c)      By mutual agreement of the parties, the first and second step meetings in Section 3(a) and (b) above may be waived and the grievance presented directly to the Director - Labor Relations or his Labor Relations designee at the second step. The grievance shall be presented in writing and shall identify the aggrieved employee(s) involved, if any, set forth the act or occurrence complained of, the date(s) of said act(s) or occurrence(s), the contract provisions alleged to have been violated, if any, and the remedy requested.  The meeting at this step shall be held within seven (7) calendar days of the presentation, and fourteen (14) calendar days from the date of the meeting shall be allowed for settlement.  Within seven (7) calendar days after having concluded the Second Step by orally announcing its final position to the Union, the Company shall transmit to the International Representative of the Union, or his designated representative, a written confirmation of its final position.

**SECTION 4.**  If the parties remain in disagreement at the conclusion of Step 2, the Union, within fourteen (14) calendar days following the receipt of the Company's written confirmation of its final position, may submit the grievance to arbitration upon written notice to the Company stating the issue to be decided, provided the grievance involves:

(a)      The interpretation or application of any of the terms of this Agreement not specifically excluded from arbitration; or

(b)      The dismissal (for just cause) of an employee who at the time of dismissal had six (6) or more months of completed net credited service; or

(c)      The suspension (for just cause) of an employee who at the time of suspension had six (6) or more months of completed net credited service; or

(d)      The demotion (for just cause, if disciplinary) of an employee who at the time of demotion had been continuously in the job from which demoted for at least six (6) months.

## Article 13. - Procedures for Regular and Expedited Arbitration

**SECTION 1.**  The procedure for arbitration shall be as follows:

(a)     Arbitration shall be conducted before an Impartial Arbitrator selected by the Union and the Company in accordance with the provisions of Section (b).

(b)     As soon as possible, a master list of twelve (12) arbitrators shall be selected by the parties.  This master list shall be organized in alphabetical order.  Each arbitrator shall serve until the termination of this Agreement unless his services are terminated earlier by written notice from either party to the other.  The arbitrator shall be notified of his termination by a joint letter from the parties.  The arbitrator shall conclude his services by deciding any grievance previously heard.   A successor arbitrator shall be selected by the parties.  Any successor arbitrator shall be added to the master list in alphabetical order.

(c)     Each case shall be assigned to the arbitrator at the top of the master list in order of receipt.  After an arbitrator is assigned a case, he shall be placed at the bottom of the list.  After the grievances have been assigned arbitrators, the Union must, within twenty-four (24) months from the date of the letter appealing the grievance to arbitration, (thirty (30) months for grievances appealed to arbitration prior to August 3, 2003), notify the Company and the arbitrator of the Union's desire to schedule the case for hearing.  Failure to do so shall constitute withdrawal of the grievance.

(d)     Upon receipt of the Union's request to schedule a grievance for hearing, the assigned arbitrator shall provide the parties with four dates on which the arbitrator is available to hear the grievance.  These dates must be within one hundred and eighty (180) days of the date on which the arbitrator is notified of the Union's request to schedule the grievance for hearing.  If the arbitrator cannot provide the parties with four possible hearing dates within this time period, either party may assign the grievance to the next arbitrator on the master list.  Within four weeks of the joint receipt of the arbitrator's proposed hearing dates, the parties will select one of the arbitrator's proposed dates or request additional hearing dates.

(e)     Hearings shall be commenced and carried to a conclusion as expeditiously as possible.  The hearings and decision of the arbitrator shall be confined to the issue or issues presented in the grievance procedure.  The parties shall, prior to the hearings, jointly stipulate in writing such issue or issues if they can agree, and if they cannot agree, the arbitrator shall reduce such issue or issues to writing at or before the commencement of the hearings.  The hearing shall be conducted in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association, and if possible, the arbitrator shall render a decision in writing within three weeks following the closing of the hearing.

(f)  The arbitrator shall have no power to add to, subtract from, modify or disregard any of the provisions of this Agreement, and in no event shall a decision have retroactive effect more than thirty (30) calendar days prior to the initial presentation of the grievance.  Both parties agree to participate in the arbitration proceedings and the decision of the arbitrator which shall contain a full statement of the grounds under which the issue or issues have been decided, shall be final and the Union, the Locals, their representatives, employees and the Company agree to abide thereby.

(g)  Each party shall bear the expense of preparing and presenting its own case.  The compensation and expenses of the arbitrator and any other expenses relative to the procedures shall be borne equally by the parties.

(h)  The Company's Director of Labor Relations and the Union's Bargaining Chair shall meet quarterly to schedule any grievances reinstated as a result of the Union's internal appeal process.

**SECTION 2.**  The procedure in this Section will apply only to grievances which are arbitrable under the provisions of Article 12, Section 4 (b), (c) and (d).  In lieu of the procedure specified in Section 1 of this Article, any grievances involving the suspension of an individual employee, except those which also involve an issue of arbitrability, contract interpretation, or work stoppage (strike) activity and those which are also the subject of an administrative charge or court action shall be submitted to arbitration under the expedited arbitration procedure hereinafter provided within fifteen (15) calendar days after the filing of a request for arbitration.  In all other grievances involving disciplinary action which are specifically subject to arbitration under Article 12, Section 4, both parties may, within fifteen (15) calendar days after the filing of the request for arbitration, elect to use the expedited arbitration procedure hereinafter provided.  The election shall be in writing and, when signed by authorized representatives of the parties, shall be irrevocable.  If no such election is made within the foregoing time period, the arbitration procedure in Section 1 of this Article shall be followed.

(a)  Arbitrators on the master list established pursuant to Section 1(b) of this Article shall be offered cases in rotating order without regard to their place on the master list based on application of Section 1(c).  If an arbitrator does not commit to hearing a case within one hundred and twenty (120) calendar days, the case will be offered to the next arbitrator.  If no arbitrator commits to hearing the case within one hundred and twenty (120) calendar days, the case will be assigned to the arbitrator who can hear the case on the earliest date.

The arbitrator selected shall be placed at the bottom of the list for purposes of selection pursuant to this Section.

(b)  The procedures for expedited arbitration shall be as follows:

22

(1)   Within three (3) working days the parties shall notify the arbitrator in writing of his assignment to decide a grievance by expedited arbitration. The arbitrator shall confirm his acceptance of this assignment in writing within five (5) working days.

(2)   The parties may submit to the arbitrator prior to the hearing a written stipulation of all facts not in dispute.

(3)   The hearing shall be informal without formal rules of evidence and without a transcript.  However, the arbitrator shall be satisfied that the evidence submitted is of a type on which he can rely, that the hearing is in all respects a fair one, and that all facts necessary to a fair settlement and reasonably obtainable are brought before the arbitrator.

(4)   Within five (5) working days after the hearing, each party may submit a brief written summary of the issues raised at the hearing and arguments supporting its position.  The arbitrator shall give his decision within five (5) working days after receiving the briefs.  He shall provide the parties a brief written statement of the reasons supporting his decision.

(5)   The arbitrator's decision shall apply only to the instant grievance, which shall be resolved thereby.  It shall not constitute a precedent for other cases or grievances and may not be cited or used as a precedent in other arbitration matters between the parties unless the decision or a modification thereof is adopted by the written concurrence of the authorized representatives of the parties.

(6)   The time limits in (1) and (4) of this Paragraph (b) may be extended by agreement of the parties or at the arbitrator's request, in either case only in emergency situations.  Such extensions shall not circumvent the purpose of this procedure.

(7)   In any grievance arbitrated under the provisions of this Section, the Company shall under no circumstances be liable for back pay for more than six (6) months (plus any time that the processing of the grievance or arbitration was delayed at the specific request of the Company) after the date of the disciplinary action.  Delays requested by the Union in which the Company concurs shall not be included in such additional time.

(8)   The arbitrator shall have no authority to add to, subtract from or modify any provisions of this Agreement.

(9)   The decision of the arbitrator will resolve the grievance, and the Company and the Union agree to abide by such decision.  The compensation and expenses of the arbitrator and the general expenses of the arbitration shall

23

be borne by the Company and the Union in equal parts.  Each party shall bear the expense of its representatives and witnesses.

## Article 14. - Pension and Sickness
## and Accident Disability Benefit Plans

**SECTION 1.**  Except as provided in this Article, there shall be no negotiations during the life of this Agreement upon changes in pensions or any other subject covered by the "Verizon Pension Plan for Mid-Atlantic Associates" and/or the "Verizon Sickness and Accident Disability Benefit Plan for Mid-Atlantic Associates.

**SECTION 2.**  In the event, during the life of this Agreement, the Company proposes to exercise the rights provided in the "Verizon Pension Plan for Mid-Atlantic Associates" or the "Verizon Sickness and Accident Disability Benefit Plan for Mid-Atlantic Associates" by action affecting the benefits or privileges of employees represented by the Union, it will before doing so notify the Union of its proposal and afford the Union a period of sixty (60) calendar days for bargaining on said proposal; provided, however, that no change may be made in any of the Plans which would reduce or diminish the benefits or privileges provided thereunder as they apply to employees represented by the Union without its consent.

**SECTION 3.**  Any dispute involving the true intent and meaning of Section 2 of this Article may be submitted to the arbitration procedure of this Agreement.  However, nothing herein shall be construed to subject any of the Plans or their administration or the terms of any proposed changes in said Plans to arbitration.

## Article 15. - Federal or State Laws

**SECTION 1**. Should any Federal or State law or the final determination of any court of competent jurisdiction or any proclamation or order having the force of law at any time affect any provision of this Agreement, such provision shall be construed as having been changed to the extent necessary to conform to such law or decision.  In the event that such law, determination or proclamation shall be repealed or held unconstitutional the provision of this contract affected thereby shall be read according to its original tenor.

## Article 16. - Basic Wage Schedules

**SECTION 1.**  The wage increase schedules and differential payments for the various job classifications and locations set forth in the Exhibit of wage schedules attached hereto shall be in effect for the term of this Agreement.

**SECTION 2.**  The Company agrees to grant wage increases to the maximum wage rates specified in their appropriate schedules in accordance with the time intervals and amounts provided in said schedules.  However, if, in the judgment of the Company, an employee's job performance merits such treatment, the Company may accelerate a wage increase, but not for more than six (6) months on the applicable Wage Schedule or for employees who have less than eight (8) months of continuous service.  Increase intervals and amount of increase for such employees shall be determined by applying the employee's current basic weekly wage rate to the wage schedule applicable to the employee's particular job classification.

**SECTION 3.**  The increase interval for an employee who has not received a regular increase since employment shall be computed from the first of the month in which he or she is employed if employed prior to the sixteenth day of said month, or from the first of the calendar month following employment if employed on or after the sixteenth day of the month.  Except as otherwise provided in this Agreement, all further wage increases under the schedules shall be computed from the effective date of the employee's immediately preceding regular increase.  In the application of this Section, increases shall be granted on the first Sunday of the calendar month in which the increase falls due.

**SECTION 4.**  The basic weekly wage rates and the maximum wage rates provided for the various job classifications in the Exhibit of wage schedules attached are based upon the hours comprising the present normal work week for full-time employees.  It is agreed that, in the event of a reduction in the number of hours comprising the present normal work week, basic weekly wage rates and maximum rates may be reduced by the Company proportionately.

**SECTION 5.** In the event of absence for any reason continuing for more than one month (thirty days) during which the employee was scheduled to receive a progression increase, the employee shall receive his/her progression increase effective the Sunday after he/she returns to work.  In addition, the accumulated absence, if over thirty (30) days (one month), will be added to extend the time until the employee's next scheduled progression increase in intervals of thirty (30) days.

27

### Article 16A. - Wage Start Rates

**SECTION 1. -** Definitions

(a)     "Job related experience" shall mean twelve (12) or more months of experience, whether consecutive or cumulative, in the same or substantially similar job or job family.

(b)     "Job related training" shall mean training which is work related and preparatory for the job or job family into which the individual is hired. "Job related training" may include a college degree. The amount of credit shall be at the Company's discretion.

(c)     "Job related experience and/or job related training" may include military experience or training.

**SECTION 2.** This Agreement shall not be construed to prevent the Company from engaging employees at starting rates which in the Company's judgment are commensurate with their previous job related training, and/or job related experience.

**SECTION 3.** Employees may be hired into any titles at rates in excess of the minimum hiring rate at the Company's discretion. If an employee is hired into a title at a pay rate in excess of the minimum hiring rate for reasons other than job related experience and/or job related training, any employee in that title in the building into which the employee is hired who is at a lower rate of pay will be raised to the rate of the individual hired.

### Article 16B. - New Job Titles and Job Classifications

**SECTION 1.** Whenever the Company determines it appropriate to create a new job title or job classification in the bargaining unit, or to restructure or redefine an existing one, it shall proceed as follows:

(a)    The Company shall notify the Union in writing of such job title or classification and shall furnish a job description of the duties and the wage rates and schedules initially determined for such job titles and classifications. Such wage rates and schedules shall be designated as temporary. Following such notice to the Union, the Company may proceed to staff such job titles or classifications.

(b)    The Union shall have the right, within thirty (30) days from the receipt of notice from the Company, to initiate negotiations concerning the initial wage rates or schedules established by the Company.

(c)    If negotiations are not so initiated, the initial wage rates and schedules set by the Company shall remain in effect and the temporary designation removed.

(d)    If agreement is reached between the parties within the sixty (60) days following the Union's receipt of notice from the Company concerning the initial wage rates and schedules, the agreed upon wage rates and schedules shall be retroactive to the date the change or new job was implemented.

(e)    If negotiations are initiated pursuant to paragraph (b), above, and if the parties are unable to reach agreement within sixty (60) days following receipt of notice from the Company, the Union may, within thirty (30) days of the expiration of the sixty (60) day period for negotiations, demand that the issue of an appropriate schedule of wage rates be submitted for resolution to a neutral third party. Within seven (7) days of such demand, each party will submit its final proposed schedule of wage rates to the other party, which cannot thereafter be changed.

(f)    The neutral third party shall be selected by mutual agreement from among those who possess acknowledged expertise in the area of employee compensation. The parties may submit all evidence deemed relevant to the issue to the neutral third party. At the request of either party, a hearing shall be held to receive such evidence. Any such hearing shall be held within thirty (30) days after the matter is referred to the neutral third party. While it is not intended that such third party undertake a full and complete job evaluation study, he or she shall review other job titles or classifications and their wage schedules for comparison purposes and may make an on-site inspection of the workplace and conduct a reasonable number of interviews of incumbents. A written decision as to the appropriate schedule of wage rates will be rendered by the neutral third party within sixty (60) days of the date that the matter is referred for resolution. In the event that the neutral third party determines that a different schedule of rates is appropriate, the new schedule shall be placed in effect retroactive to the date the change or new

job was implemented, except that in no event shall the retroactive effect exceed 150 days.

(g)     The procedures set forth in this Article shall be the exclusive means by which the Union may contest the schedule of wage rates which the Company sets for any new, restructured, or redefined job title or classification.

(h)     The cost of the neutral third party shall be borne one-half by the Company and one-half by the Union.

## Article 16C. - Team-Based Incentive Pay Plan

**SECTION 1.**  From time to time, the Companies may implement team-based incentive pay linked to service, productivity and/or other business related standards set by Lines of Business or Business Units up to 10% of annual basic wage rates.  These non-benefit-bearing payments may be paid monthly, quarterly, semi-annually, or annually.  Teams may be at career level 03 (2nd tier manager level) or larger groups.  The Company will meet with the Union to solicit input and review the details of any team-based incentive pay plan prior to its implementation.  Neither this provision nor any team-based incentive pay plan will be subject to the grievance and arbitration procedures.

## Article 17. - Corporate Profit Sharing Plan (CPS)

**Section 1.**    Plan Purpose.  The Corporate Profit Sharing Plan ("CPS") is designed to encourage and reward employees for their contribution to Company profits.

**Section 2.**    Plan Years.  The CPS will provide awards for results in calendar years 2008, 2009, and 2010 with awards payable in 2009, 2010 and 2011.

**Section 3.**    Eligibility.

(a)    Eligible Employees.  Full-time and part-time regular, term and temporary employees who are on the payroll for at least 90 days during an applicable Plan Year will be eligible to receive a CPS Distribution to the extent earned and payable. Employees who resign or are discharged for cause prior to December 31 of the Plan Year forfeit their eligibility to receive a CPS Distribution.

(b)    Proration for Partial Years.  For an employee who is employed more than 90 days, but less than 12 months, of the Plan Year, the employee's CPS Distribution will be prorated by twelfths to correspond to the number of months of participation during the Plan Year. For purposes of proration, a month will be taken into account if the employee is actively participating on the first day of the calendar month.

(c)    Proration for Part-Time Employees.  CPS Distribution for each eligible part-time employee will be prorated as a percent of the normal workweek for a full-time employee in the same title.

**Section 4.**    Time Worked and Leaves of Absence.  The following will count as time on the payroll for CPS Distributions:

(a)    Absence attributable to approved sickness or accident disability up to accrued FMLA leave.

(b)    Departmental leave (up to 30 days).

(c)    Time that an employee is eligible to receive pay for Military Leave.

(d)    Up to 30 days for Anticipated Disability Leave and Child Care leave combined.

(e)    Up to 30 days for any other approved leave.

An employee shall not lose eligibility if, on December 31 of the applicable Plan Year, the employee is absent for one of the reasons stated in (a) through (e) above.

**Section 5.**    Separations.  An employee who is otherwise eligible for a CPS Distribution will not lose eligibility due to the following separations (so long as the employee has a period of at least 90 days of active participation during the Plan Year):

(a)     Retirement

(b)     Separation due to force surplus

(c)     Transfer (or a quit/hire, with a break not exceeding 30 days) to another company that participates in this Plan or to an affiliated company with a collectively bargained corporate profit sharing plan that is substantially similar to this Plan, and the employee is on the payroll of such company on December 31 of the same year

(d)     Death of the employee

(e)     Promotion to management, and the employee is on the payroll of the company in which he or she is employed as a manager on December 31 of the same year

An employee who is separated from the active payroll for the above reasons will receive a CPS distribution that shall be prorated as described in Section 3.

**Section 6.**     CPS Distribution Calculations.

(a)     Standard Award.  The "Standard" CPS Distribution shall be as follows:

| Performance Year | Standard CPS Distributions | Year Payable |
|---|---|---|
| 2008 | $500 | 2009 |
| 2009 | $500 | 2010 |
| 2010 | $500 | 2011 |

(b)     Performance Percentage.  The actual CPS Distribution per eligible employee will be calculated by multiplying the "Standard" CPS Distribution by a "Performance Percentage" for the Plan Year that shall not be less than 0% and not more than 200%. The "Performance Percentage" shall be based on the performance percentage that is applicable to the financially driven component of the short-term annual cash incentive award (the "STIP" award) payable for that performance year to the Chief Executive Officer(s) of Verizon Communications (the "CEO"). The Performance Percentage for this Plan for a given year shall bear the same relationship to 200% as the performance percentage that is awarded to the CEO for financial results in that year bears to the maximum percentage available to the CEO for financial results under the STIP plan.  For example, for any performance year in which the performance modifier for the CEO is based on a range from 0% to 200%, then the Performance Percentage under this Plan shall be equal to the performance modifier applicable to the CEO for the same performance year. For any performance year in which the performance modifier for the CEO is based on a range from 0% to 100%, then the Performance Percentage under this Plan shall be equal to the product of two times the performance modifier applicable to the CEO for the same performance year.

(c)     Minimum Payout.  Notwithstanding paragraphs (a) and (b) above, the minimum distribution for Performance Years 2008, 2009 and 2010 will be $700, subject in all cases to prorating under Section 3.

**Section 7**.     Information Requests.  The Company agrees to provide to the Union upon request with publicly disclosed information about the STIP compensation of the CEO. With respect to information not publicly disclosed, the Company will only provide the Union with the following:

(a)     A copy of the approved STIP achievement scale for the performance year, which sets out the financially driven performance modifiers that would be applicable to various financial results for the year. The unions will treat this information as confidential and proprietary information and will not disclose the information to any person for any purpose other than monitoring the administration of the CPS program.

(b)     A report on the outcomes of the factors that affect the financially driven component of the CEO's STIP award for a performance year. This information will be provided as soon as practicable after the end of the performance year.

(c)     A summary of the total CPS distribution payments which eligible employees received under the Plan. This information will be provided as soon as practicable following the end of the Plan Year.

**Section 8**.     Payment of CPS Distributions.  CPS Distributions, when earned, will be paid by separate payroll remittance (EFT or check) not later than March 15th of the year immediately following the Plan Year. For eligible employees who are no longer employed at the time of payment, the Company will be deemed to have satisfied its obligation to pay the CPS award if it sends payment to the eligible recipient's last known address.  Each such payment shall be subject to the applicable federal withholding rate for non-recurring payments (currently, a 28% flat rate), and other applicable payroll taxes.

**Section 9**.     Benefit-Bearing Treatment of CPS Distribution.

When paid, a CPS distribution will be treated as eligible benefit-bearing pay solely for the following purposes:

(a)     The CPS distribution will be taken into account for purposes of the Supplemental Monthly Pension calculation under the qualified pension plan.

(b)     The CPS distribution shall be treated as eligible benefit-bearing pay which may be contributed to the qualified Savings and Security Plan according to the same contribution percentage (if any) as is in effect for regular wages at the time the CPS distribution is paid (and the same terms and conditions for pre-tax or after-tax treatment, and for qualifying for applicable company matching contributions).

(c)     To the extent that an employee is eligible for the one-times-pay death benefit under the qualified pension plan (subject to applicable caps on such death benefit), the last CPS distribution paid to an employee prior to an employee's death shall be taken into account (to the extent it does not cause the death benefit to exceed the applicable cap).

(d)     The last CPS distribution paid to an employee prior to an employee's death shall be taken into account under the terms of the group term life insurance plan for active employees.

(e)     The CPS distribution may be taken into account for union dues to the extent determined appropriate by the union representing the employee.

CPS distributions will not be included in calculations for any other purposes.

**Section 10**.     Grievances and Arbitration.  The employee's employing company shall have the discretion to administer this Plan according to its terms. The employing company's interpretations and determinations under this Plan shall be final and binding. The employee's union representative may present grievances relating to matters covered by the Plan but neither the Plan nor its administration shall be subject to arbitration, except that the limited issue of an employee's eligibility to participate in a specific distribution under the Plan shall be arbitrable. Any "make-whole" arbitration award (which reinstates an employee with full back pay) shall include any applicable CPS distribution for the Plan Year in which the employee had been separated from employment if the employee was otherwise eligible and did not otherwise receive a distribution for the applicable Plan Year.

## Article 18. - Special City Allowance

**SECTION 1.**  An employee whose assigned reporting location on a particular day is within the corporate city limits of Baltimore, Maryland or Washington, D.C., will be paid a Special City Allowance of $2.00 for each day he works after reporting at such assigned reporting location.

**SECTION 2.**  The Special City Allowance will enter into computations of overtime pay required by law but will not be part of the basic rate or basic weekly wages for any other purpose nor enter into the computation of any payments under the Plan for Employees' Pensions, Disability Benefits and Death Benefits or any other fringe benefits or differentials.

**SECTION 3.**  An employee must work more than 50% of a regular full-time normal daily tour, after reporting to a qualified location, to receive a full daily allowance for that day.  An employee who reports to work at a qualified location, but who works 50% or less of a regular full-time normal daily tour, will be paid one-half of a full daily allowance.

**SECTION 4.**  Not more than one full daily allowance will be paid to an employee on any one day regardless of the number of times the employee reports to a qualified location during that day.

## Article 19. - Differentials

**SECTION 1.**  Evening and Night Differential Payments - Category I, II, III, A and B Employees.  A daily differential in the amount of ten percent of the employee's basic hourly rate multiplied by the number of hours in the employee's normal daily tour shall be paid to each Category I, II, III, A and B employee whose normal daily tour includes two or more hours between 5:00 P.M. and 8:00 A.M.

**SECTION 2.**  Evening and Night Differential Payments - Category IV Employees.  Employees in Category IV, who work evening or night tours, shall receive differential payments as shown below:

| Tour Length (Hours) | Tour Ending Times (Inclusive) | Daily Differential |
|---|---|---|
| 7 | 7:15 p.m. to  8:00 p.m. | $  1.70 |
| 7 | 8:15 p.m. to  8:30 p.m. | 2.20 |
| 7 | 8:45 p.m. to 10:15 p.m. | 2.75 |
| 7 | 10:30 p.m. to 11:00 p.m. | 3.30 |
| 7 | 11:15 p.m. and after* | 3.70 |
| 7 | All Night Tours | 4.05 |
| 6 | 10:30 p.m. to 11:00 p.m. | 1.00 |
| 6 | 11:15 p.m. and after | 1.10 |
| | *Excluding all night tours | |

**SECTION 3.**  Christmas Eve and New Year's Eve Differential Payments.  Employees who work on Christmas Eve or New Years's Eve shall receive additional compensation* in the amount of an additional hour's pay, computed at their basic hourly rate, for each hour worked after 7:00 p.m. on December 24 and after 7:00 p.m. on December 31 and up to 7:00 a.m. of the following day in each case.

---

* The additional compensation provided for in this Section is in lieu of any daily overtime or premium payments which might otherwise be applicable, except as provided for under Article 24, Section 3 of this Agreement. (49th hour provision)

**SECTION 4.**  The provisions of this Article are applicable only to employees who are scheduled to work a tour which is equivalent to a normal daily tour for full-time employees.  However, the provisions of Sections 1 and 3 of this Article shall not apply to part-time employees hired on or after January 1, l981, and assigned to work in PhoneCenter Stores, Bell Customer Service Centers, Bell Phone Booths (KIOSKS), DM/DR (Direct Marketing/Direct Response) Centers and any equivalent retail sales or Service Center operations.

## Article 20. - Union Representation

**SECTION 1.**   At any meeting between a representative of the Company and an employee in which discipline (including warnings which are to be recorded in the personnel file, suspension, demotion or discharge for cause) is to be announced, a Union representative may be present if the employee so requests.

**SECTION 2.**   Pay for Union representation under this Article shall be limited to one representative and shall be at the Union representative's basic weekly wage and only for actual time spent within his normal daily tour.

## Article 21. - Promotional Wage Adjustments

**SECTION 1.**  Promotional pay adjustments shall apply for employees who are promoted to another job title having a higher maximum rate, except that this Article shall not apply to employees transferred between equivalent jobs as defined in Article 23, Section 1(e).

**SECTION 2.**  The employee shall be given a promotional pay adjustment on the date of the promotion.  The promotional pay adjustment shall be to the highest of the basic weekly wage rates resulting from the computation of the TYPE ONE, the TYPE TWO and TYPE THREE adjustments described in Sections 3, 4 and 5 below.

**SECTION 3.**  The TYPE ONE adjustment shall be computed by applying the employee's wage experience credit to the wage schedule applicable to the assignment to which the employee is being promoted to determine the equivalent weekly wage; provided that:

(a)     The resulting basic weekly wage rate shall not be less than the starting rate for the new assignment.

(b)     An employee promoted from a job classification in Category II to another job classification in Category II shall not receive a basic weekly wage less than the basic weekly wage he was receiving in the old assignment.

(c)     Except as required by paragraphs (a) and (b) above, a resulting adjustment shall not be more than ten dollars ($10) per week; provided that if the employee had been receiving the maximum rate for the job from which he is promoted for a period of six (6) months or more, the next regular increase on the new wage schedule shall be added to the adjustment so computed.

**SECTION 4.**  The TYPE TWO adjustment shall be computed by applying the employee's wage experience credit to the wage schedule applicable to the new job classification to determine the equivalent basic weekly wage; provided that:

(a)     The equivalent basic weekly wage so determined first shall be reduced in accordance with the provisions of Section 6 below if applicable; and then

(b)     Increased in the amount of the next regular increase on the new wage schedule if the employee had been receiving the maximum rate for the job from which he is promoted for a period of six (6) months or more.

**SECTION 5.**  The TYPE THREE adjustment shall be computed by applying the employee's net credited service to the wage schedule applicable to the new job classification and establishing the employee's new basic weekly wage rate on the closest lower full step; provided that the new basic weekly wage so determined shall be reduced in accordance with the provisions of Section 6 below if applicable.

**SECTION 6.** If the promotion is from a job title in a different Job Title Group to a job title in Job Title Groups 5, 6, 7, 9, 10 or 11, the resulting basic weekly wage rate shall not exceed the step down rate for the new assignment, except for promotions from Job Title Group 6 to Job Title Group 7.

**SECTION 7.** The increase interval for the employee's first regular increase following the promotional pay adjustment shall be computed from the first of the month nearest the date of the promotional adjustment,

(a)     and an employee who received a TYPE ONE or TYPE TWO adjustment and whose basic weekly wage was less than the maximum rate for the assignment from which he was promoted shall have his next regular increase interval adjusted on a pro rata basis.  For example; if three-fourths of the employee's normal interval had expired on the schedule for his old assignment, credit shall be given for three-fourths of the interval on the schedule for his new assignment.  The provisions of this paragraph (a) do not apply to promotions to Category IV job classifications or to employees whose promotional wage adjustment after the application of Section 6 above resulted in a basic weekly wage exactly on the step down point for their new assignment.

(b)     and an employee who received a TYPE ONE or TYPE TWO adjustment and who had been receiving the maximum rate for his former job classification prior to promotion for a period of less than the next increase interval for the new assignment shall be granted the next regular increase after the regular increase period for the new assignment has elapsed with the interval computed from the date the employee was granted the maximum rate for the old assignment.  The provisions of this paragraph (b) do not apply to promotions to Category IV job classifications.

(c)     and an employee who received a TYPE THREE adjustment shall be granted as a credit against the next regular increase interval that net credited service (rounded to the nearest whole month) that is in excess of the closest lower full step on his new wage schedule.  The provisions of this paragraph (c) do not apply to employees whose promotional adjustment after the application of Section 6 above resulted in a basic weekly wage exactly on the step down point for their new assignment.

**SECTION 8.** If an employee is both assigned to a new location and promoted to another job classification having a higher maximum rate, the wage treatment specified in Article 23-Transfer and Reassignment, shall first be applied before computing the promotional pay adjustment.

**SECTION 9.** In the application of this Article, no employee shall receive any increase in an amount in excess of that required to reach the maximum wage rate specified under the wage schedule applicable to the employee's new job classification.

## Article 22. - Temporary Assignments

**SECTION 1.**  On any day during which an employee in Categories II, III, IV or B is temporarily assigned by the Company to a position in the bargaining unit with a different maximum rate than his regular assignment, his normal daily tour shall be considered to be the normal daily tour for his regular assignment.

**SECTION 2.**  On any day during which an employee in Categories II, III, IV or B is temporarily assigned by the Company to a position in the bargaining unit with a higher maximum rate than that of the employee's regular assignment and assumes full responsibility in and takes over all work associated with the position for at least the number of hours equal to a full session or half tour, the employee for that day shall receive one-fifth of the difference in maximum basic weekly rates between the two wage schedules involved; provided that in no case shall an individual employee be so assigned for more than sixty (60) calendar days for any one period or assignment.

**SECTION 3.**  On any day during which an employee, pursuant to a temporary assignment, relieves a management employee for at least the number of hours equal to a full session or half-tour, such employee shall receive an additional $10 per day.  A temporary assignment to management relief of sixty (60) calendar days for any one period or assignment must be followed by thirty (30) calendar days without temporary assignment to management relief.

**SECTION 4.**  On any day during which an employee, other than a Category IV employee, is assigned to provide formal training to another employee or employees and does so for at least the number of hours equal to a half tour, such employee shall receive an additional ten dollars ($10.00) for that day and for hours equal to a full tour of formal training, such employees shall receive fifteen dollars ($15.00) for that day.  An employee is "assigned to provide formal training" when such employee is directed by the Company to give instruction, other than on-the-job coaching, using Company provided media designed exclusively for formal training purposes, such as course guides, work books, work samples and audio-visual aids.  Such an assignment may also include a directive to report back to supervision the results of written tests or other formal measures of the trainee's(s') ability to learn and perform the work which is the subject of the formal instruction.

**SECTION 5.**  During the period of any temporary assignment covered by the preceding sections of this Article, the employee shall be given wage progression treatment according to the schedule for his regularly assigned job and in computing this wage progression treatment, the payments provided for above shall be disregarded.

**SECTION 6.**  The payments provided for in Sections 2, 3 and 4 of this Article shall be considered part of the employee's basic hourly rate only for the purpose of computing daily or weekly overtime payments where applicable under the provisions of this Agreement.

## Article 23. - Transfer and Reassignment

**SECTION 1.**   An employee's basic wage shall be adjusted during the term of this Agreement in the event of a change (other than one of a temporary nature) in the employee's assignment or location, based upon the Company's determination that any one of the following conditions exists:

(a)     Transfers of employees from one Locality Wage Group to another Locality Wage Group without a change in job title and from one job title to another job title with the same maximum rate.

(b)     Demotions.

(c)     Reductions in work requirements which result in reassignment of employees to a lower paid job classification.

(d)     Return to original assignment by an employee who had received an increase incident to a temporary transfer or a temporary promotion.

(e)     Transfers of employees between equivalent jobs.   "Equivalent jobs" are defined as:

　　　　(1)     Entry 1-B Clerk and Entry 1-III Clerk

　　　　(2)     Entry 3-B Clerk and Entry 3-III Clerk

　　　　(3)     Semi-Skilled 2-B Clerk, Semi-Skilled 2-III Clerk and Operator

　　　　(4)     Skilled 1-B Clerk, Skilled 1-III Clerk, Service Assistant, and Senior Traffic Office Clerk.

**SECTION 2.**

(a)     If an employee is transferred to a new location without a change in job title or job classification or is transferred to an equivalent job in a different classification (with or without a change in work location), his basic weekly wage shall be adjusted on the date of transfer to the extent of any "wage rate differential" existing between the locations and/or the classifications involved in the transfer. The "wage rate differential" shall be computed as follows:

　　　　(1)     The employee's basic weekly wage at the time of transfer shall be applied to the wage schedule applicable to  the old assignment and the cumulative number of months corresponding to such a basic weekly wage shall be determined.

42

(2)    The period so determined in (1) shall then be applied to the wage schedule applicable to the assignment to which the employee is being transferred, and the equivalent basic weekly wage shall be determined.

(3)    The "wage rate differential" shall then be determined by taking the basic weekly wage which the employee was receiving at the time of the transfer and the basic weekly wage determined in (2) above and subtracting the lower from the higher.  The difference thus obtained shall be the "wage rate differential".

(b)    If an employee is assigned to another job title with an associated wage schedule having the same or a lower maximum rate:

(1)    The employee's basic weekly wage at the time of the reassignment shall be applied to the wage schedule applicable to the assignment from which he is being reassigned and the cumulative number of months corresponding to such basic weekly wage shall be determined.  The period of time so determined shall then be applied to the wage schedule applicable to the assignment to which the employee is being reassigned, and the equivalent basic weekly wage shall be determined.  However, if an employee, within six (6) months after having been assigned to a job title with an associated wage schedule higher than his former job title, elects to be returned or is returned to the former job title upon return to his former job title his basic weekly wage shall be the rate he would have been paid had he remained continuously in the former job title.

(2)    An employee assigned to a Category IV job title with an associated wage schedule having a lower maximum rate, whose cumulative number of months, as determined in paragraph (b)(1) of this Section, does not correspond to an established wage schedule step applicable to the Category IV job, shall have his basic weekly wage adjusted to the next higher wage schedule step.

(3)    However, in no case, in paragraphs (b)(1) and (b)(2), shall the basic weekly wage paid in the new assignment be greater than the maximum rate for that assignment except as may be provided in paragraph (c) of this Section 2.  Nor shall the basic weekly wage be less than the rate paid if the employee had been engaged in and remained continuously in the new assignment after taking into consideration any previous starting rate adjustment and any previous accelerated wage increases.

(c)    Where the wage adjustment specified in this SECTION 2 would result in a decrease in the basic weekly wage of an employee who is reassigned or transferred at the Company's initiative after having been in the job from which the transfer or reassignment is being effected for more than six (6) months, the Company shall elect either to:

43

(1)    Defer subsequent regular increases in an aggregate amount equivalent to the amount of the adjustment, or

(2)    Decrease the employee's basic weekly wage in reasonable steps to the wage applicable to the new assignment; provided, however, that if the wage adjustment is ten percent (10%) or less (or, in the case of a transfer between equivalent jobs, seven dollars and fifty cents ($7.50) or less), the full adjustment shall be made on the date of the transfer or reassignment.

(d)    The increase interval for the employee's first regular increase following the transfer or reassignment shall be computed as follows:

(1)    If the maximum wage rate for the new assignment is higher than that for the old assignment, and if

a.    the employee's basic wage rate was less than the maximum rate for the job classification (prior to the transfer or reassignment), the next regular increase interval shall be computed from the first of the month nearest the date of the transfer or reassignment, and in these cases the increase interval shall be adjusted on a pro rata basis.  For example, if three-fourths of the employee's normal increase interval had expired on the schedule for his old assignment, credit shall be given for three-fourths of the interval on the schedule for his new assignment.  The provisions of this paragraph a. do not apply to reassignments to Category IV job classifications.

b.    the employee had been receiving the maximum rate of the job classification (prior to the transfer or reassignment) for a period as long or longer than the next increase interval for the new assignment, the next regular increase shall be granted at the time of transfer or reassignment.

c.    the employee had been receiving the maximum rate for the job classification (prior to the transfer or reassignment) for a period of less than the next increase interval for the new assignment, the next regular increase shall be computed from the first of the month nearest the date of the transfer or reassignment.  Such regular increase shall be granted after the regular increase period for the new assignment has elapsed, computed from the date the employee was granted the maximum rate for the old assignment.  The provisions of this paragraph c. do not apply to reassignments to Category IV job classifications.

(2)    If the maximum wage rate for the new assignment is less than that for the old assignment, and if employee's basic wage rate is less than the maximum rate for the new assignment, the next regular increase interval shall be computed from the first of the month nearest the date of the transfer or reassignment and, in these cases, the increase interval shall be adjusted on a pro rata basis.

(e)    The wage adjustments provided for in this Section may be deferred or withheld by the Company in individual cases if, in its judgment, the employee does not merit such increase or adjustment.

(f)    An employee whose assigned reporting location on a particular day is within a Locality Wage Group with a higher maximum rate for his job title, shall be paid a daily "locality wage allowance" for each day he works after reporting at such assigned reporting location.

The "locality wage allowance" shall be one-fifth of the difference in maximum basic weekly rates between the two wage schedules involved.

The "locality wage allowance" shall be considered part of the employee's basic wage rate only for the purpose of computing daily or weekly overtime payments where applicable under provisions of this Agreement.

Not more than one "locality wage allowance" will be paid to an employee on any one day regardless of the number of times the employee reports to a qualified location during that day.

**SECTION 3.** When an employee is reassigned (on other than a temporary basis) at the initiative of the Company to a work location which is at least thirty-five (35) miles farther from his residence than the distance between his residence and his former location, the employee may elect one of the following options:

(a)    move his household within a period of twelve (12) months following the first day of reporting at the new location, and receive relocation reimbursement as specified in Section 4(b).

(b)    commute daily from his household to the new location and receive commutation allowances as specified in Section 5.

**SECTION 4.** If the employee elects option (a) of Section 3 above, the following shall apply:

(a)    The employee shall suffer no loss of regular pay for reasonable time off to arrange for the moving of household goods and personal effects and travel time to the new home location.

(b)     The employee will be reimbursed by expense voucher up to a maximum aggregate amount of six thousand dollars ($6,000.00) for the following actual expenditures reasonably incurred by him in conjunction with such move:

    (1)     Moving expenses incurred for household goods and personal effects.

    (2)     Travel ($.09 per mile if personal vehicle is used), meals and lodging expenses incurred for self and members of immediate family in connection with the final trip from the former residence.

    (3)     Travel ($.09 per mile if personal vehicle is used), meals and lodging expenses incurred in connection with pre-move househunting trip(s) and interim living for employee at new work location for meals and lodging only for up to thirty (30) consecutive days. Provided, however, that there shall be a limit of fifteen hundred dollars ($1,500.00) on expenditures reimbursed pursuant to this subparagraph (3).

    (4)     Lease cancellation fees, selling and buying costs for housing. Provided, however, that there shall be a limit of fifteen hundred dollars ($1,500.00) plus any unused amount in subparagraph (3) above on expenditures reimbursed pursuant to this subparagraph (4).

**SECTION 5.** If the employee elects option (b) of Section 3 above, the employee shall be entitled to receive monthly commutation allowances as long as he commutes daily from his household to the new location, as follows:

(a)     The Company shall determine the Commuting Mileage Factor ("CMF") by subtracting the road miles between the employee's residence and his former work location (using the most direct commonly-traveled route) from the road miles between his residence and his new work location (using the most direct, commonly-traveled route).

(b)     To determine the monthly allowance, the Company shall multiply the "CMF" by $2.00.

(c)     An employee who ceases commuting to his household shall notify the Company immediately and monthly allowances shall be discontinued effective as of the termination of daily commutation.

(d)     An employee who moves his household to a new location while receiving commutation allowances shall notify the Company no later than five (5) days following the move. The "CMF" will be adjusted using the formula specified in (a) above with the new residence substituted for his former residence. If the resulting "CMF" is greater, the monthly allowance will not be adjusted. If the resulting "CMF" is smaller, but at least 35, the monthly allowance will be reduced effective as of the date of the employee's move. If the resulting "CMF" is less

46

than 35, commutation allowances will be discontinued effective as of the date of the employee's move.

(e)     Monthly commutation allowances shall not exceed $300.

(f)     No commutation allowances will be paid for months that extend beyond the second anniversary of the employee's report date at the new work location.

## Article 24. - Overtime and Sunday Practices

**SECTION 1.**  *Weekly Overtime.*  Employees shall be paid at the rate of one and one-half times their basic hourly rate for all time worked in excess of the normal work week for full-time employees.

**SECTION 2.**  *Daily Overtime.*  Employees shall be paid at the rate of one and one-half times their basic hourly rate for all time worked in excess of a normal daily tour for a full-time employee; provided that any such daily overtime payments shall be credited against any overtime payments required under Section 1 of this Article.

**SECTION 3.**  *Premium for Work in Excess of 49 Hours.*  Employees shall receive additional pay at the rate of one-half their basic hourly rate for all time worked in excess of 49 hours in a calendar week; provided that the hourly rate for each hour worked after the 49th hour in a calendar week shall in no case be less than two times the employee's hourly rate of pay.

**SECTION 4.**  For the purpose of computing overtime and premium payments in Sections 1, 2 and 3 of this Article, in a week in which a holiday is observed pursuant to Article 30 on Monday through Friday inclusive, employees excused from work on that day shall be considered to have worked a normal daily tour.

**SECTION 5.**  *Sunday Premiums.*  All work performed by employees within a normal daily tour, except while on Emergency Call-Out, Article 27, which begins on a Sunday (this being a Sunday tour) shall be paid for at the rate of one and one-half times the employee's basic hourly rate.  Payments for Sunday work in excess of a normal daily tour, shall be as specified in the preceding Section 2 of this Article.

A Category IV employee assigned by the Company to work three or more consecutive Sunday tours, shall be paid for time worked on the third consecutive Sunday and each subsequent consecutive Sunday, additional compensation computed at one-half the employee's basic hourly rate (one-half the employee's straight-time rate).  For the purpose of administering this latter provision, a Category IV employee who is assigned to work on a Sunday and who voluntarily effects a change with some other employee to work for her shall not be deemed to have interrupted the continuity of her assigned Sundays but that Sunday shall be considered as a Sunday off for the said other employee in determining the continuity of her assigned Sundays.

**SECTION 6.**  *Holiday Overtime.*  All employees shall be paid at the rate of two and one-half times their basic hourly rate for all time worked on a holiday observed pursuant to Article 30 in excess of a normal daily tour for a full-time employee; provided that any holiday overtime hours so compensated shall be credited against any hours for which overtime payments are required under Sections 1 and 2 of this Article.

48

**SECTION 7.**  Except while on Emergency Call-Out, Article 27, work performed as part of an employee's normal daily tour which begins on one calendar day and extends into the next shall be paid for as part of the day on which the normal daily tour began.

**SECTION 8.**  Any period of work time, except while on an Emergency Call-Out, Article 27, which is not part of the employee's normal daily tour which begins on one calendar day and extends into the next day shall be paid for as part of the day on which such work began up to the usual starting time of the employee's regularly assigned daily tour regardless of whether the employee is or is not assigned to work on the particular day into which such period of work time extends.

**SECTION 9.**   The provisions of Sections 5 and 6 of this Article shall not apply to part-time employees hired on or after January 1, 1981, and assigned to work in PhoneCenter Stores, Bell Customer Service Centers, Bell Phone Booths (KIOSKS), DM/DR (Direct Marketing/Direct Response) Centers and any equivalent retail sales or Service Center Operations.

## Article 25. - Work Schedules and
## Changes in Scheduled Work Time

**SECTION 1.**  Work schedules shall be established by the Company for Category I, II, III, A and B employees.  These schedules shall show the time the employee's normal tour starts and ends on each day of the normal work week, provided that such schedules may be changed by the Company at any time in order to meet work requirements and service conditions subject, however, to Sections 2 and 3 of this Article.  Work schedules shall be posted by 6:00 P.M. of the Monday of the preceding week in advance of the first day of the employee's first normal work week shown on such schedules.

**SECTION 2.**  When the Company assigns a Category I, II, III, A or B employee to work on a day on which no tour has previously been scheduled, the employee's scheduled work time on another day of the same normal work week may be reduced by a corresponding amount, provided he is notified of the change prior to 5:00 P.M. of the second calendar day preceding the day of the added assignment or the day of the decreased assignment whichever is earlier.

If the employee is not notified of the change by Company within the time prescribed in the preceding paragraph, he may, not later than the end of the added assignment, elect to work the day on which he was previously assigned to work in addition to the added assignment.  If the employee so advises that he elects to work his previously scheduled day in addition to his added assignment, his previously scheduled normal work week will remain unchanged.   However, in respect to the added assignment under such circumstances, only the hours actually worked will be paid for.  If the employee elects not to work the hours specified in his previously scheduled normal work week in addition to the added assignment, his work time on one of the previously scheduled days in the same calendar week will be reduced to the extent of the additional assignment and the added assignment will be considered a part of his scheduled normal work week.

**SECTION 3.**  When the Company changes the starting and quitting time of a Category I, II, III, A or B employee's previously scheduled tour without giving notification to the employee of such change before 5:00 P.M. of the second calendar day preceding the day on which the change is to be made, the employee may elect to work the hours of his previously scheduled normal daily tour (or half tour) in addition to the newly assigned hours.

If the employee's previously scheduled tour entitled him to an evening or night differential under Article 19, Section 1, and the employee, having elected to work all or part of his previously scheduled tour, does work between 5:00 P.M. and 8:00 A.M., he shall be paid the differential in accordance with Article l9, Section 1.

**SECTION 4.**  The work time for employees called in to work a non-scheduled normal daily tour or half tour before the assigned starting time for such tour but on such short notice that they cannot report for work until after such assigned starting time shall be considered as beginning at the assigned starting time.