**Attachment 1**

Contracting Initiatives

Mr. Terrance T. Tipping
Assistant to Vice President
CWA, District 13, AFL-CIO
230 South Broad Street, 19th Floor
Philadelphia, PA 19102

Dear Mr. Tipping:

This will confirm our August 3, 2008 agreement regarding contracting initiatives.

The Company agrees, subject to certain conditions described below, that through 12-31-10, it will not contract out work of a type that it has not contracted out during the three years preceding the effective date of the agreement. This restriction shall not preclude contracting out work to deal with emergency situations including severe weather conditions.

The parties further agree to create a Contracting Initiatives Committee, which will be co-chaired by the CWA District Vice President and a company Senior Operations Manager (or their designee). The CEO of Verizon and the President of CWA shall be ex-officio members of the Committee. Each party may appoint up to two additional members.

The purpose of this Committee is to find ways by which the levels of contracting can be reduced within the Verizon (Mid-Atlantic) Operating companies. The objective is for company employees to do more work in a more productive and efficient manner than that performed by contractors. The company will provide all necessary resources needed by the Committee to carry out its purpose.

In addition, the Company will notify the Union at least six months in advance of planned new, major, contracting initiatives that are to be implemented on or after January 1, 2011, and which affect employees represented by the Union. The Contracting Initiatives Committee will then have the opportunity to discuss such new major initiatives. It is understood, however, that after the end of the six month period, the Company is free to implement planned, new, major initiatives that do not otherwise violate the collective bargaining agreement.

Very Truly Yours,

AGREED:

(s)
Bargaining Agent
Communications Workers of America

South CWA                                    18



**Attachment 2**

## RECLASSIFICATIONS TO REGULAR FULL-TIME

Except as provided for below, Temporary and Term employees on the payroll as of the first Sunday date following contract ratification will be reclassified to Regular Full Time.

Term employees in the following titles and work locations will be excluded from this reclassification:

| Number | Title | CBA | Address | City |
|--------|-------|-----|---------|------|
| 1 | STOREKEEPER | IBEW 0827 NJ PLANT/ENG | 109 8TH ST | PASSAIC |
| 1 | STOREKEEPER | IBEW 0827 NJ PLANT/ENG | 150 N MIDLAND AVE | SADDLE BROOK |
| 2 | STOREKEEPER | IBEW 0827 NJ PLANT/ENG | 21 CONSTITUTION AVE | PISCATAWAY |
| 1 | STOREKEEPER | IBEW 0827 NJ PLANT/ENG | 74 ROUTE 73 | VOORHEES |
| 1 | STOREKEEPER | IBEW 0827 NJ PLANT/ENG | 83 NEWARK - POMPTON TURNPIKE | RIVERDALE |
| 1 | STOREKEEPER | IBEW 0827 NJ PLANT/ENG | SHREWSBURY AVE W/C | SHREWSBURY |
| 1 | STOREKEEPER | CWA VA 2222 C&P (40) | 6295 EDSALL RD SUITE 600 | ALEXANDRIA |
| 1 | STOREKEEPER | CWA MD 2100 C&P (40) | 7545 HARMANS RD | HANOVER |
| 1 | STOREKEEPER | CWA 2108 MD C&P (40) | 3210 TUCKER RD | FORT WASHINGTON |
| 8 | ASSISTANT TECHNICIAN | CWA 2105 MD C&P (40) | 5158 WILLIAMSPORT PIKE | MARTINSBURG |
| 1 | STOREKEEPER | CWA 2105 MD C&P (40) | 5158 WILLIAMSPORT PIKE | MARTINSBURG |
| 1 | STOREKEEPER | CWA 13101 DE PLANT | 2 S INDUSTRIAL LN | MILFORD |
| 1 | STOREKEEPER | CWA 2105 MD C&P (40) | 5158 WILLIAMSPORT PIKE | MARTINSBURG |
| 1 | STOREKEEPER | CWA 13101 DE PLANT | 2 S INDUSTRIAL LN | MILFORD |
| 1 | DRAFTER | CWA 13101 DE PLANT | 2 S INDUSTRIAL LN | MILFORD |

The effective date of those being reclassified will be the first Sunday date following contract ratification.

Note: Local 13000 employees reclassified to regular full time will not count towards the 25% cap, as outlined on page 57 of Local 13000's Collective Bargaining Agreement.



**Attachment 3**

August 3, 2008

Mr. Terrance T. Tipping
Assistant to Vice President
CWA, District 13
230 S. Broad Street, 19th floor
Philadelphia, PA  19102

Re: Local Presence Centers

Dear Mr. Tipping:

     In recent years, throughout the Mid-Atlantic region, Local Presence Centers ("LPC") were staffed with vendors to provide a variety of services, including but not limited to drop off/ pick up of equipment, sales, bill payments and inventory management.  During 2008 bargaining, the Companies have agreed to staff the LPCs with bargaining unit employees.

     In particular, Verizon New Jersey Inc., Verizon Pennsylvania Inc., Verizon Delaware Inc., Verizon Virginia Inc., Verizon Washington, D.C. Inc., Verizon West Virginia Inc., and Verizon Maryland Inc. ("the Companies") and the Communication Workers of America, AFL-CIO, ("the Union") agree that:

1.  The Companies will staff the LPCs in Pennsylvania, New Jersey, Delaware, Maryland, Virginia, West Virginia and the District of Columbia with Customer Service Clerks.  These employees will be required to wear neat, Verizon-branded attire.

2.  Employees assigned to the LPCs will have access to and perform functions associated with the SPOT system, a web-based service order system, and will be performing a variety of clerical, inventory and sales functions (such as recommending/selling  products and services, making referrals),  in addition to work related to local payments and equipment pick-up and drop-off.  Neither party will attempt to cite, in any forum or for any purpose, as a basis for contending that a different job title or a different wage rate should be used, the fact that these employees use the SPOT system (or any other order entry system) or perform functions referenced above.

3.  Nothing herein imposes any obligation on the Companies to keep LPCs open for the purposes described above or for any other purposes, and nothing herein prevents the Companies from modifying the functions performed by the Customer Service Clerks in the LPCs.   If the Company does modify functions performed by Customer Service Clerks in the LPC, the Union reserves its rights to request to negotiate over the wage rates or job title under the existing "New Job Titles and Job Classifications" provision of the respective

South CWA

collective bargaining agreements (NJ – Article 9, PA – Article 28, DE – Article 24, Potomac – Article 16B).

4. This Agreement is without prejudice or precedent to the positions that any party may wish to take in any proceeding. In addition, this Agreement, including but not limited to the work assigned hereunder, or which employees performed such work, will not be cited by any party, in any forum or for any purpose, except to enforce the terms of this Agreement, should that be necessary.

5. Any grievances regarding LPC work are hereby withdrawn with prejudice. These grievances are deemed resolved and compromised, and neither party shall proceed further therewith.

6. It is understood that the Company has the right to utilize contractors in Local Presence Centers to the extent permitted by applicable Collective Bargaining Agreements. If the Company decides to permanently replace bargaining unit employees with contractors in a particular Local Presence Centers, or within a geographical and/or franchise area, the Company will discuss such plans with the Union. This agreement does not modify any provision of the parties' Collective Bargaining Agreements, and neither the Union nor the Company waives any of its rights under those Collective Bargaining Agreements.

Please indicate your agreement with the above by signing in the space provided below.

Sincerely,

Executive Director – Labor Relations
Mid-Atlantic

AGREED:

CWA Bargaining Chairperson

### Attachment 4

### Joint Marketing Committee

The parties agree to create a Mid-Atlantic Joint Marketing Committee ("JMC") in the fourth quarter 2008.  The JMC shall be comprised of representatives from the Communications Workers of America (1 representative each from PA/DE, NJ and Potomac) and a CWA District representative, all of whom have primary responsibilities for Commercial issues.  Company representatives shall include management from the National Call Center Support organization (Executive Director – Keith Gill), CSSCs and Labor Relations.

The JMC will meet within 60 days of the ratification of the 2008 contract, four times in 2009 and semi-annually thereafter to discuss ways to further utilize the sales forces and increase revenue generation in the CSSCs, which could, therefore, impact the level of sales/marketing calls handled by vendors.  While both parties desire to have the Consumer Sales and Service Centers ("CSSCs") be the primary channel for handling marketing/sales calls, it is recognized that many factors affect the Companies ability to direct sales/marketing calls into the CSSCs, such as service levels, productivity levels, volume of calls and changes in those volumes, and the amount of non-sales related work.

The JMC is charged with discussing these issues, as well as the issues listed below:

- Marketing calls generated by 1-888-GET-FiOS and similar FiOS marketing campaigns
- Door-to-Door vendors / SPOT tool
- VOL Retention and Billing work
- Pre-Sale vendors (Kippany)
- Credit Screening work
- Review additional revenue generating opportunities for CSSCs
- Explore ways to maximize utilization of forces in the CSSC
- Explore bundled services

JMC will remain in effect for the duration of the 2008 collective bargaining agreements.

**Attachment 5**

**COLLECTIONS CALLS**

During the 2008 contract negotiations, the Mid-Atlantic Companies (Verizon New Jersey Inc., Verizon Pennsylvania Inc., Verizon Delaware Inc., Verizon Virginia Inc., Verizon Washington, D.C. Inc., Verizon West Virginia Inc., and Verizon Maryland Inc.) and the Communications Workers of America, AFL-CIO  (the "Union") discussed how the overflow of incoming collections work would be handled in the Collections Centers.  Notwithstanding the Companies' ability to utilize a vendor to perform collections work, the Companies agree that the incoming (inbound) collections calls generated from customers in the Mid-Atlantic states will be directed first to the Mid-Atlantic Collections Centers to be handled by CWA-represented employees, with the overflow of such calls to be handled by a vendor.

Further, the Companies agree to reclassify existing regular part-time Consultants presently working in the Mid-Atlantic Collection Centers (see attached list) to regular full-time on a voluntary basis, effective the Sunday date following contract ratification.  This does not alter the Companies' rights to utilize part-timers in the Collection Centers.

The Union reserves its rights to challenge the Companies' use of contractors in the Collection Centers under the parties' Collective Bargaining Agreements.  The provisions of the parties' Collective Bargaining Agreements relating to subcontracting remain in effect and this agreement does not modify those provisions.

The parties agree to meet within 60 days following contract ratification to discuss utilization of the collection center forces.

**Attachment 6**

**Agreement Continuation**

The following Common Issues MOU provisions from the 2003 Memorandum of Understanding between Verizon Maryland Inc., Verizon Virginia Inc., Verizon Washington, D.C. Inc., Verizon West Virginia Inc., Verizon Pennsylvania Inc., Verizon Delaware Inc., Verizon New Jersey Inc., Verizon Services Corp., Verizon Corporate Services Corp., Verizon Avenue Inc., and Verizon Advanced Data Inc. and Communications Workers of America, AFL-CIO, effective August 3, 2003 (the "2003 MOU"), with an expiration date of August 2, 2008 (unless otherwise noted) are extended by this 2008 Memorandum of Understanding between Verizon Maryland Inc., Verizon Virginia Inc., Verizon Washington, D.C. Inc., Verizon West Virginia Inc., Verizon Pennsylvania Inc., Verizon Delaware Inc., Verizon New Jersey Inc., Verizon Services Corp., and Verizon Corporate Services Corp. (herein the "Company" or "Companies"), and Communications Workers of America, AFL-CIO (hereinafter the "Union" or "CWA") ("2008 MOU") for the life of the new collective bargaining agreements, with no change in their terms and will be included in the applicable collective bargaining agreement(s):

- Outside Copper Cable Splicing
- Internal v. External Staffing Commitment
- IME Program
- Stress Letter of Understanding
- 1991 Memorandum of Understanding ("PA Information Age Agreement")
- BANI Customer Bid Work Letter
- Letter Agreement on Termination of Outside Contractors
- Letter Agreement on Service Quality Observing
- Letter Agreement on Service Monitoring
- FMLA – Absence for Union Business
- Provisions on Vacation Scheduling Percentage (Percentage is 18%)
- Short Notice Excused Work Days

It is agreed that the following Sections of the 2003 MOU and any associated attachments have been intentionally removed and shall not be renewed: Sections XI (Annual Discussions), XII (Joint Mediation Sessions), XIII (Joint Committee On Absence Control), XIX (Independent Medical Examination Reports), XX (Service Bridging), and XXII (Limited Extension Agreement).

All Local, District and International agreements that were valid and enforceable under the 2003 collective bargaining agreements, and which have not been separately renegotiated by the parties in 2008 negotiations, will continue in effect for the life of the new agreements.

On the subject of oral agreements, there is no intention on the Companies' part to change the status of any oral agreement -- whatever contractual status any oral agreement had during the term of the 2003 contracts will remain unchanged unless a change is made subsequent to collective bargaining.

If there are particular oral agreements that the Union wishes to discuss or which become the subject of a dispute after the contract, the Union may bring them to the attention of Labor Relations. If we are unable to resolve the situation, the dispute can be submitted to arbitration under the applicable contractual arbitration procedures.

**Attachment 7**

**CWA, IBEW AND VERIZON SUPPORT NATIONAL HEALTH CARE REFORM**

For decades CWA, IBEW, Verizon and its predecessors have negotiated quality health care plans for our members, our employees and our retirees. We have committed to this effort as a matter of social responsibility and because it makes good business sense.

American businesses that provide adequate health benefits are at a significant disadvantage, competing in the global marketplace with companies that operate in countries where employers do not directly bear this cost and domestically with employers that provide little or no coverage. Indeed, those employers who provide benefits are actually subsidizing the care of workers whose employers do not. Twenty-one million U.S. workers get their health coverage from an employer other than their own, while many industrialized nations provide significant public financing of health care for their citizens.

The time for talking about this crisis is past. CWA, IBEW and Verizon have come together in the belief that our nation must exert the political will to enact comprehensive health care reform nationwide, rather than state by state, and we must do it soon. It is time to mobilize America behind a concrete plan to enact legislation that will ensure quality health care for all. We are committed to leading the effort to that end. We will work together to achieve meaningful health care reform that meets the following goals:

**Cover Everyone:** Assure quality affordable health care with comprehensive benefits for all Americans.

**Control Costs:** Create a framework that allows insurance companies and the government to offer a choice of affordable public and private options, reduce bureaucracy, and promote prevention and cost-effective care.

**Shared Responsibility:** Spread financing through the system and assure that government, employers and individuals participate in paying their fair share.

**Improve Quality:** Promote preventive care, evidence-based care and safe staffing standards and expand use of Health Information Technology.

CWA, IBEW and Verizon agree to form a Labor and Management Partnership for Health Care Reform in order to support efforts to educate Verizon employees and the public about the health care crisis and options for solutions that meet our principles. The company agrees to make an annual contribution of $2.0 million for each of the next three years to support that effort, unless federal legislation largely achieving the objectives is signed into law before then.

The purpose of the Partnership will be to conduct research and analysis of the current health care delivery system, including the financing of the employment-based group health

insurance system that covers 160 million Americans, and to develop and support health care reform proposals that will meet our shared principles.

Among the tasks that the Partnership will undertake are:

- Research and analyze the means and mechanisms to:
- Effectively control health care costs in the broader economy
- Assess alternative approaches to providing health care for pre-65 workers and retirees
- Educate and publicize about health care issues and solutions.
- Participate in other coalitions which share our views.
- Mobilize political support for our position.

The first meeting of the Partnership will take place one month after the ratification of the collective bargaining agreement. The partnership shall be established under the authority of Sec (6b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. Sec. 175a and Sec. 302(c)(9) of the Labor-Management Relations Act, 29 U.S.C. Sec. 186(c)(9).

The Governing Board will consist of six members - three appointed by CWA and IBEW combined and three appointed by Verizon. The annual budget, work plan, coalition participation and public policy positions must be approved by a majority of the Board. Expenditures must be approved by the Board and any funds contributed by Verizon and not expended are to be returned to Verizon when the project ends.

## Attachment 8

Discussions – Three Times Annually

The Union understands the Company's need to control costs and operate efficiently as we compete in the telecommunications industry.  Verizon's future in the industry will be reflected in the efforts of its IBEW and CWA represented employees.  In order for Verizon to succeed and for union members to have enhanced employment security, the parties will discuss changes in methods of operations in order to deal with this competitive situation.  These discussions will include Verizon's use of outsourcing.

The Union (IBEW and CWA) and the Company will agree to meet three times a year to discuss these issues and the subject of jobs.

The Committee will be comprised of the eight members of the current Union bargaining team. The Company should have an equal number of decision-making managers.  The Committee will address the following issues:

1.     The competitiveness of the Telecommunications Industry.
2.     The future of union jobs.
3.     Work Flexibility , Cost structure, productivity, and growth.

The Company's operational results, including productivity and absence, changes in headcount, financial results, and the results and impact of our competitors will also be discussed at these meetings.

**Attachment 9**

## VIDEO HUB TECHNICIAN AGREEMENT

Verizon New York Inc. ("VZNY"), Verizon Services Corp. ("VSC"), Verizon Corporate Services Corp. ("VCSC"), Verizon Maryland Inc. ("VZMD"), Verizon Virginia Inc. ("VZVA"), Verizon Washington, D.C. Inc. ("VZDC"), Verizon West Virginia Inc. ("VZWV"), Verizon Pennsylvania Inc. ("VZPA"), and Verizon Delaware Inc. ("VZDE"), collectively ("Company") and the Communications Workers of America, AFL-CIO and its local unions and affiliates ("CWA" or "Union"), hereby agree that certain job duties currently performed by management employees in the job title Engineer –Network Engineering, also known as Video Engineer ("Video Engineer"), should be performed by employees who are part of the "plant" bargaining units in the various states where Video Engineers perform their duties.  Accordingly, the parties agree as follows:

1.  Effective December 28, 2008, the Company will create a new job title and/or occupational classification to be populated by its employees, Video Hub Technician ("VHT"), which will be added to each of the "plant" bargaining units covering Connecticut, New York, Pennsylvania, Delaware, Maryland, Virginia, West Virginia and the District of Columbia.  The Company will initially hire new employees into, or permit existing Video Engineers to be employed in, the VHT job title and/or occupational classification, who will be assigned to existing Video Hub Offices ("VHO") listed on Attachment A, or any new VHOs that the Company establishes in Connecticut, New York, Pennsylvania, Delaware, Maryland, Virginia, West Virginia or the District of Columbia.

2.  The Recognition clauses of each Plant contract covering a state where VHTs perform their duties shall be revised to provide the Union as exclusive representative for the purpose of collective bargaining with respect to rate of pay, wages, hours of employment or other conditions of employment of Video Hub Technicians who work in any Video Hub Office that is staffed with Video Hub Technicians, and that is located within the states of Connecticut, New York, Pennsylvania, Delaware, Maryland, Virginia, West Virginia and the District of Columbia.

3.  Routine monitoring, troubleshooting, maintenance and repairs on the video network and equipment conducted in the VHO using established methods and procedures shall be performed by VHTs and shall be bargaining unit work.  Any other work in the VHO may be assigned by management to VHTs or management or both (except that supervision of other employees is exclusively a management function).  Assignment, change, or removal of the other work duties described in the immediately preceding sentence shall not be grieved, arbitrated or otherwise challenged in any proceeding, including but not limited to, before any court or state or federal agency such as the NLRB.  This shall include, by way of example but not limitation, claims that such other work duties are exclusively bargaining unit work, or are exclusively management duties, or constitute a change in job duties requiring additional compensation.

4. All terms and conditions of employment set forth in the "Plant" agreements will apply to any employee working in the VHT job title and/or occupational classification, except as otherwise set forth herein or contained in Attachment C.

5. Video Engineers who become employed in the VHT job title and/or occupational classification and whose current base wage rate exceeds the maximum wage rate contained on the wage schedule set forth in Attachment B will be paid at their current base wage rate and will receive the annual percentage increases to their base wage equal to the increases negotiated by the Union for all other technicians, commencing with the increase scheduled for August 2, 2009 under the 2008 Labor Agreements. A list identifying these particular employees will be provided to the Union no later than December 22, 2008. The Wage Rates and Progression Schedules for all other employees assigned or hired into the VHT job title and/or occupational classification for the period December 28, 2008 through August 6, 2011 are set forth in Attachment B, subject to the annual percentage increases commencing with the increase scheduled for August 2, 2009, negotiated by the Union in the 2008 Labor Agreements.

6. For an employee who becomes employed in the VHT job title and/or occupational classification, the net credited service date ("NCS Date") under the Verizon Pension Plan for New York and New England Associates or the Verizon Pension Plan for Mid-Atlantic Associates, as applicable:

    (a) shall, for purposes of determining retirement pension eligibility, recognize prior service with any entity that is eighty percent (80%) or more owned directly or indirectly by Verizon Communications Inc. and prior service with MCI, Inc. (subject to any service bridging/break in service rules under the relevant plan); and

    (b) shall, for purposes of pension accrual, be the initial date of employment in the VHT job title and/or occupational classification. Prior service with any entity will not be counted for purposes of pension accrual. To the extent existing pension plan provisions are more favorable for any particular employees, those plan provisions will be honored.

7. (a) Except as described in paragraph (c) below, the initial complement of employees who become employed in the VHT job title and/or occupational classification on December 28, 2008 shall be eligible for the "New Hire" retiree medical coverage within the meaning of the retiree medical provisions of the applicable 2008 Memorandum of Understanding. For purposes of determining the level of the benefit under the "New Hire" retiree medical coverage, service shall be credited beginning with the date the employee is first employed by an entity which at that time is eighty percent (80%) or more owned directly or indirectly by Verizon Communications Inc. Prior service with any entity shall not be counted for this purpose if that service was with an entity prior to its becoming eighty percent (80%) or more owned directly or indirectly by Verizon Communications Inc.

2

(b) Except as described in paragraph (c) below, employees who become employed in the VHT job title and/or occupational classification after the initial complement of VHTs become employed on December 28, 2008, shall be eligible for the "New Hire" retiree medical coverage within the meaning of the retiree medical provisions of the applicable 2008 Memorandum of Understanding. For purposes of determining the level of the benefit under the "New Hire" retiree medical coverage, service shall be credited beginning with the initial date of employment with the Company in the VHT job title and/or occupational classification. Prior service with any entity will not be counted for purposes of retiree medical entitlement under the "New Hire" retiree medical coverage.

(c) In lieu of the "New Hire" retiree medical provisions in (a) and (b), employees who become employed in the VHT job title and/or occupational classification after having been employed in another position under which the employee was entitled to participate in a Verizon company-subsidized retiree medical plan shall have their retiree medical benefit entitlement determined by the pension plan in which they participate upon their employment in the VHT job title and/or occupational classification, e.g., such employees covered by the Verizon Pension Plan for New York and New England Associates shall be eligible for retiree medical benefits provided by the Verizon Medical Expense Plan for New York and New England Associates, and their service under the prior retiree medical plan shall be credited and they shall continue to receive service credit while employed as a VHT.

8. The Union will withdraw with prejudice the grievances it has filed against Verizon Services Corp., Verizon Corporate Services Corp., Verizon Delaware Inc., Verizon Maryland Inc., Verizon New York Inc., Verizon Pennsylvania Inc., Verizon Virginia Inc., Verizon West Virginia Inc., or Verizon Washington, DC Inc., that claim in any manner that such companies violated their respective collective bargaining agreements with the Union by not assigning to bargaining unit employees the work currently performed by the Video Engineer. The grievances are: G06-012355 (New York), G08-005380 (New York), G08-006355 (New York), G08-006358 (New York), ER-001-06 (Arbitration Case #0128-06) (Pennsylvania); G08-007854 (Virginia), G08-006293 (Virginia), G06-011496 (Virginia), and G06-014552 (Virginia).

9. The Union, as an organization and on behalf of its members, hereby waives and releases any claim existing at the time of execution of this agreement against any or all of Verizon Communications Inc., its local exchange carrier operating companies and their service companies including Verizon Services Corporation, and/or any of their current or future divisions, units, agents, subsidiaries or affiliates in Connecticut, Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia, or the District of Columbia, that Video Engineers employed in Video Hub Offices should be accreted to any bargaining unit, or that CWA-represented employees other than VHTs in any company are entitled to perform work in the Video Hub Offices, or that bargaining unit work was transferred to Video Hub Offices unlawfully or in violation of any agreement, or that the performance of work by management employees in Video Hub Offices violates any agreement.

10. This agreement shall not in any way be construed as an admission by Verizon Services Corp., Verizon Corporate Services Corp., Verizon Delaware Inc., Verizon Maryland Inc., Verizon New York Inc., Verizon Pennsylvania Inc., Verizon Virginia Inc., Verizon West Virginia Inc., or Verizon Washington, DC Inc., that any or all of them, or any of the past, current or future divisions, units, agents, subsidiaries or affiliates of Verizon Communications Inc., acted wrongfully.  Furthermore, the parties agree that this agreement does not constitute an adjudication of the merits of G06-012355 (New York), G08-005380 (New York), G08-006355 (New York), G08-006358 (New York), ER-001-06 (Arbitration Case #0128-06) (Pennsylvania); G08-007854 (Virginia), G08-006293 (Virginia), G06-011496 (Virginia), G06-014552 (Virginia) or any other matter. Accordingly, the parties agree that none of them has prevailed on the merits of G06-012355 (New York), G08-005380 (New York), G08-006355 (New York), G08-006358 (New York), ER-001-06 (Arbitration Case #0128-06) (Pennsylvania); G08-007854 (Virginia), G08-006293 (Virginia), G06-011496 (Virginia), or G06-014552 (Virginia), and that this agreement shall not serve or be construed as evidence that any party has so prevailed.

11. This agreement supersedes all other agreements between the parties as pertains to the grievances identified in this agreement.  The parties agree that they will work to amend any other current agreements between them as necessary to conform them to this agreement.

12. The parties agree that this agreement is without precedent and that neither party may refer to this agreement in any other grievance, arbitration, or other proceeding, except as necessary to enforce the terms of this agreement itself.

13. If the validity of one or more provisions of this agreement is challenged in a court of law or before the NLRB, the Company and the Union will cooperate and take all necessary steps to defend the validity of the agreement. If one or more of the provisions of the agreement is declared void, the parties will modify the agreement, if possible, in a manner consistent with the law and the parties' original intent.  If the parties are unable to agree upon a modification of the agreement, the provision of the agreement declared void (other than Paragraph 1) will be deemed to be severed from the agreement, and the remaining provisions will remain in full force and effect.  If Paragraph 1 is declared void, and the parties cannot agree upon a modification of the agreement which is consistent with the law and the parties' original intent, the agreement shall be void and without any effect.

14. This agreement shall be binding and effective upon the parties and upon their respective predecessors, successors, and assigns.

15. This agreement may be executed in two or more counterparts, each of which counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.  Fax copies shall be deemed originals.

Executive Director,
Labor Relation – NY-NE

Executive Director,
Labor Relations – Mid-Atlantic

_____(Title)
Communications Workers
of America, AFL-CIO

ASSISTANT TO V.P. (Title)
Communications Workers
of America, AFL-CIO

5

## ATTACHMENT A

## <u>VIDEO HUB OFFICE LOCATIONS</u>

- o  Queens, NY
  71-40 164th Street, Flushing, NY 11365

- o  Buffalo, NY
  548 Elmwood Ave., Buffalo, NY 14222

- o  Silver Spring, MD
  13101 Columbia Pike, Silver Spring, MD 20904

- o  Philadelphia, PA
  17 East Oregon Ave., Philadelphia, PA 19148

- o  Pittsburgh, PA
  3096 Sassafras Way, Pittsburgh, PA 15201

- o  Richmond, VA
  3011 Hungary Spring Road, Richmond, VA 23228

- o  Norfolk, VA
  3131 B Sewells Point Road, Norfolk, VA 23513

- o  Harrisburg, PA
  210 Pine Street, Harrisburg, PA 17101

## ATTACHMENT B

## VHT WAGE AND PROGRESSION SCHEDULE

### Pennsylvania

| Video Hub Technician (36 Mos) | | | |
|---|---|---|---|
| | | Weekly Rates | |
| Wage Step | Next Increase Interval | Wage Rate | Increase Amount |
| Start | 6 Mos. | $ 810.00 | |
| 6 Mos. | 6 Mos. | $ 889.00 | $ 79.00 |
| 12 Mos. | 6 Mos. | $ 968.00 | $ 79.00 |
| 18 Mos. | 6 Mos. | $ 1,047.00 | $ 79.00 |
| 24 Mos. | 6 Mos. | $ 1,126.00 | $ 79.00 |
| 30 Mos. | 6 Mos. | $ 1,205.00 | $ 79.00 |
| 36 Mos. (Maximum) | | $ 1,285.00 | $ 80.00 |
| Pension Band | | 121 | |

### Potomac

| Video Hub Technician (36 Mos) | | | | | |
|---|---|---|---|---|---|
| | | Weekly Rates | | Weekly Rates | |
| Wage Step | Next Increase Interval | Wage Rate Zone A | Increase Amount | Wage Rate Zone B | Increase Amount |
| Start | 6 Mos. | $ 816.00 | | $ 794.00 | |
| 6 Mos. | 6 Mos. | $ 894.50 | $ 78.50 | $ 871.50 | $ 77.50 |
| 12 Mos. | 6 Mos. | $ 973.00 | $ 78.50 | $ 949.00 | $ 77.50 |
| 18 Mos. | 6 Mos. | $ 1,051.50 | $ 78.50 | $ 1,026.50 | $ 77.50 |
| 24 Mos. | 6 Mos. | $ 1,130.00 | $ 78.50 | $ 1,104.00 | $ 77.50 |
| 30 Mos. | 6 Mos. | $ 1,208.50 | $ 78.50 | $ 1,181.50 | $ 77.50 |
| 36 Mos. (Maximum) | | $ 1,287.50 | $ 79.00 | $ 1,260.00 | $ 78.50 |
| Pension Band | | 121 | | 120 | |

### New York

| Video Hub Technician (36 Mos) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Weekly Rates | | Weekly Rates | | Weekly Rates | |
| Wage Step | Next Increase Interval | Wage Rate Zone 1 4 Boroughs | Increase Amount | Wage Rate Zone 1 Rem Zone 1 | Increase Amount | Wage Rate Zone 2 | Increase Amount |
| Start | 6 Mos. | $ 1,267.00 | | $ 1,267.00 | | $ 1,243.00 | |
| 6 Mos. | 6 Mos. | $ 1,293.00 | $ 26.00 | $ 1,293.00 | $ 26.00 | $ 1,267.50 | $ 24.50 |
| 12 Mos. | 6 Mos. | $ 1,319.00 | $ 26.00 | $ 1,319.00 | $ 26.00 | $ 1,292.00 | $ 24.50 |
| 18 Mos. | 6 Mos. | $ 1,345.00 | $ 26.00 | $ 1,345.00 | $ 26.00 | $ 1,316.50 | $ 24.50 |
| 24 Mos. | 6 Mos. | $ 1,371.00 | $ 26.00 | $ 1,371.00 | $ 26.00 | $ 1,341.00 | $ 24.50 |
| 30 Mos. | 6 Mos. | $ 1,397.00 | $ 26.00 | $ 1,397.00 | $ 26.00 | $ 1,365.50 | $ 24.50 |
| 36 Mos. (Maximum) | | $ 1,424.00 | $ 27.00 | $ 1,424.00 | $ 27.00 | $ 1,391.00 | $ 25.50 |
| Pension Band | | 126 | | 126 | | 125 | |



## ATTACHMENT C
## EXCEPTIONS TO CBAs

As stated in Paragraph 4 of this agreement, all terms and conditions of employment set forth in the "Plant" agreements will apply to any employee working in the VHT job title and/or occupational classification, except as otherwise set forth in the agreement or contained in this Attachment C.  Where any provision in the agreement or in this Attachment C contradicts, conflicts with, or is inconsistent with the existing collective bargaining agreements (collectively "Labor Agreements"), including any Labor Agreements entered into during the 2008 contract negotiations, the provisions set forth in the agreement and this Attachment C shall apply and shall supersede any such contradictory, conflicting or inconsistent provision in the applicable Labor Agreements for employees in the VHT job title and/or occupational classification.

### A.  JOB TITLES

- In making determinations regarding assignment of work, the Company shall consider the individual's performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies.

### B.  STAFFING

- The workforce in the VHT job title and/or occupational classification may be drawn from the following categories of individuals:

    o  Existing video hub employees;

    o  Employees of the operating telephone companies who may be eligible to be considered for employment in the VHT job title and/or occupational classification and are, as determined by the Company, qualified for it;

    o  Applicants who are not employees of the operating telephone companies and are qualified for the VHT position.

- When filling any VHT positions, except as otherwise provided for in this agreement, the Company:

    o  shall not be required to satisfy any existing contractual internal or external posting requirements or preferential hiring requirements;

    o  shall provide notice of job openings in the VHO to existing Company employees through existing processes;

    o  shall consider the candidates' performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies.  The Company will give existing Company employees equal consideration as is given to other

8



candidates in filling new positions and shall hire the Company employee when the qualifications of Company and non-Company candidates are substantially equal;

o   may make use of knowledge tests and interviews;

o   will apply the same selection standards in considering surplus employees of the Company as it does in considering those who are not surplus employees of the Company;

o   may pay any new hire at a rate that is higher than the start rate under the applicable wage schedule on Schedule B.

- No pre-test training shall be provided by the Company for the VHT job title and/or occupational classification.

- Generally, seniority will only be used as a tiebreaker when all other qualifications are substantially equal.

## C. JOB SECURITY

- No person employed by the Company in the VHT job title and/or occupational classification shall be covered by the Job Security Letter in the Labor Agreements or by the provisions with respect to "No Involuntary Layoffs, etc." and "Change in Business Conditions" contained in the "Agreement Concerning Issues Related to the Bell Atlantic-GTE Merger," which is an attachment to the parties' Memorandum of Agreement covering the Mid-Atlantic states in the Labor Agreements (collectively with the Job Security Letter, "JSL") during the period in which they are so employed. Any employee of the Company who, immediately prior to becoming employed by the Company in the VHT job title and/or occupational classification was covered by the JSL in the Labor Agreements shall not forfeit coverage under the JSL for the period of their employment with the Company in such job title and/or occupational classification, provided that if a VHT would otherwise be laid off were it not for the individual's coverage under the JSL, the VHT shall be reassigned to another non-VHT position (with the same general wage rate in the same geographical area) in the Company for which the individual is qualified.

## D. TRANSFER OF JOBS

- NY/NE -- The "Agreement Concerning Issues Related to the Bell Atlantic-GTE Merger," which is an attachment to the parties' Memorandum of Agreement, does not apply to any of the job classifications or positions covered by the Settlement Agreement.

- Mid-Atlantic -- The provisions contained in the "Agreement Concerning Issues Related to the Bell Atlantic-GTE Merger," which is an attachment to the parties' Memorandum of Agreement, with respect to Limitations on Transfers of Jobs, do not apply to any of the job classifications or positions covered by the Settlement Agreement.



### E. LAYOFFS

- In the event of the layoff of any employee of any Verizon Communications Inc. subsidiaries or affiliates, persons occupying the VHT job title and/or occupational job classification:

  - shall not be subject to being displaced or bumped by any employee; and

  - shall not be permitted to displace or bump any employee in another job title and/or occupational classification.

- Any force adjustment plan or similar or related provisions of the Labor Agreements or any other labor agreements shall not apply to persons occupying the VHT job title and/or occupational classification.

- When the Company determines, in its discretion, to declare a surplus of VHTs within a VHO, the following will apply:

  - The Company will give the Union 15 days advance notice of a surplus which could lead to a layoff.

  - Following the 15-day notification period, the Company will solicit VHTs within the VHO, by seniority order, to volunteer to leave the business with the layoff allowance specified in the Labor Agreement. VHTs will have 14 calendar days to decide whether to take the volunteer offer to leave the business. The Company will determine the off-payroll date for those VHTs who volunteer to leave the business.

  - To the extent there are insufficient volunteers to relieve the surplus, the Company shall lay off VHTs by inverse order of seniority. Those VHTs who are laid off will receive the layoff allowance specified in the Labor Agreement.

  - Laid off employees shall be recalled in the inverse order in which such laid off employees were laid off to a vacancy in the job title and/or classification from which the layoff occurred, or to a vacancy in a lower job title or classification for which the employee is qualified, within two year of the layoff.

### F. SENIORITY

- For persons in the VHT job title and/or occupational classification, seniority for all purposes under the Labor Agreements other than as specified in Paragraphs 6 and 7 of this agreement, shall be determined by reference to NCS Date for pension eligibility purposes under the Verizon Pension Plan for New York and New England Associates or the Verizon Pension Plan for Mid-Atlantic Associates, as applicable.



## G.  WORK SCHEDULES

- Persons in the VHT job title and/or occupational classification may be assigned to a normal tour consisting of any five 8-hour days within a calendar week.  Such persons may, at the Company's discretion, be assigned to a normal tour consisting of any four 10-hour days within a calendar week, with daily overtime (where such would otherwise be required by the local collective bargaining agreement) applying only to time worked in excess of 10 hours in any day.  Such persons will not be eligible for Saturday differentials and/or premiums, but will receive a fifty percent (50%) differential for Sunday.

- The Company may assign tours to employees occupying the VHT title and/or occupational classification based upon the performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies of employees.  By Thursday of any week, the Company shall post any changes in tours for the succeeding calendar week.

- The Company may take into account performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies in the assignment and distribution of overtime.  To the extent practical and consistent with business needs, the Company, before requiring employees to work overtime, will request volunteers from among the qualified VHTs in the VHO in which overtime will be worked.  The Company shall make a good faith effort to allot overtime equally among VHTs over the course of a calendar quarter.

- In assigning work schedules and the assignment and distribution of overtime, seniority will only be used as a tiebreaker when all other qualifications are substantially equal.


## H.  WORK BY MANAGEMENT

- Supervisors and other management employees may occasionally perform work normally done by employees represented by the Union.  Supervisors and other management employees shall not perform such work where it would result in any long term reduction of bargaining unit work.  However, supervisors and other management employees may perform work normally done by Union employees in limited and unusual situations in which the available work force is insufficient to meet work needs, emergencies, training activities (which may be performed by supervisors or assigned to represented employees), and assistance incidental to a supervisory review of subordinates' work or assisting in resolving problems.

## I.  OTHER

- The Company may use contractors to perform any of the work performed by VHTs, provided that the Company may not use contractors to perform such work if it would currently and directly cause layoffs or part-timing of VHTs.  Any provisions of the Labor Agreements that can or may otherwise restrict the use of contract labor or the contracting out of work shall not apply to the work performed by the VHTs.

- Where the grievance procedure of the labor agreements covering the VHTs exceeds two steps, those labor agreements shall be modified to provide for only two steps, the second or top step of which will be heard at the Labor Relations level.



**Attachment 10**

**SETTLEMENT AGREEMENT**

This Settlement Agreement ("Agreement") is made and entered into by the Communications Workers of America, AFL-CIO and its local unions and affiliates ("CWA"), Verizon New York Inc. ("VZNY"), Verizon Avenue Inc. ("VZA"), Verizon Advanced Data Inc. ("VZAD"), Verizon New England, Inc. ("VZNE"), Empire City Subway Company Limited ("ECS"), Verizon Services Corp. ("VSC"), Verizon Corporate Services Corp. ("VCSC"), Verizon Maryland Inc. ("VZMD"), Verizon Virginia Inc. ("VZVA"), Verizon Washington, D.C. Inc. ("VZDC"), Verizon West Virginia Inc. ("VZWV"), Verizon Pennsylvania Inc. ("VZPA"), Verizon Delaware Inc. ("VZDE"), Verizon New Jersey Inc. ("VZNJ"), Verizon Business Global LLC ("VZB"), and MCI Communications Services, Inc. ("MCS").  For purposes of this Agreement, "Service Company" shall mean VSC or another company designated by VZNY, VZA, VZAD, VZNE, ECS, VSC, VCSC, VZMD, VZVA, VZDC, VZWV, VZPA, VZDE or VZNJ to perform the work described in Paragraph 1 below, that is or becomes party to a collective bargaining agreement with CWA.

WHEREAS, the company parties to this Agreement other than VZB and MCS ("Companies"), on the one hand, and CWA, on the other, are parties to certain collective bargaining agreements ("Labor Agreements");

WHEREAS, CWA represents employees in bargaining units ("Bargaining Units") covered by the above-mentioned Labor Agreements, including: plant employees in various technical and related occupations, commercial employees in various sales, customer care and related occupations, operators in various operator and related occupations, and accounting employees in various accounting, billing and related occupations;

WHEREAS, prior to January 6, 2006, the Companies served their largest business customers ("Enterprise Customers") through an organization known as the Enterprise Solutions Group ("ESG");

WHEREAS, the Companies' employees in the Bargaining Units performed services on behalf of ESG prior to January 6, 2006;

WHEREAS, on January 6, 2006, Verizon Communications Inc, the parent company of the Companies, acquired MCI, Inc. ("MCI");

WHEREAS, after January 6, 2006, MCI, renamed as VZB, became the organization responsible for serving the Enterprise Customers of the Companies;

WHEREAS, MCS is the subsidiary of VZB engaged in the installation, maintenance and operation of VZB's network throughout the United States;

WHEREAS, on or about October 5, 2006, CWA filed an initial grievance against VZNY, VZA, VZAD, VZNE, ECS, VCSC and the predecessor to VSC, pursuant to Labor Agreements that contain a grievance process, at Third Step entitled Improper Transfer, Removal and Assignment of Past, Existing and New Bargaining Unit Work, Grievance No. G06-015053;

WHEREAS, VZNY, VZA, VZAD, VZNE, ECS, VCSC and the predecessor to VSC denied CWA's Grievance No. G06-015053;

WHEREAS, CWA filed a demand for arbitration of Grievance No. G06-015053;

WHEREAS, Grievance No. G06-015053 was heard in arbitration on several hearing dates in May, June and July 2008;

WHEREAS, CWA has alleged in the arbitration that, among other things:

(i)     The work at issue has been historically performed by, or is the same as or equivalent to work performed by, employees of VZNY, VZA, VZAD, VZNE, ECS, VCSC and the predecessor to VSC in the Bargaining Units;

(ii)    ESG and MCI were integrated to form Verizon Business;

(iii)   VZNY, VZNE, VZA, VZAD, ECS, VCSC and the predecessor to VSC have violated the CBAs and MOAs, including but not limited to the recognition clauses, transfer of work provisions, Old Business Letter and the New Businesses Agreement, by:

(1)     Removing and transferring to Verizon Business and non-union Verizon Business employees work performed by each of the Bargaining Units; and

(2)     Not applying the terms of the Labor Agreements to the work performed by Verizon Business employees which is the same as or equivalent to work performed by the Companies' employees in the Bargaining Units represented by CWA.

(iv)    Any remedy provided should be for the entire Thirteen-State/DC Area because the facts and circumstances are the same throughout that area;

WHEREAS, CWA has filed other grievances against certain of the Companies pursuant to the Labor Agreements, alleging that Bargaining Unit work was transferred to Verizon Business in violation of the Labor Agreements, including but not limited to:  Grievance Nos. C08-22/23-194 (New Jersey), C08-22/23-195 (New Jersey), 13500-07044 (Pennsylvania), 13500-07045 (Pennsylvania), 13500-06088 (Pennsylvania), and an Executive Level grievance filed in Potomac on 4/26/2006;

WHEREAS, the Companies denied and continue to deny the allegations of CWA's grievances;

WHEREAS, the parties now desire to settle these and all of the matters referred to herein on a non-precedential basis, they agree as follows:

1.  Work By Service Company.  The work described below in this Paragraph 1(a) and 1(b) performed on the VZB network, and in this Paragraph 1(c) performed for VZB network products and services, within the Thirteen-State/DC Area where CWA represents employees of the Companies performing the same or equivalent work shall be contracted to a Service Company that is or becomes a party to a Labor Agreement with CWA.  For purposes of this Agreement, "Thirteen-State/DC Area" shall mean the area comprised of the thirteen states of Maine, New

Hampshire, Vermont, Rhode Island, Massachusetts, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, and the District of Columbia:

    (a)    effective as of December 28, 2008, the work of the Thirteen-State/DC Area Apprentice Technicians, Technicians, Advanced Technicians, and Senior Technicians currently employed by MCS, including the performance of wiring, the making of physical connections, the installation and testing of equipment and circuits, in the central offices, outside plant, and on customer premises, required for purposes of filling customer orders, the repair or maintenance of malfunctioning circuits, and connecting customer premises to the network. Service Company shall be the sole contractor for this work and shall perform this work exclusively. Currently there are approximately 445 MCS employees in such positions in the Thirteen-State/DC Area, but that number may fluctuate based upon business needs;

    (b)    effective as of December 28, 2008, the work of the Thirteen-State/DC Area Apprentice Technicians, Technicians, Advanced Technicians, and Senior Technicians currently employed by MCS in its Operation Support Centers, including the performance of remote on-net local metro private line circuit activation, LD DS-3 remote connections in SONET and DXC platforms, LD switch IMT and FG-D activations, repair of LD switch and DS-3 level circuits, escalation and coordination of LEC DS-3 repair, statusing customers regarding installation or repair activity, and field force coordination as required for the above described activities. Service Company shall be the sole contractor for this work and shall perform this work exclusively. Currently there are approximately 145 MCS employees in such positions in the Thirteen-State/DC Area, but that number may fluctuate based upon business needs;

    (c)    (1) effective as of October 25, 2009 the equivalent of one hundred (100) full-time employees performing commercial work, such as order implementation and processing, for VZB network products and services that CWA-represented employees do not perform as of the date of this Agreement, and (2) effective as of no later than October 24, 2010, the equivalent of an additional one hundred (100) full-time employees performing commercial work, such as order implementation and processing, for VZB network products and services that CWA-represented employees do not perform as of the date of this Agreement, and (3) effective as of October 25, 2009, the order implementation and processing work for the sale of VZB network products and services to the small- and medium-size business customer market corresponding to the same type of work currently performed by Representative, Special Representative and other commercial titles in CWA District One, and comparable titles in District Two, District Thirteen and District One in New Jersey. Service Company shall be the sole contractor for the work described in subparagraph 1(c)(3) and shall perform this work exclusively. The work described in subparagraph 1(c)(3) shall not be considered part of the work of the two hundred (200) full-time equivalents described in subparagraphs 1(c)(1) and 1(c)(2) above. Nothing in this subparagraph 1(c)(3) shall prejudice the Service Company's right to contract out work to the extent permitted under the applicable Labor Agreement. Service Company employees shall be provided computer access to and be trained on the VZB network products and services to the extent necessary to perform their work under this subparagraph 1(c).

2.  <u>Performance of Work at Service Company</u>.  The Labor Agreements between CWA and Service Company shall provide that CWA bargaining unit employees of Service Company shall perform the work described in Paragraph 1 within the Thirteen-State/DC Area where CWA currently represents employees of the Companies performing the same or equivalent work.

(a)       Service Company shall create one or more new job title(s) and/or job classification(s) for the performance of the work described in subparagraphs 1(a) and 1(b), and shall recognize CWA as the bargaining representative of the employees in those new job title(s) and/or job classification(s).  Employees within these job title(s) and/or classification(s), including those working in Connecticut, shall be included in the VZNY "Plant" bargaining unit in New York and in the corresponding VZMD, VZVA, VZDC, VZWV, VZPA or VZDE bargaining units outside of New York that cover "Plant" employees, and shall be paid in accordance with attached Schedule A.  The provisions of the appropriate "Plant" Labor Agreements shall apply to Service Company employees within these job title(s) and/or classification(s), except as modified as set forth in Schedule B.1, attached hereto.

(b)     (1)  The work described in subparagraphs 1(c)(1) and 1(c)(2) shall be performed by existing or new CWA bargaining unit employees of Service Company within the Thirteen-State/DC Area where CWA currently represents employees of the Companies performing the same or equivalent work and shall be included in the VZNY "Commercial" bargaining unit in New York and the corresponding VZMD, VZVA, VZDC, VZWV, VZNJ, VZPA or VZDE bargaining units outside of New York that cover "Commercial" employees.  The work described in subparagraph 1(c)(1) shall be performed by employees represented by CWA in District One.  The work described in subparagraph 1(c)(2) shall be performed by employees in areas represented by CWA in District Two, District Thirteen and District One in New Jersey.  The work described in subparagraphs 1(c)(1) and 1(c)(2) shall be performed by employees represented by CWA in appropriate titles, primarily by the Representative and Special Representative titles in CWA District One, and comparable titles in District Two, District Thirteen and District One in New Jersey.  The provisions of the appropriate Labor Agreements covering "Commercial" employees shall apply to Service Company employees within these job title(s) and/or classification(s), except as modified as set forth in Schedule B.2, attached hereto.

(2)  The work described in subparagraph 1(c)(3) shall be performed by existing CWA bargaining unit employees of Service Company within the Thirteen-State/DC Area where CWA currently represents employees of the Companies performing the same or equivalent work and shall be included in the appropriate Labor Agreement covering "Commercial" employees.  The provisions of the appropriate Labor Agreements covering "Commercial" employees shall apply to Service Company employees within these job title(s) and/or classification(s).  To the extent that CWA bargaining unit employees currently sell to the small- and medium-size business customer market as of the date of this Agreement, that sales work will continue under the applicable Labor Agreement.

3.  <u>Hiring at Service Company.</u>  With respect to the work described in subparagraphs 1(a) and 1(b) above, at a designated time prior to December 28, 2008, MCS employees performing such work shall have the opportunity, if they so choose, to express an interest in being hired into

the positions at Service Company to be created in connection with this Agreement that are the same as or equivalent to the position that they currently hold.  During this period, and notwithstanding the provisions of any other agreement, such employees who express an interest and are on the payroll on December 27, 2008 shall be hired to perform work described in subparagraphs 1(a) and 1(b) above.  Positions will be filled pursuant to the applicable provisions set forth in Schedule B.1.

4.   <u>Dismissal of Grievances.</u>  The parties agree to the dismissal with prejudice of Grievance Nos. G06-015053 (New York/New England), C08-22/23-194 (New Jersey), C08-22/23-195 (New Jersey), 13500-07044 (Pennsylvania), 13500-07045 (Pennsylvania), 13500-06088 (Pennsylvania), the April 26, 2006 Potomac Executive Level grievance, and any other case of any kind or nature in the Thirteen-State/DC Area raising the issue of whether the transfer of any work to, or the performance of any work by, VZB or MCS violates the Labor Agreements.

5.   <u>Waiver of Claims.</u>  The parties agree as follows:

(a)  CWA promises and agrees that, in connection with any arbitration, and in connection with any other legal, equitable or administrative suit, proceeding or charge arising subsequent to the effective date of this Agreement between CWA and Verizon Communications Inc., VZNY, VZA, VZAD, VZNE, ECS, VSC, VCSC, VZMD, VZVA, VZDC, VZWV, VZPA, VZDE, VZNJ, VZB, MCS, or Service Company, including but not limited to any proceeding before the National Labor Relations Board or its delegate, CWA hereby waives any claim, allegation, or argument, and agrees to refrain from presenting this Agreement, or any action or information related to it, as evidence in support of any claim, allegation or argument, that any or all of Verizon Communications Inc., VZNY, VZA, VZAD, VZNE, ECS, VSC, VCSC, VZMD, VZVA, VZDC, VZWV, VZPA, VZDE, VZNJ, VZB, MCS, Service Company and/or any of their past, current or future subsidiaries and/or their divisions, units, agents, or affiliates, are or have been a single employer, joint employers, alter-egos, or that any employees should be accreted to any bargaining unit, or that CWA-represented employees in any company are entitled to perform any work, to the extent that any such claim, allegation or argument is based upon:

(1)   the claims underlying Grievance Nos. G06-015053 (New York/New England), C08-22/23-194 (New Jersey), C08-22/23-195 (New Jersey), 13500-07044 (Pennsylvania), 13500-07045 (Pennsylvania), 13500-06088 (Pennsylvania), the April 26, 2006 Potomac Executive Level grievance, any case dismissed in accordance with this Agreement, or any claims made or any action taken in connection with, in relation to, or as a result of this Agreement;

(2)   access to systems, equipment, accounts or training associated with this Agreement or its implementation, or the management, supervision or direction of employees associated with this Agreement or its implementation, or any changes in the administration and/or control of labor relations by Verizon Communications Inc., VZNY, VZA, VZAD, VZNE, ECS, VSC, VCSC, VZMD, VZVA, VZDC, VZWV, VZPA, VZDE, VZNJ, VZB, MCS, Service Company and/or any of their past,

current or future subsidiaries and/or their divisions, units, agents, or affiliates as a result of this Agreement or its implementation; or

(3) any change in the scope, availability in employees, or administration by management of any program or practice for the effectuation of employee-initiated transfers between or among different subsidiaries or bargaining units as a result of this Agreement or its implementation; provided, however that this subparagraph (3) shall not be construed as having any effect on CWA's right or the Companies' obligation, to the extent the same may exist under applicable law and/or any pre-existing CBAs, to negotiate changes in the terms and conditions applicable to such transfers.

(b) CWA, as an organization and on behalf of its members, hereby waives and releases any claim in existence at the time of this Agreement in the Thirteen-State/DC Area alleging that VZNY, VZA, VZAD, VZNE, ECS, VSC, VCSC, VZMD, VZVA, VZDC, VZWV, VZPA, VZDE, VZNJ, Service Company and/or any of the past or current subsidiaries and/or divisions, units, agents, or affiliates of Verizon Communications Inc., transferred work to VZB or MCS unlawfully or in violation of any agreement or that the performance of any work by VZB or MCS violates the Labor Agreements.

6.  Non-Admission of Liability.  This Agreement shall not in any way be construed as an admission by VZNY, VZA, VZAD, VZNE, ECS, VSC, VCSC, VZMD, VZVA, VZDC, VZWV, VZPA, VZDE, VZNJ, VZB, MCS and/or Service Company that any or all of them, or any of the past, current or future divisions, units, agents, subsidiaries or affiliates of Verizon Communications Inc., acted wrongfully.  Furthermore, the parties agree that this Agreement does not constitute an adjudication of the merits of Grievance Nos. G06-015053 (New York/New England), C08-22/23-194 (New Jersey), C08-22/23-195 (New Jersey), 13500-07044 (Pennsylvania), 13500-07045 (Pennsylvania), 13500-06088 (Pennsylvania), the April 26, 2006 Potomac Executive Level grievance or any other matter.  Accordingly, the parties agree that none of them has prevailed on the merits of Grievance Nos. G06-015053 (New York/New England), C08-22/23-194 (New Jersey), C08-22/23-195 (New Jersey), 13500-07044 (Pennsylvania), 13500-07045 (Pennsylvania), 13500-06088 (Pennsylvania), the April 26, 2006 Potomac Executive Level grievance or any other matter, and that this Agreement shall not serve or be construed as evidence that any party has so prevailed.

7.  Effect on Other Agreements.  This Agreement supersedes all other agreements between the parties as pertains to the grievances identified in this Agreement.  The parties agree that they will work to amend any other current agreements between them as necessary to conform them to this Agreement.

8.  Non-Precedential Settlement.  The parties agree that this Agreement is without precedent and that neither party may refer to this Agreement in any other grievance, arbitration, or other proceeding, except as necessary to enforce the terms of the Agreement itself.

9.  Severability.  If the validity of one or more provisions of this Agreement is challenged in a court of law or before the NLRB, the Company and CWA will cooperate and take all necessary steps to defend the validity of the Agreement. If one or more of the provisions of the Agreement is declared void, the parties will modify the Agreement, if possible, in a manner

consistent with the law and the parties' original intent. If the parties are unable to agree upon a modification of the Agreement, the provision of the Agreement declared void (other than Paragraphs 1 or 2 above) will be deemed to be severed from the Agreement, and the remaining provisions will remain in full force and effect. If Paragraph 1 or 2 is declared void, and the parties cannot agree upon a modification of the Agreement which is consistent with the law and the parties' original intent, the Agreement shall be void and without any effect.

10. Binding Agreement. This Agreement shall be binding and effective upon the parties and upon their respective predecessors, successors, and assigns.

11. Counterparts. This Agreement may be executed in two or more counterparts, each of which counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. Fax copies shall be deemed originals.

| For:   CWA | For:      Verizon New York Inc. |
|---|---|
| _____ | _John Navarro_ |
| Date: _____ | Date: _8/10/08_ |
| | For:      Verizon New England Inc |
| | _John Navarro_ |
| | Date: _8/10/08_ |
| | For:      Verizon Services Corporation |
| | _John Navarro_ |
| | Date: _8/10/08_ |
| | For:      Empire City Subway Company Limited |
| | _John Navarro_ |
| | Date: _8/10/08_ |

|  | For:      Verizon Corporate Services Corp.<br><br>*John Navarro*<br><br>Date:      8/10/08 |
|  | For:      Verizon Maryland Inc.<br><br>*John Navarro*<br><br>Date:      8/10/08 |
|  | For:      Verizon Virginia Inc.<br><br>*John Navarro*<br><br>Date:      8/10/08 |
|  | For:      Verizon Washington, D.C. Inc.<br><br>*John Navarro*<br><br>Date:      8/10/08 |
|  | For:      Verizon West Virginia Inc.<br><br>*John Navarro*<br><br>Date:      8/10/08 |
|  | For:      Verizon Pennsylvania Inc.<br><br>*John Navarro*<br><br>Date:      8/10/08 |
|  | For:      Verizon Delaware Inc.<br><br>*John Navarro*<br><br>Date:      8/10/08 |
|  | For:      Verizon New Jersey Inc.<br><br>*John Navarro*<br><br>Date:      8/10/08 |

For:       Verizon Avenue Inc.

_John Navarro_

Date: _____ 8/10/08 _____

For:       Verizon Advance Data Inc.

_John Navarro_

Date: _____ 8/10/08 _____

For:       Verizon Business Global LLC

Date: _____ 8/14/08 _____

For:       MCI Communications Services, Inc.

Date: _____ 8/10/08 _____



## SCHEDULE A -- WAGE RATES
### New York Wage Schedules

### New York
### Apprentice Technician - Business/Government

| Wage Step | Next Increase Interval | Weekly Rates Wage Rate Zone 1 4 Boroughs | Increase Amount | Weekly Rates Wage Rate Zone 1 Rem Zone 1 | Increase Amount | Weekly Rates Wage Rate Zone 2 | Increase Amount |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $ 557.50 | | $ 557.50 | | $ 532.50 | |
| 6 Mos. | 6 Mos. | $ 587.00 | $ 29.50 | $ 587.00 | $ 29.50 | $ 561.00 | $ 28.50 |
| 12 Mos. | 6 Mos. | $ 616.50 | $ 29.50 | $ 616.50 | $ 29.50 | $ 589.50 | $ 28.50 |
| 18 Mos. | 6 Mos. | $ 646.00 | $ 29.50 | $ 646.00 | $ 29.50 | $ 618.00 | $ 28.50 |
| 24 Mos. | 6 Mos. | $ 675.50 | $ 29.50 | $ 675.50 | $ 29.50 | $ 646.50 | $ 28.50 |
| 30 Mos. | 6 Mos. | $ 705.00 | $ 29.50 | $ 705.00 | $ 29.50 | $ 675.00 | $ 28.50 |
| 36 Mos. | 6 Mos. | $ 734.50 | $ 29.50 | $ 734.50 | $ 29.50 | $ 703.50 | $ 28.50 |
| 42 Mos. | 6 Mos. | $ 764.00 | $ 29.50 | $ 764.00 | $ 29.50 | $ 732.00 | $ 28.50 |
| 48 Mos. (Maximum) | | $ 793.50 | $ 29.50 | $ 793.50 | $ 29.50 | $ 760.50 | $ 28.50 |
| Pension Band | | 104 | | 104 | | 103 | |

### New York
### Technician - Business/Government

| Wage Step | Next Increase Interval | Weekly Rates Wage Rate Zone 1 4 Boroughs | Increase Amount | Weekly Rates Wage Rate Zone 1 Rem Zone 1 | Increase Amount | Weekly Rates Wage Rate Zone 2 | Increase Amount |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $ 819.00 | | $ 819.00 | | $ 783.50 | |
| 6 Mos. | 6 Mos. | $ 863.00 | $ 44.00 | $ 863.00 | $ 44.00 | $ 825.50 | $ 42.00 |
| 12 Mos. | 6 Mos. | $ 907.00 | $ 44.00 | $ 907.00 | $ 44.00 | $ 867.50 | $ 42.00 |
| 18 Mos. | 6 Mos. | $ 951.00 | $ 44.00 | $ 951.00 | $ 44.00 | $ 909.50 | $ 42.00 |
| 24 Mos. | 6 Mos. | $ 995.00 | $ 44.00 | $ 995.00 | $ 44.00 | $ 951.50 | $ 42.00 |
| 30 Mos. | 6 Mos. | $ 1,039.00 | $ 44.00 | $ 1,039.00 | $ 44.00 | $ 993.50 | $ 42.00 |
| 36 Mos. | 6 Mos. | $ 1,083.00 | $ 44.00 | $ 1,083.00 | $ 44.00 | $ 1,035.50 | $ 42.00 |
| 42 Mos. | 6 Mos. | $ 1,127.00 | $ 44.00 | $ 1,127.00 | $ 44.00 | $ 1,077.50 | $ 42.00 |
| 48 Mos. (Maximum) | | $ 1,171.00 | $ 44.00 | $ 1,171.00 | $ 44.00 | $ 1,119.50 | $ 42.00 |
| Pension Band | | 117 | | 117 | | 116 | |

### New York
### Sr. Technician - Business/Government

| Wage Step | Next Increase Interval | Weekly Rates Wage Rate Zone 1 4 Boroughs | Increase Amount | Weekly Rates Wage Rate Zone 1 Rem Zone 1 | Increase Amount | Weekly Rates Wage Rate Zone 2 | Increase Amount |
|---|---|---|---|---|---|---|---|
| Start | 6 Mos. | $ 1,065.00 | | $ 1,065.00 | | $ 1,017.00 | |
| 6 Mos. | 6 Mos. | $ 1,122.00 | $ 57.00 | $ 1,122.00 | $ 57.00 | $ 1,071.50 | $ 54.50 |
| 12 Mos. | 6 Mos. | $ 1,179.00 | $ 57.00 | $ 1,179.00 | $ 57.00 | $ 1,126.00 | $ 54.50 |
| 18 Mos. | 6 Mos. | $ 1,236.00 | $ 57.00 | $ 1,236.00 | $ 57.00 | $ 1,180.50 | $ 54.50 |
| 24 Mos. | 6 Mos. | $ 1,293.00 | $ 57.00 | $ 1,293.00 | $ 57.00 | $ 1,235.00 | $ 54.50 |
| 30 Mos. | 6 Mos. | $ 1,350.00 | $ 57.00 | $ 1,350.00 | $ 57.00 | $ 1,289.50 | $ 54.50 |
| 36 Mos. | 6 Mos. | $ 1,407.00 | $ 57.00 | $ 1,407.00 | $ 57.00 | $ 1,344.00 | $ 54.50 |
| 42 Mos. | 6 Mos. | $ 1,464.00 | $ 57.00 | $ 1,464.00 | $ 57.00 | $ 1,398.50 | $ 54.50 |
| 48 Mos. (Maximum) | | $ 1,521.00 | $ 57.00 | $ 1,521.00 | $ 57.00 | $ 1,453.00 | $ 54.50 |
| Pension Band | | 130 | | 130 | | 127 | |



## Pennsylvania Wage Schedules

### Pennsylvania
### Apprentice Technician - Business/Government

| Wage Step | Next Increase Interval | Weekly Rates | |
|---|---|---|---|
| | | Wage Rate | Increase Amount |
| Start | 6 Mos. | $ 532.50 | |
| 6 Mos. | 6 Mos. | $ 561.00 | $ 28.50 |
| 12 Mos. | 6 Mos. | $ 589.50 | $ 28.50 |
| 18 Mos. | 6 Mos. | $ 618.00 | $ 28.50 |
| 24 Mos. | 6 Mos. | $ 646.50 | $ 28.50 |
| 30 Mos. | 6 Mos. | $ 675.00 | $ 28.50 |
| 36 Mos. | 6 Mos. | $ 703.50 | $ 28.50 |
| 42 Mos. | 6 Mos. | $ 732.00 | $ 28.50 |
| 48 Mos. (Maximum) | | $ 760.50 | $ 28.50 |
| **Pension Band** | | 104 | |

### Pennsylvania
### Technician - Business/Government

| Wage Step | Next Increase Interval | Weekly Rates | |
|---|---|---|---|
| | | Wage Rate | Increase Amount |
| Start | 6 Mos. | $ 783.50 | |
| 6 Mos. | 6 Mos. | $ 825.50 | $ 42.00 |
| 12 Mos. | 6 Mos. | $ 867.50 | $ 42.00 |
| 18 Mos. | 6 Mos. | $ 909.50 | $ 42.00 |
| 24 Mos. | 6 Mos. | $ 951.50 | $ 42.00 |
| 30 Mos. | 6 Mos. | $ 993.50 | $ 42.00 |
| 36 Mos. | 6 Mos. | $ 1,035.50 | $ 42.00 |
| 42 Mos. | 6 Mos. | $ 1,077.50 | $ 42.00 |
| 48 Mos. (Maximum) | | $ 1,119.50 | $ 42.00 |
| **Pension Band** | | 117 | |

### Pennsylvania
### Sr. Technician - Business/Government

| Wage Step | Next Increase Interval | Projected Weekly Rates | |
|---|---|---|---|
| | | Wage Rate | Increase Amount |
| Start | 6 Mos. | $ 1,017.00 | |
| 6 Mos. | 6 Mos. | $ 1,071.50 | $ 54.50 |
| 12 Mos. | 6 Mos. | $ 1,126.00 | $ 54.50 |
| 18 Mos. | 6 Mos. | $ 1,180.50 | $ 54.50 |
| 24 Mos. | 6 Mos. | $ 1,235.00 | $ 54.50 |
| 30 Mos. | 6 Mos. | $ 1,289.50 | $ 54.50 |
| 36 Mos. | 6 Mos. | $ 1,344.00 | $ 54.50 |
| 42 Mos. | 6 Mos. | $ 1,398.50 | $ 54.50 |
| 48 Mos. (Maximum) | | $ 1,453.00 | $ 54.50 |
| **Pension Band** | | 129 | |



## Potomac Wage Schedules

### Potomac Apprentice Technician – Business/Government

| Wage Step | Next Increase Interval | Weekly Rates | | Weekly Rates | |
|---|---|---|---|---|---|
| | | Wage Rate Zone A | Increase Amount | Wage Rate Zone B | Increase Amount |
| Start | 6 Mos. | $ 532.50 | | $ 484.50 | |
| 6 Mos. | 6 Mos. | $ 561.00 | $ 28.50 | $ 510.50 | $ 26.00 |
| 12 Mos. | 6 Mos. | $ 589.50 | $ 28.50 | $ 536.50 | $ 26.00 |
| 18 Mos. | 6 Mos. | $ 618.00 | $ 28.50 | $ 562.50 | $ 26.00 |
| 24 Mos. | 6 Mos. | $ 646.50 | $ 28.50 | $ 588.50 | $ 26.00 |
| 30 Mos. | 6 Mos. | $ 675.00 | $ 28.50 | $ 614.50 | $ 26.00 |
| 36 Mos. | 6 Mos. | $ 703.50 | $ 28.50 | $ 640.50 | $ 26.00 |
| 42 Mos. | 6 Mos. | $ 732.00 | $ 28.50 | $ 666.50 | $ 26.00 |
| 48 Mos. (Maximum) | | $ 760.50 | $ 28.50 | $ 692.50 | $ 26.00 |
| Pension Band | | 104 | | 102 | |

### Potomac Technician – Business/Government

| Wage Step | Next Increase Interval | Weekly Rates | | Weekly Rates | |
|---|---|---|---|---|---|
| | | Wage Rate Zone A | Increase Amount | Wage Rate Zone B | Increase Amount |
| Start | 6 Mos. | $ 783.50 | | $ 712.50 | |
| 6 Mos. | 6 Mos. | $ 825.50 | $ 42.00 | $ 750.50 | $ 38.00 |
| 12 Mos. | 6 Mos. | $ 867.50 | $ 42.00 | $ 788.50 | $ 38.00 |
| 18 Mos. | 6 Mos. | $ 909.50 | $ 42.00 | $ 826.50 | $ 38.00 |
| 24 Mos. | 6 Mos. | $ 951.50 | $ 42.00 | $ 864.50 | $ 38.00 |
| 30 Mos. | 6 Mos. | $ 993.50 | $ 42.00 | $ 902.50 | $ 38.00 |
| 36 Mos. | 6 Mos. | $ 1,035.50 | $ 42.00 | $ 940.50 | $ 38.00 |
| 42 Mos. | 6 Mos. | $ 1,077.50 | $ 42.00 | $ 978.50 | $ 38.00 |
| 48 Mos. (Maximum) | | $ 1,119.50 | $ 42.00 | $ 1,017.00 | $ 38.50 |
| Pension Band | | 117 | | 114 | |

### Potomac Sr. Technician – Business/Government

| Wage Step | Next Increase Interval | Projected Weekly Rates | | Weekly Rates | |
|---|---|---|---|---|---|
| | | Wage Rate Zone A | Increase Amount | Wage Rate Zone B | Increase Amount |
| Start | 6 Mos. | $ 1,017.00 | | $ 925.00 | |
| 6 Mos. | 6 Mos. | $ 1,071.50 | $ 54.50 | $ 974.50 | $ 49.50 |
| 12 Mos. | 6 Mos. | $ 1,126.00 | $ 54.50 | $ 1,024.00 | $ 49.50 |
| 18 Mos. | 6 Mos. | $ 1,180.50 | $ 54.50 | $ 1,073.50 | $ 49.50 |
| 24 Mos. | 6 Mos. | $ 1,235.00 | $ 54.50 | $ 1,123.00 | $ 49.50 |
| 30 Mos. | 6 Mos. | $ 1,289.50 | $ 54.50 | $ 1,172.50 | $ 49.50 |
| 36 Mos. | 6 Mos. | $ 1,344.00 | $ 54.50 | $ 1,222.00 | $ 49.50 |
| 42 Mos. | 6 Mos. | $ 1,398.50 | $ 54.50 | $ 1,271.50 | $ 49.50 |
| 48 Mos. (Maximum) | | $ 1,453.00 | $ 54.50 | $ 1,322.00 | $ 50.50 |
| Pension Band | | 129 | | 125 | |



## SCHEDULE B – EXCEPTIONS TO CBAs

As stated in Paragraph 2 of the Settlement Agreement, all provisions of the applicable Labor Agreements between CWA and Service Company shall apply to employees in Service Company job title(s) and/or classification(s) performing the work described in Paragraph 1 of the Settlement Agreement, with the exception of the provisions set forth in Schedules B.1 and B.2. Where any provision in Schedules B.1 or B.2 contradicts, conflicts with, or is inconsistent with the existing Labor Agreements, the provisions set forth in Schedules B.1 and B.2 shall apply and shall supersede any such contradictory, conflicting or inconsistent provision in the applicable Labor Agreements for employees in Service Company job title(s) and/or classification(s) performing the work described in Paragraph 1 of the Settlement Agreement.

## SCHEDULE B.1

Schedule B.1 applies only to Service Company job titles(s) and/or classification(s) performing the work described in Paragraphs 1(a) and 1(b) of the Settlement Agreement.

### A. WAGES

- The wage schedules applicable to the job title(s) and/or classification(s) created in accordance with the Settlement Agreement, shall be as set forth in Schedule A to the Settlement Agreement.

- Employees of MCS who become employed in the job title(s) and/or classification(s) created in accordance with the Settlement Agreement and whose current base wage rate equals or exceeds the maximum wage rate contained on the wage schedule set forth in Schedule A to the Settlement Agreement will be paid at their current base wage rate and will receive the annual percentage increases to their base wage equal to the increases negotiated by CWA for all other technicians commencing with the increase scheduled for August 2, 2009 under the 2008 Labor Agreements. The wage rates contained on the wage schedules set forth in Schedule A shall also be adjusted annually to reflect the annual percentage increases negotiated by CWA for all other technicians commencing August 2, 2009. A list identifying these particular employees, as well as a list of all of the employees as of the date of the list who are expected to be employed in the job title(s) and/or classification(s) created in accordance with the Settlement Agreement will be provided to CWA no later than November 15, 2008.

- Service Company shall have the right, in its discretion, to pay any new hire at a rate that is higher than the start rate under the applicable wage schedule on Schedule A.

13



## B.  JOB TITLES

- Service Company shall create the following new job title(s) and/or classification(s) in accordance with the Settlement Agreement.

    o   Apprentice Technician - Business/Government

    o   Technician – Business/Government

    o   Senior Technician – Business/Government

- Employees in the new job title(s) and/or classification(s) will be placed in work groups as determined by Service Company.

- In making determinations regarding assignment of work, Service Company shall consider the individual's performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies.  Seniority will be used as a tiebreaker when all other qualifications are substantially equal.

- Employees may be promoted from one Technician position to another (e.g., from Technician to Senior Technician) when there is no vacant or new position to be filled.  In making determinations regarding these in-place promotions, Service Company shall consider the individual's performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies.  Seniority will be used as a tiebreaker when all other qualifications are substantially equal.

## C.  STAFFING

- The workforce in the new job title(s) and/or classification(s) to be created under the Settlement Agreement may be drawn from the following categories of individuals:

    o   MCS employees who satisfy the requirements of Paragraph 3 of the Settlement Agreement;

    o   Employees of the Companies who may be eligible to be considered for employment in the new job title(s) and/or classification(s) and are qualified for them;

    o   Applicants who are not employees of the Companies and are qualified for them.

- When filling any positions in the new job title(s) and/or classification(s) to be created under the Settlement Agreement, except as otherwise provided for in the Settlement Agreement, Service Company:

    o   shall not be required to satisfy any existing contractual internal or external posting requirements or preferential hiring requirements;

    o   shall provide notice of job openings to employees of Service Company and the Companies through existing processes;

- shall consider the candidates' performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies. Service Company will give existing Service Company employees equal consideration as is given to other candidates in filling new positions and shall hire an employee of Service Company or the Companies when the qualifications of Service Company/Companies and non-Company candidates are substantially equal;

- may make use of knowledge tests and interviews;

- generally will use local staffing practices if it determines to post such vacancies internally. Surplus employees of the Companies will be subject to consideration under the same selection standards as those who are not surplus employees of the Companies;

- may pay any new hire at a rate that is higher than the start rate under the applicable wage schedule on Schedule A.

- No pre-test training shall be provided by the Service Company for the job title(s) and/or job classification(s) created in accordance with the Settlement Agreement.

- Seniority will only be used as a tiebreaker when all other qualifications are substantially equal.

## D. PENSION AND RETIREE MEDICAL

- For an employee who becomes employed by Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement, the net credited service date ("NCS Date"), under the Verizon Pension Plan for New York and New England Associates or the Verizon Pension Plan for Mid-Atlantic Associates, as applicable:

  - shall, for purposes of determining retirement pension eligibility, recognize prior service with any entity that is eighty percent (80%) or more owned directly or indirectly by Verizon Communications Inc. and prior service with MCI, Inc. (subject to any service bridging/break in service rules under the relevant plan); and

  - shall, for purposes of pension accrual, be the initial date of employment with Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement. Prior service with any entity will not be counted for purposes of pension accrual.

  To the extent existing pension plan provisions are more favorable for any particular employees, those plan provisions will be honored.

- Employees who become employed on December 28, 2008 (initial complement of employees) by Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement shall be eligible for retiree medical coverage upon retirement to the same extent as a "New Hire" within the meaning of the retiree medical provisions of the applicable 2008 Memorandum of Understanding. For purposes

of determining the retiree medical benefit for the initial complement of employees, prior service back to January 1, 2006 with any entity that is eighty percent (80%) or more owned directly or indirectly by Verizon Communications Inc., including MCI, Inc. and MCS as of their January 6, 2006 acquisition by Verizon shall be recognized. For employees hired after December 28, 2008 (later hires), prior service with any entity shall not be recognized and their service date for the "New Hire" retiree medical coverage shall be the initial date of employment with Service Company in the new job title(s) and/or classifications(s) to be created under the Settlement Agreement. Provided, however, in lieu of the "New Hire" retiree medical provisions, employees who become employed by Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement after being employed in another position under which the employee was entitled to participate in a company-subsidized retiree medical plan, shall have their retiree medical benefit entitlement determined by the pension plan in which they participate upon their employment by Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement, e.g., such employees covered by the Verizon Pension Plan for New York and New England Associates shall be eligible for retiree medical benefits provided by the Verizon Medical Expense Plan for New York and New England Associates. Accordingly, for any such employees, the retiree medical benefits to which they will be entitled will be those in effect under the applicable plan as of the date of their retirement. For any such employees, their service under the predecessor retiree medical plan shall be credited and they shall continue to receive service credit while employed with Service Company.

## E. JOB SECURITY

- No person employed by Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement shall be covered by the Job Security Letter in the Labor Agreements or by the provisions with respect to "No Involuntary Layoffs, etc." and "Change in Business Conditions" contained in the "Agreement Concerning Issues Related to the Bell Atlantic-GTE Merger," which is an attachment to the parties' Memorandum of Agreement covering the Mid-Atlantic states in the Labor Agreements (collectively with the Job Security Letter, "JSL") during the period in which they are so employed. Any employee of the Companies who, immediately prior to becoming employed by Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement, was covered by the JSL in the Labor Agreements shall not forfeit coverage under the JSL for the period of their employment with Service Company in such job title and/or classification, provided that if an employee employed by Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement would otherwise be laid off were it not for the individual's coverage under the JSL, the individual shall be reassigned to another position (with the same general wage rate in the same geographical area) in Service Company or Companies for which the individual is qualified.

## F. TRANSFER OF JOBS

- NY/NE -- The "Agreement Concerning Issues Related to the Bell Atlantic-GTE Merger," which is an attachment to the parties' Memorandum of Agreement, does not apply to any of the job classifications or positions covered by the Settlement Agreement.

- Mid-Atlantic -- The provisions contained in the "Agreement Concerning Issues Related to the Bell Atlantic-GTE Merger," which is an attachment to the parties' Memorandum of Agreement, with respect to Limitations on Transfers of Jobs, do not apply to any of the job classifications or positions covered by the Settlement Agreement.

## G. LAYOFFS

- In the event of the layoff of any employee occupying a Service Company job title(s) and/or job classification(s) created in accordance with the Settlement Agreement, employees occupying the Service Company job title(s) and/or job classification(s) created in accordance with the Settlement Agreement:

    o shall be considered a separate seniority pool for layoff purposes;

    o shall not be subject to being displaced or bumped by any employee;

    o shall not be permitted to displace or bump any employee in another job title and/or occupational classification.

- Any force adjustment plan or similar or related provisions of the Labor Agreements shall not apply to persons occupying Service Company job title(s) and/or job classification(s) created in accordance with the Settlement Agreement.

- When Service Company determines, in its discretion, to declare one or more job title(s) and/or job classification(s) created in accordance with the Settlement Agreement surplus in a work group or location, the following will apply:

    o Service Company will give CWA 15 days advance notice of a surplus which could lead to a layoff.

    o Following the 15-day notification period, the Service Company will solicit employees in the job title(s) and/or job classification(s) created in accordance with the Settlement Agreement, by seniority order, to volunteer to leave the business with the layoff allowance specified in the Labor Agreement. Employees will have 14 calendar days to decide whether to take the volunteer offer to leave the business. The Company will determine the off-payroll date for those employees who volunteer to leave the business.

    o To the extent there are insufficient volunteers to relieve the surplus, Service Company shall lay off employees in the job title(s) and/or job classification(s) created in accordance with the Settlement Agreement by inverse order of seniority. Those employees who are laid off will receive the layoff allowance specified in the Labor Agreement.

    o Laid off employees shall be recalled in the inverse order in which such laid-off employees were laid off to a vacancy in the job title and/or classification from which the layoff occurred, or to a vacancy in a lower job title or classification for which the employee is qualified, within two years of the layoff.

## H.  SENIORITY

- For an employee who becomes employed by Service Company in the new job title(s) and/or classification(s) to be created under the Settlement Agreement, seniority for all purposes under the Labor Agreements other than as specified in Section D. Pension and Retiree Medical above, shall be determined by reference to NCS Date for pension eligibility purposes under the Verizon Pension Plan for New York and New England Associates or the Verizon Pension Plan for Mid-Atlantic Associates, as applicable.

## I.  WORK SCHEDULES

- Persons hired into Service Company job title(s) and/or job classification(s) created in accordance with the Settlement Agreement may be assigned to a normal tour consisting of any five 8-hour days within a calendar week on any shift.  Such persons may, at Service Company's discretion, be assigned to a normal tour consisting of any four 10-hour days within a calendar week, with daily overtime (where such would otherwise be required by the local collective bargaining agreement) applying only to time worked in excess of 10 hours in any day.  Such persons will not be eligible for Saturday differentials and/or premiums, but will be paid one and one-half times the basic hourly wage rate for hours worked on Sunday.

- Service Company may assign tours to employees occupying job title(s) and/or job classification(s) created in accordance with the Settlement Agreement based upon the performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies of employees.  By Thursday of any week, Service Company shall post any changes in tours for the succeeding calendar week.

- Service Company may take into account performance, demonstrated skills, abilities, knowledge, education, training, experience and competencies in the assignment and distribution of overtime.  To the extent practical and consistent with business needs, Service Company, before requiring employees to work overtime, will request volunteers from among the qualified employees in the work location in which overtime will be worked.  Service Company shall make a good faith effort to allot overtime equally over the course of a calendar quarter.

- In assigning work schedules and the assignment and distribution of overtime, seniority will only be used as a tiebreaker when all other qualifications are substantially equal.

## J.  WORK BY MANAGEMENT

- Supervisors and other management employees may perform work normally done by CWA-represented employees in emergencies, training activities (which may be performed by supervisors or assigned to represented employees), and assistance incidental to a supervisory review of subordinates' work.

18

## K. OTHER

- Service Company may use contractors to perform any of the work described in Paragraphs 1(a) and 1(b) of the Settlement Agreement, provided that Service Company may not use contractors to perform such work if it would currently and directly cause layoffs or part-timing of employees. Any provisions of the Labor Agreements that can or may otherwise restrict the use of contract labor or the contracting out of work shall not apply to the work performed by the job title(s) and/or job classification(s) created in accordance with the Settlement Agreement. The parties shall establish one Service Company Contracting and Competitiveness Initiatives Committee to discuss CWA's concerns about how contracting out of work can be reduced and the work provided to Service Company employees. As part of these discussions, issues impacting the competitiveness and efficient operation of Service Company will be discussed.

- Employees of Service Company in the job title(s) and/or job classification(s) created in accordance with the Settlement Agreement performing the work described in Paragraph 1(a) may continue to be assigned to perform such work throughout the Thirteen-State/DC Area under the temporary transfer, travel, board and lodging, and other similar relevant provisions of the Labor Agreements that cover "Plant" employees to the same extent that MCS technicians were assigned to perform that work prior to December 28, 2008.

- As of the date of the Settlement Agreement, the type of technician work described in Paragraph 1(b) is performed both inside and outside of the Thirteen-State/DC Area. This work may continue to be distributed on and after December 28, 2008 among MCS and Service Company Operations Support Centers both inside and outside of the Thirteen-State/DC Area. Within a calendar year, no more than 22 percent of the total amount of such work will be performed outside of the Thirteen-State/DC Area. For example, if 145 technicians' worth of work were performed inside the Thirteen-State/DC Area, then 40 technicians' worth of work (21.7% x 185) could be performed outside the Thirteen-State/DC Area.

- The grievance procedure of the Labor Agreements covering the job title(s) and/or job classification(s) created in accordance with the Settlement Agreement shall be modified to provide for only two steps, the second or top step of which will be heard at the Labor Relations level.

- Stand-by pay – one hour of pay at the regular straight time rate shall be paid for each day assigned. Unless specifically assigned to stand-by duty, wearing a pager or carrying a cell phone does not constitute "being available" for purposes of receiving Stand-by pay.

## SCHEDULE B.2

Schedule B.2 applies only to the work described in subparagraphs 1(c)(1) and 1(c)(2) of the Settlement Agreement.

**TRANSFER OF JOBS**

- NY/NE -- The "Agreement Concerning Issues Related to the Bell Atlantic-GTE Merger," which is an attachment to the parties' Memorandum of Agreement, does not apply to any of the work described in subparagraph 1(c)(1) of the Settlement Agreement.

- Mid-Atlantic -- The provisions contained in the "Agreement Concerning Issues Related to the Bell Atlantic-GTE Merger," which is an attachment to the parties' Memorandum of Agreement, with respect to Limitations on Transfers of Jobs, do not apply to any of the work described in subparagraph 1(c)(2) of the Settlement Agreement.

**Attachment 11**

## MEMORANDUM OF AGREEMENT

This Agreement is made and entered into, the 3rd day of August 2008, by and between all present and future In-BA-Region subsidiaries, or operating units thereof, of Verizon Communications Inc. ("VZ"), except Cellco Partnership, its subsidiaries, and its affiliates d/b/a Verizon Wireless, Verizon Information Services BA - Region Directory South Sales (NTD/PDD/CDS), and all entities (and all of their subsidiaries) with a market capitalization or value of more than $3 billion, acquired or merged with Bell Atlantic Corporation, Verizon Communications Inc., or their subsidiaries, with a closing date after August 9, 1998 (hereinafter "Company"), and the Communications Workers of America, AFL-CIO (hereinafter called "CWA"), addressing certain issues, as follows:

1.      The two agreements by and between NYNEX and Bell Atlantic Companies and the CWA entitled "Agreement concerning issues related to the Bell Atlantic- NYNEX Merger" (copies of which are attached hereto and incorporated herein by reference) are amended and will be included, as amended, within the new collective bargaining agreements which will be effective for the period August 3, 2008 to August 6, 2011.

2.      The Company and the CWA will execute the attached Memorandum of Agreement Regarding Neutrality and Card Check Recognition.

3.      Whenever the Company assigns employees of VZ Companies (hereinafter "VZ employees") to perform work for the Data Solutions Group (DSG, including Verizon Network Integration Corp., Inc., formerly named BANI) which is currently, has been

historically, or is substantially comparable to work performed by CWA bargaining unit employees, such work will be exclusively performed by CWA operating telephone company (hereinafter "OTC") bargaining unit employees covered by the existing collective bargaining agreements.

Operational work associated with the data network which the Company assigns to VZ employees shall be exclusively performed by CWA OTC bargaining unit employees covered by the existing collective bargaining agreements.  Central offices and associated control centers will be staffed exclusively by CWA OTC bargaining unit employees covered by the existing collective bargaining agreements carrying titles such as COT/SET/TTA/CSA or their equivalents.

4.      All plant work associated with digital subscriber lines (i.e., xDSL, a generic term which includes ADSL, HDSL, SHDSL, RADSL, IDSL, and all similar and subsequent technologies) between and including the central office and the network interface device shall be performed exclusively by CWA OTC bargaining unit employees covered by the existing collective bargaining agreements.  All work associated with the xDSL splitter shall be exclusively performed by CWA OTC bargaining unit employees covered by the existing collective bargaining agreements.  The Company shall not contract out any of the xDSL work discussed above.

When an end user customer purchases Verizon-on-Line DSL Service$^{TM}$ directly from Verizon Internet Services Inc. ("VISI") and uses Verizon as its ISP and the end user customer contracts with VISI to have it perform the installation and maintenance of the inside-data-wiring and jack, the digital modem, the Network Interconnection Card,

and/or the software and configuration of the computer on the end user customer's premises ("Customer's Premise DSL I&M Work") for the Verizon-on-Line DSL Service[TM], the Customer's Premise DSL I&M Work for that service will be assigned to CWA OTC bargaining unit employees.  That Customer's Premise DSL I&M Work shall not be contracted out in the former BA Region.

When an end user customer purchases Verizon InfoSpeed DSL Service[TM] directly from Verizon Advanced Data Inc. ("VADI") and does not use Verizon as its ISP and the end user customer contracts with VADI to have it perform the installation and maintenance of the inside-data-wiring and jack, the digital modem, the Network Interconnection Card, and/or the software and configuration of the computer on the end user customer's premises ("Customer's Premise DSL I&M Work") for the Verizon InfoSpeed DSL Service[TM], the Customer's Premise DSL I&M Work for that service will be assigned to CWA OTC bargaining unit employees.  That Customer's Premise DSL I&M Work shall not be contracted out in the former BA Region.

The Company may designate a select group of CWA OTC bargaining unit employees to perform the Customer's Premise DSL I&M Work.  The Company will first seek input from the Union but reserves the right to establish training requirements, selection, certification, attire, scheduling which is consistent with the parties' collective bargaining agreements, and other requirements for those employees.  In making its designations of employees to perform that work, the Company will consider an employee's seniority but reserves the right to make the designations solely on the basis of qualifications.  The Company shall begin transitioning the above work to the OTC bargaining unit

employees as soon as August, 2000 and shall have completed the transition no later than April 30, 2001.

5.      Whenever the Company assigns VZ employees to perform work which is currently, or which has been historically, performed by CWA OTC employees such work shall be performed exclusively by CWA OTC employees covered by the existing collective bargaining agreements.

Whenever the Company assigns VZ employees to service or sell bundled services which include any service which is currently, or historically has been, serviced or sold by CWA-represented employees, then such work shall be performed exclusively by CWA-represented employees, and the primary service and sales channel for such services shall be the OTC Business and Residence office, to the extent permitted by law or regulation.

Existing Bell Atlantic (BA Plus) accounts will begin to be transferred back to CWA OTC bargaining unit locations on October 1, 1998.  There will be no new promotions to transfer accounts or to transfer the servicing of accounts started for BA Plus.  CWA-represented service representatives/consultants will not be impacted adversely in any way by the transfer of BA Plus accounts.  All accounts must be transferred to CWA OTC bargaining units no later than March 30, 1999.  Such BA Plus accounts shall be transferred to broadly defined appropriate OTC organizational areas, such as the Electronic Traffic/Transfer Zone or the area served by the ACD in which the work was performed in the OTC.  The commitment regarding BA Plus accounts shall have no

effect on the parties' rights with respect to the transfer, movement or assignment of any work under the OTC contracts under which such work is then performed.

If the work assignment or other practices of a company which is merged with or acquired by VZ and which is covered by this Agreement are inconsistent with one or more terms of this Agreement, there shall be a reasonable transition period, not to exceed six months from the date of the closing of the merger or acquisition, to eliminate such inconsistency.

6.     Whenever the Company assigns VZ employees to perform long distance work that is similar to work which is currently, or historically has been, performed by CWA-represented employees then such work shall be assigned to CWA-represented employees covered by the existing OTC collective bargaining agreements.

To the extent permitted by law or regulation, the primary sales and service channel for long distance services shall be the OTC Business and Residence office.

Whenever the Company assigns VZ employees within CWA jurisdiction to perform work associated with video, alarm monitoring, customer contact, or the Internet, that is similar to work which is currently, or historically has been, performed by CWA-represented employees, then such work shall be performed exclusively by CWA-represented employees.

7.     Whenever any employee engaged by the Company within the CWA jurisdiction is assigned to perform data services work permitted by FCC 706 exceptions, then such work shall be performed by CWA OTC employees covered by the existing collective

bargaining agreements; however, if the FCC requires the Company to assign such work to a separate subsidiary or affiliate, then the work shall be performed by CWA-represented employees working under an equivalent collective bargaining agreement.

8.      Nothing in this agreement is intended to limit, diminish, or infringe upon the two letters incorporated in the collective bargaining agreements by and between NYNEX Corporation on behalf of itself, and New York Telephone, New England Telephone, Empire City Subway, Telesector Resources Group, and NYNEX Information Resources, and the CWA entitled respectively "New Business" and "Old Business Letter," dated April 3, 1994, (copies of which, adapted to apply under this Agreement, are attached hereto and incorporated herein by reference) (the "Old and New Business Agreements").  The Old and New Business Agreements are amended and renewed and will be included, as amended, within the new collective bargaining agreements between parties to the 2008 MOU.  The terms Bell Atlantic Corporation ("BAC") and Verizon Communications Inc. ("VZ") as defined and used in the New Businesses Agreement means the Company as defined in the introductory paragraph of this Agreement, which is controlling.

## INTERPRETIVE COMMENTS

1.      Work will be considered to have been "historically performed" by CWA-represented employees if it has been performed by such employees within the last seven years and over a significant period of time.

2.      "Current work" includes any evolution of such work.

3.      This agreement is not intended to affect any issue regarding a claim that management employees are performing bargaining unit work.  It is also recognized that CWA will continue to press such claims.

4.      It is not the intent of this Agreement that existing work being performed by Verizon Connected Solutions, Inc. ("VCSI"), formerly named Bell Atlantic Communications and Construction Services, Inc. (BACCSI), is to be returned to the OTCs, except as specifically provided in the amended Broadband Network / Employment Security Provisions of the 2000 MOU between the former BA South Region OTC's and the CWA.  (Copy attached and incorporated herein.)  However, it is the Intent of this Agreement to not transfer more OTC work to VCSI.

5.      This Agreement applies only to work assigned to and performed by VZ employees within the former Bell Atlantic footprint.  Due to the merger between BA and GTE, the names of certain companies in this Agreement have changed from the 1998 Agreement between the parties.  This Agreement is not intended to expand the meaning or scope of the 1998 Agreement, except as noted in paragraphs 1, 4 and 5 of this Agreement, and paragraph 4 of the Interpretive Comments of the 1998 MOA, and

the deletion of paragraph 9 of the Interpretive Comments of 1998 MOA.  For that reason, the following terms are defined:

> VZ Companies are subsidiaries of VZ, covered by the Agreement, operating within the former BA footprint;

> VZ Employees are employees of VZ Companies performing work in the former BA footprint.

6.     Any provisions of this Memorandum of Agreement are subject to legal and regulatory requirements.

7.     Any obligation to have work performed by CWA-represented employees is limited to areas within CWA jurisdiction in the former BA footprint.

8.     It is not the intent of paragraph 4 of this Agreement to affect work by suppliers in the Central Office prior to the operational phase of a service or product.

This Agreement expires at 11:59 p.m. on August 6, 2011.

For: Communications Workers
     of America

Date: 8/10/08

For:  Company

Date: 8-10-08

AGREEMENT CONCERNING ISSUES
RELATED TO THE BELL ATLANTIC-GTE MERGER

This Agreement ("Agreement"), by and between Verizon ("VZ") Network Services, Inc., VZ - Delaware, Inc., VZ - Maryland, Inc., VZ - New Jersey, Inc., VZ - Pennsylvania, Inc., VZ - Virginia, Inc., VZ - Washington, D.C., Inc., VZ - West Virginia, Inc., and Verizon Information Services with respect to its Elkins Park, PA Directory Clerical, Potomac Directory Clerical, and West Orange, NJ Directory Sales and Clerical bargaining units (hereinafter collectively called "the Companies" and individually called a "Company"), and the Communications Workers of America, AFL-CIO (hereinafter, "CWA"), addresses certain employment security and other issues relating to the Bell Atlantic - GTE merger.

A. **No Involuntary Layoffs, etc.** - Effective August 3, 2008 and terminating concurrently with the labor agreements, August 6, 2011, the Companies agree that, except with respect to employees with a net credited service date, on the effective date of this MOA and as defined in Article 2 of the Pension Plan for Mid-Atlantic Associates, of August 3, 2003 or later ("New Employees"), which employees shall be subject to the other layoff and related provisions of their collective bargaining agreements, there shall be no layoffs, forced transfers requiring a home relocation, or downgrades as a result of any company initiated "process change," which includes process reengineering initiatives, workplace consolidations, office closings, contracting, shifting of bargaining unit work, network upgrades, and other business changes, developed to accommodate new technology or to improve productivity, efficiency or methods of operation.

B. **Limitations on Transfer of Jobs** - The following limitations on permanent transfers of jobs shall be effective August 3, 2008 and terminate concurrently with the labor agreements, August 6, 2011.

(1) During each year of the parties' current collective bargaining agreements ("CBA"), from August 3, 2008 to August 6, 2011, a Company may not permanently transfer more than .7% of the CWA represented jobs from any of the universes described below to an area outside the former Bell Atlantic ("BA") South Region.

(a) <u>New Jersey</u> - The universes for the State of NJ are the bargaining units in NJ.
(b) <u>Delaware</u> - The universes for the State of Delaware are the bargaining units in DE.
(c) <u>Pennsylvania</u> - The universes for the State of Pennsylvania are the bargaining units in PA.
(d) <u>Maryland, Virginia, West Virginia, and the District of Columbia</u> - The universe for each of the States of Maryland, Virginia, West Virginia and the District of Columbia is the bargaining unit within each of those states and D.C.

(2)   Transfers of jobs within the former BA South Region, if permitted by the parties' CBA, do not count against the .7% per year limit on the permanent transfer of jobs.

(3)   The percentage of permanent job transfers will be calculated for each universe as follows:

   a.   Total CWA Represented Jobs in a universe permanently transferred outside the former BA South Region;
   b.   (divided by) Total CWA Represented Jobs in that universe.

(4)   If an employee voluntarily transfers to a job outside the former BA South Region, the transfer of that employee shall not be included in the number of transferred jobs for purposes of calculating whether the .7% per year limit on the permanent transfer of jobs has been exceeded.

C.   **Change in Business Conditions** - Any job loss caused by an "external event" as that term is used in a letter dated April 3, 1994 from James J. Dowdall to Elisa Riordan ("Job Security Letter"), is specifically excluded from the terms of the commitments made in sections A above.  The relevant portion of the "Job Security Letter" states:

   The parties also agree that an "external event" that is viewed as significant and that directly reduces the need for a large number of employees, shall not be considered "process change."  An example of an external event might be a state or federal regulatory change that causes the Company to abandon a line of business, an interexchange carrier takeback of billings and collections, or the loss of a major telecommunications network contract.

   This paragraph C shall not apply to New Employees as defined in paragraph A above.

D.   This Agreement does not limit or restrict Employee Transfer Plans.

For The Companies                              For The CWA

_____                        _____

## MEMORANDUM OF AGREEMENT
## REGARDING NEUTRALITY AND CARD CHECK RECOGNITION

The Verizon Communications Inc. ("VZ") Companies Covered by this Memorandum of Agreement ("the Companies") and Communications Workers of America ("the Union"), for and in consideration of the mutual promises and agreements set forth below, hereby enter into this Memorandum of Agreement Regarding Neutrality and Card check Recognition ("Agreement") as of the 3rd of August, 2008.

1.    <u>Duration</u>.  This Agreement is effective as of the date stated above, and shall remain in effect until 11:59 PM on August 6, 2011, unless extended, modified or terminated by mutual written agreement of the parties.  The parties expressly understand, however, that in the event this Agreement is terminated before August 6, 2011 all of the terms hereof nevertheless shall survive said termination and remain in effect with respect to any reorganization or restructuring of any bargaining unit as a result of which management creates any new in-region subsidiary, division, or operating entity as to which no Union representation then exists.

2.    <u>Applicability</u>.

(a)    All card check procedures and any Union recognition provided for by this Agreement shall be applicable as of August 3, 2008, for non-management employees of the Companies "In the former BA Region" ("In-Region"), <u>i.e.</u>, within the former BA operating region in thirteen state and District of Columbia region comprised of Maine, New Hampshire, Vermont, Rhode Island, Massachusetts, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia and the District of Columbia.

(b)    As used herein, "the Companies" means all present and future In-Region subsidiaries, or operating units thereof, of VZ, except Cellco Partnership, its subsidiaries, and its affiliates d/b/a Verizon Wireless, Verizon Network Integration Corp., Inc., Verizon Information Services BA-Region Directory South - Sales (CDSC/NTD/PDD), and all entities (and all of their subsidiaries) with a market capitalization or value of more than $3 billion, acquired by or merged with Bell Atlantic Corporation, Verizon Communications Inc., or their subsidiaries, with a closing date after August 9, 1998.  [Includes for all of the above Companies, all In-Region operations in the thirteen state and D.C. region.  Staff operations in an "out of region" organization, even if located within the thirteen state "In-region" territory, or any other operations outside this thirteen state territory, are not included.]

(c)    As used herein, "non-management" means employees who normally perform work in non-management job titles, as determined by the Companies, in accordance with the statutory requirements of the National Labor Relations Act, as amended, and applicable decisions of the National Labor Relations Board and reviewing courts.  If the Union disagrees with any such determination, the parties agree

to submit the issues of unit definition to arbitration as set forth in paragraph 3, below, using the aforesaid statutory requirements and decisions as the governing principles.

(d)     In addition to the foregoing, the parties further agree that any proposed bargaining unit shall exclude, but not by way of limitation, all professional, confidential, and managerial employees, guards and supervisors as defined in the National Labor Relations Act.

3.     Card Check Recognition Procedure.

(a)     When requested by the Union, the Companies agree to furnish the Union lists of employees in the bargaining units.  This list of employees will include the work location, job title and home address.

(b)     The Union will give twenty one (21) days' notice for access to Company locations.  Access will be limited to one sixty (60) day period in any twelve months for each unit agreed upon or determined as provided herein.

(c) (1) The Union and the Companies shall meet within a reasonable period, but not to exceed ninety (90) days, after the effective date hereof for the purpose of defining appropriate bargaining units for all presently existing potential bargaining units.  In the event that the parties are unable to agree, after negotiating in good faith for a reasonable time, upon the description of an appropriate unit for bargaining, the issue of the description of such unit shall be submitted to arbitration administered by, and in accordance, with, the rules of the American Arbitration Association (AAA).  The arbitrator shall be confined solely to the determination of the appropriate unit for bargaining and shall be guided in such deliberations by the statutory requirements of the National Labor Relations Act and the precedential decisions of the National Labor Relations Board and Appellate reviews of such Board decisions.  The parties agree that the decision of the Arbitrator shall be final and binding.  The Companies and the Union agree to select by agreement a permanent arbitrator and an alternate within 30 days of signing this Agreement to hear disputes under this Agreement.  If the parties cannot agree, they shall select the arbitrators from list(s) provided by the AAA.

(2)     If either the Companies or the Union believes that the bargaining unit as agreed or determined in (c) (1), above, is no longer appropriate due to organizational changes, then the parties shall meet and confer in good faith for the purpose of re-defining the appropriate unit.  In the event that the parties are unable to agree, after negotiating in good faith for a reasonable time, upon the re-definition of an appropriate unit, the issue of the description of such unit, shall be submitted to arbitration as provided in (c) (1).

(d)     The Companies agree that the Union shall be recognized as the exclusive bargaining agent for any agreed-upon or otherwise determined bargaining unit(s) not later than ten (10) days after receipt by the Companies of written notice from

the American Arbitration Association ("AAA") that the Union has presented valid authorization cards signed by a majority of the employees in such unit(s).

(e)     For the purposes of determining the number of employees that constitute a majority of the bargaining unit, the employee population will be composed of only those employees employed in the bargaining unit on the earliest date which appears on the cards presented to the AAA.  The cards so presented must be dated within sixty (60) days of each other, but no earlier than the date of execution of this Agreement, and each card so presented must contain at least the language set forth in Attachment 1 hereto.  The Companies shall provide the AAA all employees, job title and other information required for the AAA to verify the existence of more than 50% of employee authorizations as provided for in this Agreement.

(f)     In the event the Union fails to deliver to AAA valid authorization cards signed by a majority of employees in any aforesaid bargaining unit upon completion of its card-signing effort, the Union agrees not to begin any further card-signing effort in such unit for a period of one year from the date on which access was first granted as provided in (b), above.

(g)     As soon as practicable after the aforesaid recognition and upon written request by the Union, the Companies, or the appropriate subsidiary, division or operating unit thereof, shall commence bargaining in good faith with the Union with respect to wages, hours, and other terms and conditions of employment for the employees employed within the agreed upon or otherwise determined appropriate bargaining unit.

Neutrality.

(a)     The Companies agree, and shall so instruct all appropriate managers, that the Companies will remain neutral and will neither assist nor hinder the Union on the issue of Union representation.

(b)     For purposes of this Agreement, "neutrality" means that management shall not, within the course and scope of their employment by the Companies, express any opinion for or against Union representation of any existing or proposed new bargaining unit, or for or against the Union or any officer, member or representative thereof in their capacity as such.  Furthermore, management shall not make any statements or representations as to the potential effects or results of Union representation on the Companies or any employee or group of employees.  The Union also agrees that, in the course of any effort by the Union to obtain written authorizations from employees as provided for in paragraph 3(b), above, neither the Union nor any of its officers, representatives, agents or employees will express publicly any negative comment concerning the motives, integrity or character of the Companies, Verizon Communications Inc., or any of their officers, agents, directors or employees.

(c)     This Agreement supersedes and terminates any and all other agreements, Memoranda of Understanding, commitments or statements of intent

regarding neutrality, card-check procedures or union organizing rights that may exist as of the date hereof between the Union and any of the Companies, including but not limited to the existing NYNEX Neutrality Agreement, the Neutrality, Card Check and Successorship Agreements with the operating telephone companies of Bell Atlantic Corporation prior to its merger with NYNEX, and with BA Network Services, Inc., and the BA Communications, Inc. Agreement on Principles and Behaviors with Regard to Union Organizing Campaigns, but does not supersede or terminate the NYNEX New Business Agreement, NYNEX Old Business Letter, or the Common Interest Council Letter.

     5.    <u>Valid Authorization Card</u>.  For purposes of this Agreement, a valid written authorization card shall state specifically that by signing the card, the employee agrees to be represented by the Union, using the language set forth in Attachment 1.

     6.    <u>Regulatory and Legislative Support</u>.  The Union hereby agrees to continue its support before the appropriate regulatory and legislative bodies for the Companies' efforts to remain competitive in, and/or gain entry to, all telecommunications and related markets in which the Companies choose to participate, unless the Union determines such support to be in conflict with its interests.  If the Union determines such conflict exists, the Union will promptly so notify the Companies and, the request of the Companies, meet to discuss and confer on such conflict.

     The Companies hereby agree to support Union efforts before regulatory and legislative bodies unless the Companies determine such support to be in conflict with their interests.  If the Companies determine such a conflict exists, the Companies will so notify the Union, and will if requested by the Union, meet to discuss and confer on such conflict.

     7.    <u>Dispute Resolution</u>.  Except as to disputes referenced in paragraph 3 (c) of this Agreement, all disputes concerning the meaning or application of the terms of this Agreement shall be handled and addressed by the meeting of designated representatives of the Companies and the Union.  Either party may request such a meeting and each party pledges its best efforts to address any and all concerns raised as to the meaning or application of this Agreement.  With the exception of matters referenced in paragraph 3 (c) above, the meaning or application of this Agreement shall not be subject to arbitration.  Each party reserves its right to seek judicial or other relief provided by law to enforce this Agreement.  However, the parties agree that prior to seeking such relief provided by law, the parties will meet and confer as set forth above.

     8.    <u>Wavier of Claims</u>.

(a)    The Union promises and agrees that, in connection with any arbitration, and in connection with any other legal, equitable or administrative suit, proceeding or charge arising subsequent to the effective date of this Agreement between the Union and any VZ Company, or VZ Communications Inc., including but not limited to any proceeding before the National Labor Relations Board or its delegate, the Union hereby waives any claim, allegation or argument, and agrees to refrain from presenting this agreement, or

any action or information related to it, as evidence in support of any claim, allegation or argument, that any VZ Company or VZ Communications Inc., and/or any of its current or future subsidiaries, and/or their divisions, units, agents, or affiliates, are or have been a single employer, joint employers, alter-egos, or that any employees should be accreted to any bargaining unit, to the extent that any such claim, allegation or argument is based upon

       (1)    any changes on or after August 15, 1997, in the administration and/or control of labor relations by Bell Atlantic Corporation, VZ Communications Inc. or any Bell Atlantic or VZ Companies; or

       (2)    any change in the scope, availability in employees, or administration by management of any program or practice for the effectuation of employee-initiated transfers between or among different subsidiaries or bargaining units; provided, however, that this subparagraph (2) shall not be construed as having any effect on the Union's right or the Companies' obligation, to the extent the same may exist under applicable law and/or any preexisting collective bargaining agreement(s), to negotiate changes in the terms and conditions applicable to such transfers.

       (b)    The provisions of this paragraph 8 shall survive the expiration of the remainder of this Agreement, and shall have full force and effect until specifically voided by mutual written agreement of the parties.

       9.    <u>Severability</u>.  Should any portion of this Agreement be voided or held unlawful or unenforceable by the National Labor Relations Board or any court of competent jurisdiction, the remaining provisions shall remain in full force and effect for the duration of this Agreement.

COMMUNICATIONS WORKES OF AMERICA

By    _____

Date   8/10/08_____

Verizon COMPANIES

By    _____

Date    8-10-08_____



**Verizon Network Integration Corp, Inc. Customer Bid Work**

1.      This Agreement applies to the performance of work within the former Bell Atlantic footprint on customer service contracts bid-on by Verizon Network Integration Corp, Inc. ("VNICI") after October 5, 1998 (the "Work").

2.      For the part of the Work which is currently or has been historically performed by CWA bargaining unit employees, VNICI shall designate the appropriate operating telephone company ("OTC") employing CWA bargaining unit members as its sole contractor and its bargaining unit employees shall perform the work.

3.      As appropriate, VNICI may obtain the assistance and participation of bargaining unit employees and the CWA and its leadership in connection with the process of bidding on customer work.

4.      Recognizing the exceptionally competitive market in which VNICI operates, which demands the highest standards of quality, productivity and customer care, the parties agree that specific employees may be assigned to specific accounts.

5.      Recognizing the nature of the Work as described in paragraph 4 and the commitments of VNICI to assign Work to CWA represented employees as described herein, the parties agree to cooperate with each other in the implementation of this Agreement in order to insure its success as integral to the success of VNICI.  To that end, the parties agree that as a fundamental requirement the quality and productivity standards on which bids are based must be met.  Accordingly, the parties will creatively address such issues as work rules, work schedules, productivity, customer pricing sensitivity, and quality standards in order to create the conditions conducive to having customer focused high performance employees.

6.      Representatives of the Union (including the International Union) and the Company will meet periodically to review the progress of the above efforts and to resolve any difficulties that may have arisen.

This Agreement expires at 11:59 p.m. on August 6, 2011.


For:   Communications Workers of        For:   Company
       America

Date: 8/10/08                           Date: 8-10-08

August 3, 2008


Terrance Tipping
Bargaining Chair
Communications Workers of America, AFL-CIO

Dear Mr. Tipping:

If Verizon Communications Inc. ("VZ") acquires a subsidiary subject to the parties' 2008 MOA ("Sub"), and that subsidiary sells Verizon-on-Line DSL Service ("VOLS") or VOLS is eliminated as a service or it is renamed or rebranded ("Renamed/Rebranded VOLS") and Sub sells Renamed/Rebranded VOLS, directly to an end user customer within the former Bell Atlantic ("BA") Region and the customer uses Verizon or Sub as its ISP and the end user customer contracts with Sub to have it perform the installation and maintenance of the inside-data-wiring and jack, the digital modem, the Network Interconnection Card, and/or the software and configuration of the computer on the end user's customer's premises ("Customer's Premise DSL I&M Work") for the Verizon-on-Line DSL Service$^{TM}$ or Renamed/Rebranded VOLS, the assignment of the Customer's Premise DSL I&M Work for that service within the former BA Region will be governed by the parties' 2008 MOA and assigned to CWA OTC bargaining unit employees pursuant to the terms of the 2008 MOA. That Customer's Premise DSL I&M Work shall not be contracted out in the former BA Region pursuant to the terms of the parties' 2008 MOA.

If Verizon Communications Inc. ("VZ") acquires a subsidiary subject to the parties' 2008 MOA ("Sub"), and that subsidiary sells Verizon InfoSpeed DSL Service$^{TM}$

("VISS"), or VISS is eliminated as a service or it is renamed or rebranded ("Renamed/Rebranded VISS") and Sub sells Renamed/Rebranded VISS, directly to an end user customer within the former Bell Atlantic ("BA") Region and the customer does not use Verizon or Sub as its ISP and the end user customer contracts with Sub to have it perform the installation and maintenance of the inside-data-wiring and jack, the digital modem, the Network Interconnection Card, and/or the software and configuration of the computer on the end user customer's premises ("Customer's Premise DSL I&M Work") for the Verizon InfoSpeed DSL Service$^{TM}$ or Renamed/Rebranded VISS, the assignment of the Customer's Premise DSL I&M Work for that service within the former BA Region will be governed by the parties' 2008 MOA and assigned to CWA OTC bargaining unit employees pursuant to the 2008 MOA.  That Customer's Premise DSL I&M Work shall not be contracted out in the former BA Region pursuant to the terms of the parties' 2008 MOA.

Sincerely yours,

Joseph Gimilaro